UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

**NOV 2 0 2018**

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| JOHN SAIN, DAVID CUMMINGS, | § | |
| MICHAEL CUMMINGS, PHILLIP GULLETT, | § | |
| THYEE MCGRUDER, BRANDON PRUITT, | § | |
| BRIAN QUINTANILLA, JERRY SMITH, | § | |
| and DAVID WILSON, | § | |
| individually and on behalf of those similarly situated. | § | CIVIL ACTION NO. |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | **18 CV 4412** |
| | § | |
| BRYAN COLLIER, in his official capacity, | § | |
| JAMES MCKEY, in his official capacity, | § | |
| DONALD MUNIZ, in his official capacity, | § | |
| TEXAS DEPARTMENT OF CRIMINAL JUSTICE, | § | |
| CORRECTIONAL MANAGED HEALTH CARE | § | |
| COMMITTEE, and the | § | |
| UNIVERSITY OF TEXAS MEDICAL BRANCH | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

## TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ................................................................. 4

INTRODUCTION ................................................................................ 5

I.     STATEMENT OF THIS CASE ................................................. 7

II.    JURISDICTION AND VENUE ................................................ 9

III.   PARTIES ............................................................................. 9

       A. Plaintiffs ........................................................................ 9

       B. Defendants ..................................................................... 10

IV.    FACTS ................................................................................ 12

       A. The Luther Unit Houses Sick, Elderly, And/Or Both Physically And Mentally Disabled
          Inmates ......................................................................... 12

B. The Luther Unit's Inmate Housing, Work, Programs, Activity, And Service Areas Are Not Air Conditioned .................................................................................................. 14

C. The Vast Majority Of TDCJ's Inmate Housing, Work, Programs, Activity, And Service Areas Are Not Climate Controlled .................................................................. 22

D. Temperatures Inside The Luther Unit Are Dangerously High During The Summer ....... 28

Table 1. – Outdoor Heat Index at the Pack Unit ....................................................... 29

Table 2. – Outdoor Heat Index at the Luther Unit ................................................... 29

Table 3. – Highest Apparent TDCJ Recorded Temperatures (June 2018 – July 2018) .................................................................................................................. 30

E. The Extreme Temperatures At The Luther Unit Threaten Illness, Injury, And/Or Death 31

1. Extreme Heat Can Injure or Kill People ................................................... 31

2. People with Medical Conditions that Impair Cooling are at Additional Risk ............ 34

3. Heat in Texas Prisons is Deadly ................................................................ 38

Table 4. – Reported Prisoner Deaths of Heat-Related Illnesses (1986-2012) ........... 39

Table 5. – National Weather Service Heat Index Chart ............................................ 42

F. Inmates And Officers At The Luther Unit Routinely Suffer Heat-Related Illnesses And Injuries During The Summer ............................................................................... 48

G. Many Plaintiffs' Disabilities Put Them At Increased Risk Of Heat-Related Illnesses, Injuries, And/Or Death ..................................................................................... 57

1. Cummings, D. Suffers from Heat-Related Disabilities and is at Increased Risk ....... 57

2. Cummings, M. Suffers from Heat-Related Disabilities and is at Increased Risk ...... 59

3. Gullett Suffers from Heat-Related Disabilities and is at Increased Risk ................. 61

4. McGruder Suffers from Heat-Related Disabilities and is at Increased Risk ............. 63

5. Quintanilla Suffers from Heat-Related Disabilities and is at Increased Risk ........... 66

6. Sain Suffers from Heat-Related Disabilities and is at Increased Risk ...................... 68

7. Smith Suffers from Heat-Related Disabilities and is at Increased Risk .................. 71

8. Wilson Suffers from Heat-Related Disabilities and is at Increased Risk ................. 73

H. Other Inmates At The Luther Unit Are At Increased Risk Of Heat-Related Injuries ....... 74

I. Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, Wilson, And Many Others At The Luther Unit Suffer From Qualifying Heat-Related Disabilities ..... 75

1. The Effects of Heat on an Individual with Comorbidities ......................... 76

a) Advanced Age ................................................................................ 76

b) Cardiovascular Disease ................................................................... 77

c) Hypertension .................................................................................. 77

d) Diabetes ............................................................................................... 78

e) Obesity ............................................................................................... 80

f) Psychiatric Conditions ...................................................................... 80

g) Pulmonary Disease ............................................................................ 83

h) Sweat Gland Dysfunction ................................................................. 85

i) Cirrhosis of the Liver, Cystic Fibrosis, & Thyroid Dysfunction .......... 86

2. The Effects of Heat on an Individual Taking Certain Medications ........... 86

a) Anticonvulsants ................................................................................. 86

b) Anticholinergics & Antihistimines ................................................... 87

c) Antipsychotics ................................................................................... 87

d) Antidepressants ................................................................................. 88

e) Antimanics ........................................................................................ 88

f) Beta Blockers & Calcium Channel Blockers .................................... 89

g) Diuretics ........................................................................................... 89

3. The Effects of Heat on an Individual with Multiple Comorbidities and/or Who Takes Certain Medications ..................................................................... 89

J. Though Plaintiff Pruitt Does Not Suffer From Heat-Related Disabilities, He Still Experiences Symptoms Of Heat-Related Illness Each Summer ......................... 90

V. CLASS ACTION ................................................................................................. 91

A. Classes—Qualifying Attributes ........................................................................ 91

B. Numerosity ......................................................................................................... 93

C. Commonality ...................................................................................................... 95

D. Typicality ........................................................................................................... 97

E. Adequacy Of Class Counsel .............................................................................. 98

VI. CAUSES OF ACTION ........................................................................................ 100

A. Eighth And Fourteenth Amendment: Conditions Of Confinement .................. 100

B. The Americans With Disabilities Act, Rehabilitation Act, And ADA Amendment Act 101

VII. INJUNCTIVE AND DECLARATORY RELIEF ................................................ 104

VIII. ATTORNEYS' FEES ......................................................................................... 105

IX. PRAYER FOR RELIEF ...................................................................................... 105

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
| --- | --- |
| AD/SEG | Administrative Segregation |
| ACA | American Correctional Association |
| ADA | American Disability Act |
| ADAAA | American Disability Act - Amendment Act 2008 |
| AMA | American Medical Association |
| AMS | American Meteorological Society |
| BMA | Brenham Municipal Airport |
| CDC | Center for Disease Control and Prevention |
| COPD | Chronic Obstructive Pulmonary Disease |
| Civ. Prac. Rem. Code | Civil Practice and Remedies Code |
| CMHCC or Defendant | Correctional Managed Health Care Committee |
| °F | Degrees Fahrenheit |
| Rx | Doctor Prescribed Medications |
| 8th | Eighth |
| EPA | Environmental Protection Agency |
| Fed. R. Civ. P. | Federal Rules of Civil Procedure |
| FAS | Fire Alarm System |
| 14th | Fourteenth |
| HSD | Help Services Division |
| HG | Hospital Galveston |
| ICS | Incident Command System |
| IDS | Inmate Barber Shop |
| I-60 | Inmate Request to Official |
| Lt. | Lieutenant |
| Maj. | Major |
| M.S. | Multiple Sclerosis |
| M.D. | Muscular Dystrophy |
| NCEI | National Centers for Environmental Information |
| NIOSH | National Institute for Occupational Safety and Health |
| NOAA | National Oceanic and Atmospheric Administration |
| NWS | National Weather Service |
| ODR | Officers Dining Room |
| Luther Unit or P2 | O.L. Luther Unit |
| OEF | Operation Enduring Freedom |
| HRS-18 | Patient Restrictions Page |
| PTSD | Post Traumatic Stress Disorder |

| Abbreviation | Description |
| --- | --- |
| PLRA | Prison Litigation Reform Act |
| Rec | Recreation |
| Air Conditioning or A/C | Refrigerated Air |
| RA | Rehabilitation Act |
| Sgt. | Sergeant |
| SSI | Social Security Insurance |
| Step 1 | Step 1 Grievance, I-127 |
| Step 2 | Step 2 Grievance, I-128 |
| Tex. Admin. Code | Texas Administrative Code |
| TBCJ | Texas Board of Criminal Justice |
| Tex. Code. Ann. | Texas Code Annotated |
| TDCJ or Defendant | Texas Department of Criminal Justice |
| Tex. Gov't. Code | Texas Government Code |
| Tex. Rev. Civ. Stat. Ann. | Texas Revised Civil Statutes Annotated |
| TTUHSC | Texas Tech University Health Sciences Center |
| U.S.C. | United States Code |
| U. S.C.A. | United States Code Annotated |
| UTMB or Defendant | University of Texas Medical Branch |
| V.T.C.A. | Vernon's Texas Codes Annotated |
| Pack Unit or P1 | Wallace Pack Unit |
| WHO | World Health Organization |

## INTRODUCTION

Since 2011, at least twelve inmates have died from heat stroke because of the sweltering temperatures inside buildings where Texas Department of Criminal Justice (TDCJ or Defendant) houses inmates. Hundreds more have suffered heat-related illnesses, many of whom were among the sick, elderly, and both physically and mentally disabled inmates housed at the O.L. Luther Unit (Luther Unit).

The Luther Unit is a 24/7 medical unit, of the same age, general construction, layout, size, demographics, population, and conditions as its sister unit, the Wallace Pack Unit (Pack Unit), approximately two (2) miles distant. The Luther Unit and the Pack Unit are within the same County and experience the same geographic and atmospheric/climatological conditions at both units, acquiring their weather data locally and from Brenham Municipal Airport sources (BMA). The

*TDCJ Unit Directory* web pages list Luther Unit as "co-located with Pack", and that, "Luther and Pack work in cooperation." The TDCJ designation for the Pack Unit is P1, and due to their close location and physical design, the Luther Unit is designated P2.

University of Texas Medical Branch (UTMB or Defendant) and TDCJ staff routinely move and work by moving between units as the work load demands. As the Pack Unit litigated in *Cole v. Collier*, Civil Action No. 4:14-cv-01698 (S.D., Tex., Houston, 2018), within this same District and Division Court, both units are near identical in their facilities, conditions, location, demographics, atmospheric/climatological conditions, and complaints in which expert witnesses testified.

By information and belief, inmate C., a resident in 1 Dorm of the Luther Unit, died in July 2018, a month of extremely high temperatures and humidity, after succumbing to extreme heat and humidity, which exasperated his chronic medical conditions and reaction(s) to his doctor prescribed medications (Rx), that TDCJ, the Correctional Managed Health Care Committee (CMHCC or Defendant), and UTMB have identified as having a high-risk potential for heat-related illness.

Despite this, CMHCC and UTMB have not identified and provided equal access and accommodations to all housing, work, program, activity, and service areas. TDCJ has done nothing to lower the temperatures inside the housing, work, program, activity, and service areas at the Luther Unit. As this inflicts needless suffering on inmates, and exposes them, many of whom are sick, elderly, and disabled to serious risk of harm, Plaintiffs ask the Court to enjoin TDCJ, CMHCC, and UTMB from continuing these dangerous practices and provide equal access and accommodations to all housing, work, program, activity, and service areas to the class and subclasses that the non-disabled enjoy.

## I.   STATEMENT OF THIS CASE

1.     Plaintiffs, on behalf of themselves and those similarly situated, bring this lawsuit because the Defendants, including TDCJ, refuse to ensure airflow, cool inmate housing, work, program, activity, and service areas, despite the cruel and dangerously hot indoor temperatures inmates are forced to live under.

2.     TDCJ operates the Luther Unit. The Luther Unit is a 24/7 medical prison. Inmates suffer power outages that prevent and disable the use of personal fans for cooling. These outages also disable the roof mounted exhaust fans which normally provide limited air circulation while exhausting hot air and should the new Fire Alarm System (FAS) be activated, dispense smoke and toxic gases from the living areas along with any other area with connected exhaust fans. The indoor inmate housing, work, program, activity, and service areas are not climate controlled with refrigerated air (commonly called air conditioning or A/C). As a result, during the hot Texas summers the apparent temperatures routinely exceed 100 degrees Fahrenheit (°F) inside inmate housing, work, program, activity, and service areas, threatening the health and welfare of all inmates living and working there, especially the elderly, sick, and disabled. (Excluding twelve (12) assisted living beds with A/C in the infirmary for the seriously ill).

3.     The Defendants knowingly subject Plaintiffs and the Class to extremely hot apparent temperatures inside inmates' housing, work, program, activity, and service areas in violation of the *Eighth (8th)* and *Fourteenth (14th) Amendments* to the *United States Constitution*.

4.     CMHCC contracted with UTMB and Texas Tech University Health Services Center (TTUHSC) to provide direct patient care for men and women incarcerated in TDCJ facilities. UTMB, through its contract with CMHCC, provides direct patient care to approximately 78% of the men and women incarcerated in TDCJ facilities.

5.      The Defendants are acutely aware of the health risk that extreme heat poses, especially to inmates with heat-sensitive medical conditions and disabilities. Nevertheless, they refuse to make reasonable accommodations for these inmates with disabilities, in violation of the American Disabilities Act (ADA), Rehabilitation Act (RA), and the ADA Amendments Act of 2008 (ADAAA).

6.      Injunctive and declaratory relief are the only means to address the Defendants' studied indifference to the fact that extremely hot, indoor apparent temperatures constitute cruel and unusual punishment to inmates. Plaintiffs ask the Court to order the Defendants to provide 24/7 electrical power. This includes during power outages to each cubicle outlet and to the dorm/buildings mounted exhaust fans. It is also requested that this is done to ensure fire safety and the maintenance of air circulation and flow. Also, to keep indoor apparent temperatures below dangerous levels, it is requested they be ordered to mechanically lower the indoor apparent temperatures to a safe level (such as 88°F or lower), identify, and provide equal access and accommodations to all housing, work, program, activity, and service areas, including those provided but not limited to the Pack Unit.

7.      Due to the extensive similarities of the Luther Unit and the Pack Unit, as the Pack Unit litigated in *Cole v. Collier*, Civil Action No. 4:14-cv-01698 (S.D., Tex., Houston, 2018), within this same District and Division Court, both units are near identical in their facilities, conditions, location, demographics, atmospheric/climatological conditions, and complaints in which expert witnesses testified. The Plaintiffs seek that the Court sees the wisdom of the Federal Rules of Civil Procedures (Fed. R. Civ. P.) Rule 23(g)(3), and (g)(1) in assigning the same Court and Plaintiffs' Class Counsel that successfully litigated the *Cole v. Collier* suit. The Plaintiffs request, due to the complexity and complications within the case, large expenditure of time and expense, the massive

undertaking of securing expert witness testimony, the four plus years of litigation taxing the Court's resources, the time the Court and attorneys spent gaining knowledge and expertise of the facts of the case, all being persuasive in regard to the economization of expenses and expediting proceeding, thus saving time for the Court and the litigants as detailed in Fed. R. Civ. P. Rule 23(g)(3), and (g)(1), that the same Court, and Plaintiffs' Class Councils may be assigned to litigate this complex and complicated case to conclusion.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 United States Code (U.S.C.) §1331 (federal question), §1343 (civil rights), §2201 (Declaratory Judgement Act), and 42 U.S.C. §1983.

9.      Venue is proper in this Court, pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## III.    PARTIES

### A.      Plaintiffs

10.      David Cummings is 50 years old and incarcerated at the Luther Unit. He is not expected to be released from custody until 2037. He attempted informal resolution and exhausted all local and state remedies via an Inmate Request to Official (I-60) to the Warden, Step 1 Grievance, I-127 (Step 1), and Step 2 Grievance, I-128 (Step 2) #2018109132, all with negative results.

11.      Michael Cummings is 64 years old and incarcerated at the Luther Unit. He is not expected to be released from custody until 2026.

12.      Phillip Gullett is 60 years old and incarcerated at the Luther Unit. He is not expected to be released from custody until 2037. He attempted informal resolution and exhausted all local and

state remedies via an I-60 to the Warden, Step 1, and Step 2 Grievances #2018109932, all with negative results.

13.     Thyee McGruder is 37 years old and incarcerated at the Luther Unit. He is not expected to be released from custody until 2022.

14.     Brandon Pruitt is 21 years old and incarcerated at the Luther Unit. He is not expected to be released from custody until 2025. He attempted informal resolution and exhausted all local and state remedies via an I-60 to the Warden, Step 1, and Step 2 Grievances #2018113155, all with negative results.

15.     Brian Quintanilla is 32 years old and incarcerated at the Luther Unit. He is not expected to be released from custody until 2034. He attempted informal resolution and exhausted all local and state remedies via an I-60 to the Warden, Step 1, and Step 2 Grievances #2018113148, all with negative results.

16.     John Sain is 62 years old and incarcerated at the Luther Unit. He will not be eligible for parole until 2031, with a final discharge date of 2056.

17.     Jerry Smith is 66 years old and incarcerated at the Luther Unit. He is not expected to be released from custody until 2036.

18.     David Wilson is 52 years old and incarcerated at the Luther Unit. He is not expected to be released from custody until 2028. He attempted informal resolution and exhausted all local and state remedies via an I-60 to the Warden, Step 1, and Step 2 Grievances #2018112730, all with negative results.

### B.     Defendants

19.     Bryan Collier is the Executive Director of the Texas Department of Criminal Justice. As such, Collier is the commanding officer of all TDCJ correctional officers, guards, and TDCJ

employees and contractors, and is responsible for their training, supervision, and conduct. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all times described herein, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief.

20.     James McKey has been tentatively selected as the successor Warden of the TDCJ Luther Unit. At all times described herein, he, if confirmed, will be acting under color of state law. As the Warden of the Luther Unit, he is responsible for ensuring constitutional conditions of confinement exist at the Luther Unit. He is sued in his official capacity for declaratory and injunctive relief.

21.     Donald Muniz is the Warden of the TDCJ Luther Unit. At all times described herein, he was acting under color of state law. As the Warden of the Luther Unit, he is responsible for ensuring constitutional conditions of confinement exist at the Luther Unit. He is sued in his official capacity for declaratory and injunctive relief.

22.     Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas, responsible for the incarceration of convicted felons. TDCJ has jurisdiction over the entire adult and youth criminal justice system in the state of Texas, including probation and parole; Texas Government Code (Tex. Gov't. Code) §493.004. At all relevant times, it operates the Luther Unit, a penal facility with programs and services Plaintiffs and other inmates with disabilities are qualified for. TDCJ is a recipient of federal funds. The Defendant is sued for violations of the ADA, RA, and ADAAA, and in failing to equally identify and accommodate each Plaintiff's disabilities.

23.     CMHCC The Correctional Managed Health Care Committee (CMHCC or Defendant) is a statutorily created committee; Tex. Gov't. Code §501.131. They are responsible for developing, implementing, and monitoring the correctional managed health care services for offenders

confined in institutions operated by TDCJ. CMHCC has authority to contract for healthcare services "for and on behalf of TDCJ"; Tex. Gov't. Code §501.147. The Defendant is sued for violations of the ADA, RA, and ADAAA, and in failing to equally identify and accommodate each Plaintiff's disabilities.

24.     University of Texas Medical Branch (UTMB or Defendant) is contracted to provide direct patient care for men and women incarcerated in TDCJ facilities. Regarding the quality of care delivered by UTMB, the contract states that, "TDCJ may require the health care providers to take corrective action if the care provided does not meet expectations...." UTMB, through its contract with CMHCC, provides direct patient care to approximately 78% of the men and women incarcerated in TDCJ facilities. The Defendant is sued for violations of the ADA, RA, and ADAAA in failing to equally identify and accommodate each Plaintiff's disabilities, and negligence.

## IV.    FACTS

### A.    The Luther Unit Houses Sick, Elderly, And/Or Both Physically And Mentally Disabled Inmates

25.     The Luther Unit is a TDCJ prison complex located in Navasota, Grimes County, Texas.

26.     The Luther Unit is a 24/7 medical unit, of the same age, general construction and layout, size, demographics, population, and conditions as its sister unit, the Pack Unit, approximately two (2) miles distant. The Luther Unit and the Pack Unit are within the same County and experience the same geographic and atmospheric/climatological conditions at both units, acquiring their weather data locally and from BMA sources. The *TDCJ Unit Directory* web pages list Luther Unit as "co-located with Pack", and that, "Luther and Pack work in cooperation." The TDCJ designation for the Pack Unit is also known as Pack 1 or (P1), and due to their close location and physical design, the Luther Unit is also known as Pack 2 and designated as (P2) even after the name change

to O.L. Luther. UTMB and TDCJ staff routinely move and work by moving between units as the work load demands. As the Pack Unit litigated in *Cole v. Collier, supra,* within this same District and Division Court, both units are near identical in their facilities, conditions, location, demographics, atmospheric/climatological conditions, and complaints in which expert witnesses testified.

27.     The Luther Unit began operating in July 1982 (the Pack Unit started in September 1983). It presently has the capacity to house 1,316 inmates, with a current population 1263 (as of July 2018). The prison typically operates at or near capacity. The Luther Unit staff consists of approximately 275 TDCJ employees, and approximately 27 UTMB medical personnel.

28.     Like most prisons, the population of the Luther Unit is fluid, as new inmates arrive and inmates who have completed their sentences are released. Likewise, inmates are frequently transferred between temporary medical facilities and other TDCJ prisons.

29.     Despite the frequent transfer of inmates into and out of the Luther Unit, the population's general characteristics (such as average age, percentage with disabilities, and percentage with heat sensitive medical conditions) remain fairly consistent.

30.     The Luther Unit is a 24/7 medical facility, and houses geriatric inmates, inmates with both physical and mental disabilities, and inmates with chronic medical problems. The Luther Unit also houses a number of men who are young and healthy (able-bodied). These men work in the fields, laundry, maintenance, the kitchen, and other assigned locations, and are integral to the functions of the Luther Unit as a whole.

31.     As of July 2018, the Luther Unit housed approximately 114 men over the age of 50. Of these 49 are between 50 and 55, 37 are between 55 and 60, 17 are between 60 and 65, and 11 men are over 65 years of age. Of these, 51 inmates are classified as, "medically unassigned" per the

individual's Patient Restriction Page (HRS-18). This indicates that they are disabled to such an extent that they are unable to work in prison in any capacity. These numbers are a typical age distribution for the Luther Unit.

### B.   The Luther Unit's Inmate Housing, Work, Programs, Activity, And Service Areas Are Not Air Conditioned

32.   The majority of inmates at the Luther Unit, including Plaintiffs, are housed in inmate dormitories. The dorms do not have air conditioning, or any other form of climate control technology that mechanically lowers the indoor temperatures or humidity during the summer.

33.   The ventilation system at the Luther Unit cannot lower the indoor heat index below the outdoor heat index and cannot ensure that temperatures inside the housing, work, program, activity, and service areas are safe and do not exacerbate numerous inmates' serious medical conditions. Rather, the ventilation system just brings in "fresh" hot air from the outside, while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning.

34.   At the Luther Unit, the electricity to the unit will go off, normally at night or during most storms. With the power off, no personal fans or building exhaust fans (that promote ventilation) operate. During these power outages, when it is storming, normally the windows must remain closed. The heat and the humidity in the living areas (dorms) can be very high and dangerous. As the power is off, there is no movement into respite areas.

35.   Without electrical power, the exhaust fans are inoperable, the smoke and toxic gas removal function of the new FAS is disabled. This function was designed and installed to activate in the event of fire or smoke. The dorms/buildings exhaust fans remove any smoke and toxic gases. Step 1 and Step 2 Grievances have been processed. The Luther Unit has a backup generator, but it is

not connected to the circuits for the main roof mounted exhaust fans nor for the outlets that inmates utilize to power their personal fans when there is a power outage. The generator does not provide power to the building respite areas nor their A/C units.

36.     The Luther Unit recently mounted two large drum fans directed across the front and back dayrooms in the main building dorms. They are not directed down the length of the dorm over individual rows of bunks to provide air flow/relief from the heat and humidity for the inmates in the bunk areas. The two dayrooms will not hold all the inmates who live in the dorm at one time. Additionally, the fan in the front-dayroom is mounted high and pulls hot air from the ceiling and directs it downward onto inmates. The back-dayroom fan is mounted very close to the back corner of the walls and has limited opportunity to draw fresh air.

37.     The Plaintiffs believe the Court findings of the *Cole v. Collier, supra*, should apply equitably to the Luther Unit. With its determination that operating all fans (including but not limited to personal 9", drum, and 24" mounted fans) within indoor environments, with high temperature and humidity, and without A/C, is unhelpful and potentially harmful as follows:

> "The Court finds that Defendants have made a genuine effort to ensure that there are adequate fans in the housing areas at the Pack Unit. But there are significant problems with their heavy reliance on fans as a mitigation measure. First, the Center for Disease Control ("CDC") does not recommend the use of fans above a 95-degree heat index, as fans actually increase heat stress by blowing air that is warmer than the body's temperature over the skin's surface. Docket Entry No. 460 at 37-38. Another study found that "the use of fans indoors in rooms without air conditioning should be strongly discouraged . . . when the heat index exceeds . . . 99 degrees Fahrenheit." *Id.* at 38. Indeed, TDCJ's own "Training Circular" about heat, which is distributed to all inmates, instructs, "Do not direct the flow of portable electric fans toward yourself when room temperature is hotter than 90 degrees. The dry blowing air will dehydrate you faster, endangering your health." Pls.' Ex. 53 at 1. The Court also notes that the CDC advises individuals to "not rely on a fan as your primary cooling device" during periods of extreme heat. Defs.' Ex. 88 at 2. Accordingly, the Court finds that the use of fans is unhelpful, and potentially harmful, when the heat index exceeds 95 degrees, as is regularly the case in the housing areas of the Pack Unit." *Cole v. Collier, supra*, Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, pp. 48-49, I., G., 1., Fans, para. 2. and,

"The Court has already found that the large fans and personal fans used in the Pack Unit dormitories are ineffective, and are in fact potentially harmful, above temperatures of 95 degrees. Defendants are aware of this fact —indeed, it is written into their "Training Circular." [33] Yet they still use fans as one of the major mitigating measures in the housing areas, despite knowing that the heat index regularly reaches 95 degrees." *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, p. 88, II., B., 2., b., para. 5.

38.     Upon information and belief, "TDCJ chose not to air condition the Luther Unit with refrigerated air for political and financial reasons." *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 6, para. 30.

39.     Upon information and belief, a new million dollar plus chapel is scheduled to begin ground breaking in November 2018. It is unknown if this new modern building is scheduled to have a means of reducing and controlling indoor apparent temperatures as is found in several other similarly situated chapels in the TDCJ system. This would provide A/C services for volunteer activities which TDCJ has resisted in the past.

40.     As a consequence of the lack of air conditioning, TDCJ's former Executive Director Brad Livingston has admitted, "during the summer months there sometimes is not a large difference between the indoor and outdoor temperatures at TDCJ facilities."

41.     TDCJ's top physicians have noted that indoor apparent temperatures can actually be dramatically higher than the outdoor temperatures: "A few years ago, a top TDCJ executive found that when the temperature was 98°F outside, we had dorms with temps up to 110°F inside. It seems like the inmates in that case were better off outside." *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, pp. 5-6, para. 29.

42.     Upon information and belief, Dr. Lannette Linthicum, M.D., the head of TDCJ's Health Services Division (HSD), and Brad Livingston were aware of this at the time the observation was made. Moreover, they are certainly aware the indoor summer temperatures can be hotter than the outdoor summer temperatures.

43.    Some inmates routinely sleep on the concrete floor because the concrete is marginally cooler than laying in their bunks. But, sleeping on the floor is forbidden in the **TDCJ Offender Orientation Handbook**, I-202, Feb 2017, and as such warrants a violation and a disciplinary case per the **Disciplinary Rules and Procedures for Offender Handbook**, GR-106, Feb 2015 should one be processed.

44.    In the dorms where the windows do open, the temperature is not appreciably cooler when the windows are open in the summer. Inmates have found that **HOT AIR** input via the windows will heat the dorm. It is better to keep the windows closed till it is cool outside.

45.    Several windows at the Luther Unit either will not or are difficult to open or close. Most windows have screens, but many screens have holes or long rips that have not been repaired on an as needed basis. The screen mesh materials gaps are large enough that opening a window in the summer allows numerous small black biting bugs and others to enter, irritating inmates and infesting their bunks and living areas. Due to these nightly pests, many inmates with bunks near windows will keep the windows closed. Such necessary actions reduce an inmate's access to cooler air.

46.    As a result, and as TDCJ and its officials well know, there is considerable difference between the indoor and outdoor temperatures at the Luther Unit, and often the temperature and humidity can be higher indoors than outdoors resulting in a higher apparent temperature indoors. As in the Pack Unit Litigation, expert witnesses testified that the metal buildings that comprise the unit conduct heat as a convection oven, retaining heat and humidity. Due to similarities in building design, the Luther Unit experiences the same heat-related problems. During the hotter parts of the summer days, with higher humidity within the buildings due to human occupancy, the apparent temperature within living areas of the Luther Unit are normally 10°F to 25°F higher than the

outside apparent temperature. This high apparent temperature is very dangerous to the Plaintiffs and enhances the possibility for heat-related illnesses, injuries, and/or death.

47.     TDCJ's claim that wellness checks are being conducted for those with heat-sensitives is misleading for two reasons:

      a.  Not all inmates eligible for, "no extreme temperatures" and/or, "no extreme humidity," are accurately reflected in each individual's HRS-18 profile. *e.g.* Plaintiffs' Cummings D., Smith, and Wilson.

      b.  It is clear there is no difference between the security checks that have always been performed at the Luther Unit, and the wellness checks that TDCJ claims are being performed.

Thus, two of the major mitigation measures touted by TDCJ are ineffective or are somewhat effective but still inefficient.

48.     Defendants also know very few parts of the prison accessible to inmates have A/C, and inmates' time in these places is strictly limited. The law library, for example, has A/C, but inmates can only go there a few times per week for a two-hour period. The law library is only large enough to hold two dozen inmates. The education building has A/C, but only inmates enrolled in educational programming can go there, and it is only large enough to accommodate 25-30 inmates at a time, without disrupting classes. Visitation is also air conditioned; however, inmates can only go to visitation one time per week, Saturday or Sunday, for a maximum of two hours. This is only if they have a visitor there to see them, and only if they are eligible to receive visitors.

49.     While the ***Luther Unit Respite Directive*** lists the three respite areas to be utilized by inmates, it does not note what an inmate may take with him (water, cup, chill towel, book, paper/pen, etc., as normally allowed in the day room) to a respite area. As such, staff normally do

not allow inmates to leave the dorms with personal property, as listed above, when moving to a respite area. In the infirmary and education, two of the listed respite areas, personal property is not normally allowed. As provided for in the *Cole v. Collier, supra*, Doc., 769, Defendant's Response To The Courts Findings, p.6: The Pack Unit respite poster allows that, "inmates may talk quietly, may bring reading and/or writing materials (as allowed in the dayrooms), bring a drink or cup to fill with water, and bring a cooling towel." The third area identified as a respite area is the major's hallway; this is the default location an inmate is sent to for respite. This hallway has a long bench and is near the Administrative Segregation (AD/SEG) exit door. As such, anytime an inmate is escorted to or from AD/SEG, all other inmates must stand and face the wall or exit the hallway until the hallway clears. This is a hardship and limiting factor for Plaintiffs with mobility issues.

50.     Additionally, the major's hallway has no fans, no controlled A/C, no A/C returns, no restrooms, no available water, and no direct supervision/security nor oversight. 24-July-2015 Deputy Director Robert Eason authorized an email to all TDCJ Wardens and Regional Directors ordering all Wardens to ensure, "***5. All offenders who are provided access to a respite area shall be under direct supervision.***" (***emphasis added***), *Cole v. Collier,* supra, Doc. 477, Order for Preliminary Injunction, p. 8 para. 22. The three staff office doors located within the hallway remain closed and normally locked. The only A/C that enters the major's hallway respite area is what normally escapes from the bottom gap between the office doors and the floor and from two A/C vents which are attached to an outlet above the adjacent offices. The offices have a thermostat, but it is ineffective in modulating and controlling the temperature in this separately located respite area. This area is often not cool.

51.     These respite areas can handle only a fraction of the men living at the Luther Unit, and even then, the men are often forced to stand, sit on the floor, not talk, and must move quickly from one respite are to another.

52.     On occasion, inmates at Luther Unit were forced to submit to a measurement of their core body temperature using a rectal thermometer by UTMB medical staff as a pre-requisite to being allowed to go to a respite area.

53.     Cool-down showers, when available, are typically called at approximately noon. Normally, it consists of only a 15-minute open call to inmates that are physically in the dorm. Inmates at work, school, infirmary, or at other appointments or duties are not afforded the opportunity of this shower. Cool-down showers only occur once per day. Inmates cannot carry or utilize a wash cloth or soap. They undress, get wet, and move out to the dressing area. Guards stand in the shower, with the inmates, directing traffic and calling time so no one lingers. As this occurs at or before noon, the hottest part of the day is yet to come, and since the cool-down showers do not provide deep-core cooling, their effectiveness is so short-term that there are no long-term benefits.

> "The Court finds that cool-down showers are an effective means of cooling the body when the body is overheated. However, the Court finds that cool-down showers are a less effective mitigating measure for preventing individuals from becoming overheated in the first place. Indeed, Dr. McGeehin credibly testified that showers reduce the body's temperature for the short term, but that the beneficial effect is limited by putting the body back into a hot and humid environment. Docket Entry No. 460 at 45-45. This testimony supports and bolsters the testimony of the plaintiffs, who credibly and consistently testified that the cool-down showers help while they are in the shower and for a brief time afterward, but that within 15-20 minutes they are again sweating profusely and feeling hot. Hearing Tr. 1 at 43; 87; 118; 141." *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, pp. 47-48, I., G., 1., Cool Down Showers, para. 3.

Thus, cool-down showers are not available and/or generally ineffective and avoided by most inmates.

54.     Plaintiffs are rarely allowed to go to air-conditioned portions of the prison during the summer.

55.     The Luther Unit trustee camp and main building laundry, due to their extensive use of water, the extraction of water with heat, and the pressing of uniforms and civilian clothes using steam, are areas of very high temperatures and humidity. These areas do not have installed mechanical cooling except in the staffs' small offices. Inmates with HRS-18 restrictions of, "no extreme temperatures," and/or, "no extreme humidity," are routinely assigned long-term work assignments in these areas.

56.     Upon belief and information, the Luther Unit inmate dining hall, kitchen, and scullery underwent a multi-million-dollar renovation in 2015 thru 2016. This massive modernization project did not improve ventilation and the installation of air conditioning was not considered. Conditions in the cooking/prep area are hot and humid as very little ventilation exists and there are very high humidity conditions, leading to virtually all surfaces "sweating." The heat index is very high in these areas, regardless of the time of day. These areas do not have installed mechanical cooling except in the staffs' small offices.

57.     The Luther Unit dining facility, during each of its three meals, seats approximately 228, and there can also be up to 250 standing, split between two incoming lines. The offender dining facility and the attached scullery are both hot and humid. There are six 24" fans mounted high and are non-moving. Air movement is spotty and minimal. Due to these oppressively hot and humid conditions, many inmates choose to skip a meal to avoid the long walk, the long time in line, the extended time sitting after finishing their meal while waiting for movement orders, the long exit line wait, and the hot hallway back to their dorm.

58.     Additionally, for the past five years, inmates have requested salt be available on tables at each meal as it is in the Officers Dining Room (ODR). Many grievances have been submitted without long-term results. Salt is necessary in hot weather to compliment water intake necessary for the prevention of heat-related illness. The **UTMB Correctional Managed Healthcare Policy Manual**, D-27.2, II, Heat Cramps, and III, Heat Exhaustion state, "Prevention is accomplished by ample fluid intake during work, proper-rest cycles, and salting of foods during meals if not medically contradicted." Electrolyte replenishment drinks are usually limited and often out of stock and not available at the commissary for inmate and staff purchase.

59.     The Luther Unit gym is utilized for: recreation during some periods of poor weather (normally during winter), lockdown inspections of all inmates (normally nine days in duration/twice per year), graduations attended by VIP's/offender relatives, dad and child days, veterans activities, sports tournaments, movies, most religious services, activities held throughout the week, Kairos meetings, related multi-day retreats, and additional events. Most, if not all events, are multi-hour. The gym is hot and humid much of the year. Several fans are available to place near moderate size groups but are only effective if inmates are stationary and sitting. With these conditions present, coupled with the fact that the gym is located at the far north end of the Luther Unit, most if not all the Plaintiffs avoid going to activities in the gym unless the activities occur very early in the morning or at night.

60.     In stark contrast, Warden McKey's and/or Muniz's office is air conditioned, as are all the administrative offices in the prison, and including the prison's armory.

### C.     The Vast Majority Of TDCJ's Inmate Housing, Work, Programs, Activity, And Service Areas Are Not Climate Controlled

61.     In fact, though TDCJ imprisons over 150,000 inmates system-wide, there are only 551 beds available with air conditioning for inmates with medical conditions system-wide. These extremely

limited beds are reserved for the patients at the most extreme risk of heat-related illness (such as advanced-stage cancer patients) and are not available even for patients with multiple conditions that make them more susceptible to heat-related illnesses, injuries, and/or death—like Plaintiffs Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson. TDCJ's medical providers have testified before the Texas Legislature that these beds are filled by inmates that are so sick that they will never recover and will likely die in them. In addition, due to *Cole v. Collier, supra,* the Pack Unit is now **temporarily** able to maintain an indoor heat index below 88°F.

62.     The CMHCC is a statutorily created committee; Tex. Gov't. Code §501.131. They are responsible for developing, implementing, and monitoring the correctional managed health care services for offenders confined in institutions operated by TDCJ. CMHCC is composed of two individuals each from TDCJ, UTMB, and TTUHSC. One of the two individuals from each agency must be a physician. Three additional members of the committee are appointed by the Governor; two of these members must be physicians.

63.     CMHCC has authority to contract for healthcare services "for and on behalf of TDCJ"; Tex. Gov't. Code §501.147. The contract between TDCJ and CMHCC establishes that all statewide Health Services policies and procedures will be developed through joint policy and procedure committee processes that include representatives of TDCJ, UTMB, TTUHSC, and the CMHCC. The TDCJ Medical Director shall retain final approval authority for all statewide policies and procedures. Regarding the quality of care delivered by UTMB and TTUHSC, the contract states that, "TDCJ may require the health care providers to take corrective action if the care provided does not meet expectations...."

64.     CMHCC contracted with UTMB and TTUHSC to provide direct patient care for men and women incarcerated in TDCJ facilities. UTMB, through its contract with CMHCC, provides direct patient care to approximately 78% of the men and women incarcerated in TDCJ facilities.

65.     TDCJ's medical provider, UTMB, has testified there simply are not enough beds system-wide to accommodate even the inmates with serious medical conditions who are at greater risk of heat-related illnesses, injuries, and/or death.

66.     The Luther Unit and the Pack Unit are both served by UTMB. Within the *Cole v. Collier, supra*, Doc., 629, 3rd Amended Class Action Complaint, p. 7, para. 41, testimony was given by Dr. Glenda Adams, one of the senior medical providers at UTMB who has been designated as an expert witness in the heat stroke wrongful death litigation. She testified as follows:

> Q: So that Utilization Review Committee is really performing some sort of triage situation, is that right?
>
> A: Pretty much. That's a fair description.
>
> Q: Do you know how many of these triage beds or cells you're talking about?
>
> A: How many are there?
>
> Q: Yeah.
>
> A: Absolutely ... there were 471 [in 2011]. We now have 481.[1]
>
> Q: Well, do you think that's enough to protect the inmates who are susceptible to extreme heat or are especially vulnerable to extreme heat?
>
> A: No, but it's all we have.
>
> Q: I understand that. And what you're telling me is, "Look, this is an impossible situation. We have to evaluate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds", right?
>
> A: Essentially, yes.

---

[1] Dr. Adams testified about the beds available to the University of Texas Medical Branch, which provides healthcare to the majority of TDCJ inmates. The Texas Tech University Health Science Center, which also provides care to TDCJ inmates, has additional beds available. Together, the UTMB and Texas Tech beds total 551. The Pack Unit is served by UTMB.

67.  In other words, TDCJ knows it does not provide enough air-conditioned beds to safely house inmates at risk of heat-related illnesses, injuries, and/or death.

68.  At the Luther Unit, there are only twelve air-conditioned beds available for inmates with serious medical conditions. These beds are in the infirmary's assisted living area and are reserved for inmates who are very sick.

69.  In other litigation, TDCJ has admitted it, "knows of the high temperatures within its prisons and regard[s] it as a potential risk to health and safety" of inmates.

70.  Likewise, Livingston admitted knowing, "TDCJ ha[d] no written [policy] to address high temperatures in inmates' housing, work, programs, activities, and service areas" before this litigation began.

71.  There is no penalogical purpose behind refusing to provide inmates with climate-controlled housing.

72.  In fact, the State of Texas requires county and state jails to keep indoor temperatures between 65°F and 85°F. *See* Texas Administrative Code (Tex. Admin. Code) Title 37, Part 9, §259.160.

73.  Indeed, TDCJ even air conditions limited portions of inmate housing, work, program, activity, and service areas - such as administrative segregation and solitary confinement cells, including Death Row - at other TDCJ prisons. But decisions to place inmates in these cells are made for security, not medical, reasons.

74.  As in the Pack Unit litigation, expert witnesses have testified that air conditioning inmate living areas, "would be beneficial" to protect inmates from the dangers of extreme temperatures. *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 9, para. 49.

75.     The expert witnesses have also specifically acknowledged that extreme heat—like that commonly experienced at the Luther Unit—placed Plaintiffs at increased risk of harm.

76.     "In the modern South, "contemporary standards of decency" require air conditioning, and a lack of air conditioning amounts to a "deprivation of basic human needs." [*Rhodes v. Chapman*, 452 U.S. 337 (1981) at p.347]. For this reason, many state prison systems in the South and Southwest are air-conditioned. Arkansas requires temperatures inside prisons stay between 74 and 78, and has air-conditioned all its facilities since the 1970s.[7] Arizona prisons prohibit indoor temperatures over 78 degrees.[8] New Mexico and Oklahoma mandate indoor temperatures "appropriate to both summer and winter comfort zones."[9] Tennessee requires local jails to keep temperatures between 65 and 80.[10] North Carolina prohibits temperatures above 85 in jails.[11] Even Texas requires county jails - but not state prisons - to keep indoor temperatures between 65 and 85 degrees, and has since 1978.[12]" *Cole v. Collier, supra,* Doc., 321, Plaintiffs' Reply Brief In Support Of Class Certification, pp. 17-18, para. 3.

---

[7] Mike Ward, Guards to join convict litigation over hot state prisons, AUSTIN AMERICAN-STATESMAN (Sept. 27, 2018), https://www.statesman.com/NEWS/20130829/Guards-to-join-convict-litigation-over-hot-state-prisons (last visited Nov. 17, 2018).

[8] PHYSICAL PLANT STANDARDS TECHNICAL MANUAL 1.5.1.3.2.1 (Ariz. Dep't of Corrections 2012).

[9] PHYSICAL PLANT REQUIREMENTS CD-163000 FF (N.M. Dep't of Corrections 2011); STANDARDS FOR INSPECTIONS OP-130107.IV.B.16 (Okla. Dep't of Corrections 2012).

[10] RULES OF THE TENNESSEE CORRECTIONS INSTITUTE CORRECTIONAL FACILITIES INSPECTION 1400-1.04(1)(D) (TENNESSEE CORRECTIONS INSTITUTE 2004).

[11] N.C. ADMIN. CODE § 14J.1217 (2013).

[12] 37 TEX. ADMIN. CODE § 259.160. *See also* 3 *Tex. Reg.* 897, 902 *(adopted Mar.* 14, 1978).

77.     "Similarly, even prisons in states with more temperate climates housing elderly and infirm inmates, like the Pack Unit, frequently air condition housing areas. *See* Ex. 2, Report of Eldon Vail, p. 4. Even prisons that primarily house the most dangerous inmates – such as the Federal Super-max facility in Florence, Colorado,[13] or the military prison for terrorism suspects in

Guantanamo Bay, Cuba- have air-conditioning. *Id.*" *Cole v. Collier, supra,* Doc., 321, Plaintiffs'

Reply Brief In Support Of Class Certification, p. 18, para. 4.

---

[13] Home to notorious inmates like Terry Nichols, Ramzi Yousef, and Ted Kaczynski.

78.     In fact, the comment to the American Correctional Association (ACA) standards instructs prisons to be able to "mechanically lower" temperatures in housing areas. TDCJ deliberately violates this instruction as indoor apparent temperatures at the Luther Unit cannot be mechanically lowered.

79.     Most TDCJ prisons, including the Luther Unit, were built after air conditioning became common in public buildings in Texas.

80.     Indeed, TDCJ officials made an intentional decision not to air condition the inmate housing, work, program, activity, and service areas at the Luther Unit. And, upon information and belief, they did so for political and financial reasons.

81.     Upon information and belief, a new million dollar plus chapel is scheduled to begin ground breaking in November 2018. It is unknown if this new modern building is scheduled to have a means of reducing and controlling indoor apparent temperatures as is found in several other similarly situated chapels in the TDCJ system. This would provide A/C services for volunteer activities which TDCJ has resisted in the past.

82.     On the Luther Unit, official TDCJ notification of extreme heat and/or a heat-wave does not extend to the inmates. Rarely will an inmate hear a guard's radio announce the temperature, humidity, and heat-index. Most guards, if they notice inmates concerned about the hourly announcements, will turn down the volume of their radios. Only with close-proximity to a guard with a radio, and at the precise time, can an inmate have a possible opportunity to hear this very

short broadcast each hour on the half hour. This weather information is **NOT** disseminated to inmates on the Luther Unit.

83.     Moreover, despite their knowledge of numerous heat-related injuries occurring indoors, all of which would be prevented with air conditioning, TDCJ, including Bryan Collier and the Texas Board of Criminal Justice (TBCJ), have intentionally decided to continue exposing inmates to extremely high indoor temperatures at the Luther Unit despite acknowledging these high indoor apparent temperatures put inmates at risk of heat-related illnesses, injuries, and/or death.

### D.     Temperatures Inside The Luther Unit Are Dangerously High During The Summer

84.     TDCJ routinely records the outdoor apparent temperatures at the Luther Unit during the summer. According to TDCJ's own records, the outdoor apparent temperatures at the Luther Unit routinely exceed 100°F during the summer. In 2017, an American Meteorological Society (AMS) study warned that what we now call extreme heat will be commonplace as soon as 2020.

85.     As in the *Cole v. Collier, supra*, Doc., 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, p. 23, expert witnesses have testified that the data in the following Table 1 is accurate:

**Table 1. – Outdoor Heat Index at the Pack Unit**

### Outdoor Heat Index at the Pack Unit
### Heat Index Highs (2011 - 2016)*

| Year | Number of Days High Over 100°F | Number of Days High Between 90 - 99°F | Number of Days High Between 80 - 89°F |
|------|------|------|------|
| 2011 | 74 | 16 | 1 |
| 2012 | 45 | 43 | 2 |
| 2013 | 73 | 16 | 3 |
| 2014 | 34 | 47 | 9 |
| 2015 | 11 | 71 | 9 |
| 2016 | 13 | 55 | 13 |

*The Pack Unit and the Luther Unit have similar daily temperatures due to their close geographical location and atmospheric/climatological conditions.

86.     Luther and the Pack Units share near proximity geographically and share the same atmospheric/climatological conditions. According to TDCJ's own records, quantity of noted days within the charts' particular apparent temperatures ranges will apply to both units with only minor variations if any. The 2017 and 2018 data are drawn from TDCJ daily temperature log sheets from the Luther Unit as shown in Table 2.

**Table 2. – Outdoor Heat Index at the Luther Unit**

### Outdoor Heat Index at the Luther Unit
### Heat Index Highs (2017 - 2018)
April 15, 2017 to October 15, 2017
April 16, 2018 to October 10, 2018 (Partial Period)

| Year | Number of Days High Over 100°F | Number of Days High Between 90 - 99°F | Number of Days High Between 80 - 89°F |
|------|------|------|------|
| 2017 | 92 | 47 | 35 |
| 2018 | 126 | 26 | 17 |

* Some Days Missing Due To Luther Unit Unable To Provide.

87.     This comes as no surprise to Texans, given the brutal summer temperatures and high humidity in the Brenham-Houston areas. Below, Table 3 notes the apparent temperatures during the months of June and July 2018. This represents and allows a visualization of the apparent

temperatures experienced daily at the Luther Unit. TDCJ policy requires a recorded reading every

hour on the half-hour. The complete information and all data points can be gleaned from the TDCJ

daily temperature log sheets.

## Table 3. – Highest Apparent TDCJ Recorded Temperatures (June 2018 – July 2018)

Highest Apparent TDCJ Recorded Temperatures (June 2018 - July 2018)

| Day | Time Recorded | Apparent Temperature °F | | Day | Time Recorded | Apparent Temperature °F | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | TDCJ Written Log | Inmate Heard via Radio Broadcast* | | | TDCJ Written Log | Inmate Heard via Radio Broadcast* |
| **June 2018** | | | | **July 2018** | | | |
| 1 | 1530 | 113°F | 111°F | 1 | 1430 | 111°F | ** |
| 2 | 1430 | 116°F | ** | 2 | 1330 | 113°F | 113°F |
| 3 | 1430 | 126°F | ** | 3 | 1330 | 118°F | 118°F |
| 4 | 1630 | 105°F | ** | 4 | 930 | 93°F | ** |
| 5 | 1430 | 114°F | ** | 5 | 1830 | 108°F | ** |
| 6 | 1330 | 107°F | ** | 6 | 1530 | 106°F | 126°F |
| 7 | 1230 | 106°F | ** | 7 | 930 | 111°F | ** |
| 8 | 1230 | 108°F | ** | 8 | 1230 | 105°F | ** |
| 9 | 1330 | 118°F | ** | 9 | 1230 | 113°F | ** |
| 10 | 1630 | 109°F | ** | 10 | 1230 | 116°F | 107°F |
| 11 | 1430 | 106°F | ** | 11 | 1230 | 118°F | 118°F |
| 12 | 1630 | 111°F | 108°F | 12 | 1230 | 120°F | ** |
| 13 | 1330 | 115°F | 112°F | 13 | 1230 | 114°F | 113°F |
| 14 | 1330 | 114°F | ** | 14 | 1130 | 115°F | ** |
| 15 | 1630 | 106°F | 108°F | 15 | 1330 | 113°F | ** |
| 16 | 1330 | 105°F | ** | 16 | 1330 | 118°F | ** |
| 17 | 1130 | 103°F | ** | 17 | 1530 | 120°F | 120°F |
| 18 | 1430 | 98°F | 95°F | 18 | 1430 | 119°F | 118°F |
| 19 | 1130 | 91°F | ** | 19 | 1430 | 119°F | 120°F |
| 20 | 1330 | 98°F | ** | 20 | 1330*** | 120°F | 111°F |
| 21 | 1330 | 110°F | 108°F | 21 | 1330*** | 121°F | ** |
| 22 | 1430 | 125°F | 125°F | 22 | 1530*** | 117°F | 117°F |
| 23 | 1430 | 111°F | ** | 23 | 1530*** | 119°F | 118°F |
| 24 | 1630 | 107°F | ** | 24 | 1530 | 109°F | 109°F |
| 25 | 1230 | 105°F | 105°F | 25 | 1030 | 118°F | 117°F |
| 26 | 1430 | 106°F | 106°F | 26 | 1130 | 109°F | 109°F |
| 27 | 1230 | 120°F | 120°F | 27 | 1030 | 110°F | 108°F |
| 28 | 1530 | 114°F | 112°F | 28 | 1030 | 114°F | ** |
| 29 | 1230 | 112°F | 111°F | 29 | 1330 | 118°F | ** |
| 30 | 1230 | 110°F | ** | 30 | 1430 | 122°F | ** |
| | | | | 31 | 930 | 103°F | ** |

\* Times may vary from TDCJ Log time.

\*\* Data not overheard by inmate

\*\*\* TDCJ supplied logs have multiple versions for the same date. Data varies per log.

88.     Pursuant to TDCJ policy and practice, Wardens McKey and/or Muniz review this data

daily during the summer and know that apparent temperatures at the Luther Unit are dangerous.

89.     Despite this, upon belief and information, Wardens McKey and/or Muniz have not

investigated costs associated with ways to cool even a single indoor housing area.

90.     Likewise, Executive Director Collier is aware that apparent temperatures inside TDCJ

prisons are hazardous during the summer. Even so, Executive Director Collier and HSD took no

steps to bring the dangerous temperatures down in any TDCJ facility. He did not order a study to

determine the cost before several heat-related deaths in 2011 and 2012 and being sued for

injunctive and declaratory relief in the *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion

Setting Out Findings of Fact and Conclusions of Law, p. 44, para. 4.

91.     According to the National Weather Service (NWS), summer temperatures in the future will

not be lower than temperatures from 2011-2014. In fact, temperatures will likely increase in the

future.

      **E.**      **The Extreme Temperatures At The Luther Unit Threaten Illness, Injury, And/Or Death**

          **1.**      **Extreme Heat Can Injure or Kill People**

92.     According to the NWS, "heat is the number one weather-related killer in the United States."

Over a hundred people die from exposure to extreme heat each year, and thousands are injured.

On average, heat kills more people in the United States each year than hurricanes, tornadoes,

floods, or lightning combined.

93.     According to the NWS, the American Medical Association (AMA), the Environmental

Protection Agency (EPA), and the Center for Disease Control and Prevention (CDC),

"[m]aintaining a consistent internal body temperature, generally 98.6°F, is essential to normal

physical functioning." Excessive heat can, "stress the body's ability to maintain this ideal

temperature. If individuals fail or are unable to take steps to remain cool, and begin to experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

94.     High temperatures and humidity prevent the human body from regulating its temperature. When exposed to heat, the heart will beat faster to increase blood flow to the skin in order to dissipate heat and keep the internal organs from overheating. As the blood circulates to the skin, excess heat escapes into the cooler air. With so much blood pumped to the skin, the body struggles to maintain its normal functions.

95.     Likewise, the body also cools itself through sweating. The body produces sweat, which evaporates to cool the body. But when the humidity is high, the sweat cannot evaporate, preventing the body from cooling. In addition, continued exposure to heat causes the body to lose water and become dehydrated. When the body loses enough water, it also loses oxygen.

96.     Thus, when exposed to high heat and humidity, the body cannot cool itself through sweating and circulation, the body's temperature rises, and heat-related illnesses may develop.

97.     Plaintiffs believe the conditions at the Luther Unit mirror those of the Pack Unit and the effects upon its inmates.

> "The environment also has an effect on the body's ability to dissipate heat. Dr. Rieger, Defendants' expert, credibly testified that one of the most important ways that the body manages heat loss is through perspiration. *Id.* at 12. However, the amount of perspiration that the air can absorb from the human body is governed by how much humidity is already in the air. *Id.* At 100 percent humidity, the air can no longer absorb water, and the body will be unable to cool itself through perspiration. *Id.* Thus, Dr. Rieger explained, the higher the humidity, the less efficient perspiration is, and the less efficient perspiration is, the less heat dissipation can take place. *Id.* The Pack Unit is located in a humid geographic region, and the housing areas in the Pack Unit are likewise extremely humid. Professor Sager's measurements from August 27, 2014, to October 6, 2014, ***show that humidity levels in the housing areas were consistently above 80 percent, and often over 90 percent***. (***emphasis added***) Docket Entry No. 340-18 at 123-124. The Court finds that the high humidity levels in the housing areas of the Pack Unit impede the inmates' ability to cool their bodies through evaporative

cooling." *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, p. 28, I., D., para. 3.

98.     Indeed, as in *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 12, para. 67, "expert witnesses have testified that ambient temperatures above 85°F can be hazardous to inmates' health."

99.     Continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death. High temperatures can also cause less deadly, but still painful, heat-related illnesses, including heat exhaustion and heat cramps.

100.    **Heat Exhaustion:** Symptoms of heat exhaustion, according to the federal National Institute for Occupational Safety and Health (NIOSH), include: fatigue; heavy sweating; nausea; dizziness; elevated body temperature; and fast, shallow breathing.

101.    According to the Mayo Clinic and TDCJ's own training materials, heat exhaustion can quickly progress to heat stroke if the person does not cool down quickly.

102.    As in *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 12, para. 71, "expert witnesses have testified that heat exhaustion by itself is a serious health condition that puts inmates at a serious health risk."

103.    **Heat Cramps:** Heat cramps can, "consist of [m]uscle pain or spasms usually in the abdomen, arms, or legs", according to NIOSH.

104.    Heat cramps are extremely painful. The doctor who cares for all inmates at the Pack Unit has testified that heat cramps can result in severe pain.

105.    Even TDCJ's own medical policy recognizes that pain from heat cramps, "may be quite severe."

106.   **Heat Stroke:** NIOSH describes heat stroke as "the most serious heat-related disorder", in which, "the body temperature can rise to 106°F or higher within 10 to 15 minutes." Symptoms often include: hot, dry skin, hallucinations, chills, headaches, confusion, and slurred speech. "Heat stroke can cause death or permanent disability if emergency treatment is not given." According to resources published online by the Mayo Clinic, "[i]n a period of hours, untreated heatstroke can cause damage to your brain, heart, kidneys and muscles."

107.   In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death. According to NIOSH, "[t]he different forms of heat-related illness... increase in severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

108.   As in *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 13, para. 77, "expert witnesses have testified that heat stroke can come on suddenly, and heat stroke is possible at apparent temperatures as low as 90°F."

109.   Indeed, even TDCJ's own medical policies and training materials recognize heat stroke is, "a medical emergency", that "the onset is often sudden", and that "death may occur."

110.   Upon information and belief, virtually all inmates at the Luther Unit, regardless of underlying medical conditions, suffer at least some symptoms of heat-related illness or injury caused by or exacerbated by the high indoor apparent temperatures each summer. Typical symptoms include: cramping, headaches, dizziness, nausea, light-headedness, elevated temperature, and heavy sweating.

### 2.    People with Medical Conditions that Impair Cooling are at Additional Risk

111.   Though all people suffer in the heat, people with physiological conditions that impair their bodies' ability to cool are at increased risk of suffering heat-related illnesses, injuries, and/or death.

112.   The Defendants' policies recognize inmates with certain, "underlying medical condition[s]... place them at increased risk," including: amyotrophic lateral sclerosis, arthritis, asthma, cardiovascular disease, cerebral palsy, chronic obstructive pulmonary disease (COPD), cirrhosis of the liver, cystic fibrosis, depression, diabetes, hypertension, multiple sclerosis (M.S.), muscular dystrophy (M.D.), obesity, seizure disorders, Sjogren's syndrome, spastic hemiplegia, spinal cord injuries, sweat gland dysfunction, thyroid dysfunction, psychiatric conditions and mental illness treated with psychotropic Rx's, and others as recommended. Heat tolerance weakens the body, and the risk of heat-related illness increases for people who suffer from these conditions. The Defendants' policies and procedures should recognize inmates with these conditions are at a greater risk of heat-related illnesses, injuries, and/or death.

113.   Similarly, the Defendants' policies state the risk of heat-related illness increases for individuals utilizing doctor prescribed medications (Rx)'s, such as: anti-cholinergics, anti-convulsants, anti-depressants, anti-histamines, anti-psychotics, beta blockers, diuretics, immune system suppressants, psychotropics, and others as recommended. Typically, these drugs impair the body's ability to cool itself. These medications are used to treat a wide range of illnesses and disabilities common to inmates at the Luther Unit, including: amyotrophic lateral sclerosis, arthritis, asthma, cardiovascular disease, cerebral palsy, chronic obstructive pulmonary disease (COPD), cirrhosis of the liver, cystic fibrosis, depression, diabetes, hypertension, multiple sclerosis (M.S.), muscular dystrophy (M.D.), obesity, seizure disorders, Sjogren's syndrome, spastic hemiplegia, spinal cord injuries, sweat gland dysfunction, thyroid dysfunction, psychiatric conditions and mental illness treated with psychotropic Rx's, and others as recommended. The Defendants' policies and procedures recognize these medications increase inmates' risk of heat-related illnesses, injuries, and/or death, and that these inmates "should not be allowed to work or

recreate in environments where the apparent temperature is 95°F or higher." Bryan Collier, Dr. Lannette Linthicum, James McKey, and/or Donald Muniz are aware of these policies and the risks they identify.

114.    UTMB, the medical provider at the Luther Unit, has informed TDCJ of this danger on numerous occasions.

115.    TDCJ identifies approximately 313 inmates at the Luther Unit as having medical conditions/restrictions that prohibit them from working in: "extreme temperatures," "extreme humidity," and/or "direct sunlight," or are, "medically unassigned" as per their HRS-18. Of these, there are approximately 249 inmates restricted by, "no extreme temperature," 148 inmates restricted by, "no extreme humidity," 213 inmates restricted by, "no direct sunlight," and 51 inmates that are, "medically unassigned." Many of these conditions overlap one person. However, all conditions individually cause heat-sensitivity. These conditions will be discussed in more detail below. The inmates' medical conditions place them at increased risk of heat-related illnesses, injuries, and/or death, or are prescribed the medications TDCJ identifies as putting people at increased risk of heat-related illnesses, injuries, and/or death. The Luther Unit also houses a number of men who are young and healthy (able-bodied). These men work in the fields, laundry, maintenance, the kitchen, and other assigned locations, and are integral to the functions of the Luther Unit as a whole.

116.    This list is under-inclusive, as it **DOES NOT** include Plaintiffs Cummings D., Smith, or Wilson, as recently as the summer of 2018 even though they also take many of the medications and suffer from heat-related disabilities that TDCJ recognizes put inmates at increased risk of heat-related injuries.

117.    Likewise, upon information and belief, it does not include other inmates who suffer from heat-sensitive medical conditions or take prescription medications that increase their risk of heat-related illnesses, injuries, and/or death.

118.    For inmates to access certain TDCJ housing, jobs, education, and programs, inmates are urged/required to go to the UTMB infirmaries provider and drop their restrictions from their HRS-18 in order to be considered/accepted into one of the above areas/programs resulting in under-reporting of critical restrictions necessary for the safety and health of inmates and notification of staff for individuals required mandatory wellness checks and oversight.

119.    TDCJ also acknowledges other factors that increase the risk of heat-related illness, such as age (particularly for people over 65).

120.    According to the CDC, heat stroke mortality rate increases with age. For example, the rate of heat stroke deaths doubles between ages 35 and 55. The CDC also recognizes that people over the age of 65 are more prone to heat stress.

121.    Yet, no accommodations are made relating to the extreme heat for inmates based on age, even though it is known to be associated with increased risk of heat-related illnesses, injuries, and/or death.

122.    The Defendants' approved policies made no accommodation for vulnerable inmates during extreme temperatures and humidity.

123.    The Defendants fail to provide climate-controlled housing, or cool the Luther Unit housing, work, program, activity, and service areas in any way, approving policies and practices that deny vulnerable inmates safe and equal housing, work, program, activity, and service areas.

124.    The Defendants approved TDCJ policies which made no accommodations for housing people with medical conditions (like depression, hypertension, and obesity) known to cause medical emergencies and deaths during periods of extreme temperature and humidity.

125.    CMHCC, as the UTMB policy maker, failed to protect inmates from the extreme temperatures and humidity and the corresponding medical risks. They failed to implement policies that protect heat-sensitive inmates from extreme temperatures and humidity, and they failed to train prison staff on the dangers of extreme temperatures and humidity.

126.    A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequence of not adopting a policy will be a deprivation of constitutional rights.

127.    TDCJ is aware that it houses inmates with disabilities (like Plaintiffs Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson) who require reasonable accommodations because their disabilities are impacted by exposure to extremely high indoor apparent temperatures. As TDCJ's policies identify these inmates as being at additional risk of heat-related illnesses, injuries, and/or death, their need for an accommodation is obvious.

128.    Upon information and belief, Luther Unit inmates with these heat-sensitive disabilities experience symptoms of heat-related illness more frequently or more intensely than able-bodied inmates. These inmates with disabilities are also at greater risk of heat-related illness, including heat exhaustion, heat cramps, and heat stroke.

### 3.    Heat in Texas Prisons is Deadly

129.    Since 1998, at least twenty-three TDCJ inmates in facilities around Texas have died of hyperthermia, or heat stroke, as set forth in Table 4 that follows:

**Table 4. – Reported Prisoner Deaths of Heat-Related Illnesses (1986-2012)**

Reported Prisoner Deaths of Heat-Related Illness (1986 - 2012)

| Prisoner Name | DOD | Age | Prison | Obesity | Hypertension | Depression | Schizophrenia | Cardiovascular Disease | Bipolar | Psychiatric Medication | Diabetes | Developmental Disability | HIV | Unknown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adolfo Banda | 7/30/86 | 30 | Pack (Navasota) | X | X | | | | | | | | | |
| Archie White | 6/29/98 | 48 | Robertson (Abilene) | X | X | X | X | | | | | | | |
| Anselmo Lopez | 7/14/98 | 41 | Eastham (Huntsville) | | | | X | | | | | | | |
| James Moore | 7/30/98 | 47 | Byrd (Huntsville) | | X | | X | | | | | | | |
| Charles Finke Jr. | 8/08/99 | 38 | Huntsville | | | X | | | | | | | | |
| Gary Gemma | 8/13/99 | 35 | Coffield (Tyler) | | | | | | | | | | | X |
| Carl Green | 8/19/00 | 44 | Boyd (Teague) | X | | | | X | | | | | | |
| John Cardwell | 8/04/01 | 39 | Allred (Wichita Falls) | | | X | | | | | | | | |
| Darrell Wafer | 5/19/03 | 40 | McConnell (Corpus) | | | | | | | | | | | X |
| Ricky Robertson | 7/16/04 | 37 | Darrington (Houston) | | X | X | | | X | | | | | |
| James Shriver | 8/08/07 | 47 | Byrd (Huntsville) | | X | | | | | X | | | | |
| Dionicia Robles | 8/13/07 | 54 | Byrd (Huntsville) | | | | | | | X | | | | |
| Douglas Hudson | 7/25/11 | 62 | Gurney (Tyler) | | X | | | | | | | | | |
| Larry McCollum | 7/28/11 | 58 | Hutchins (Dallas) | X | X | | | | | | X | | | |
| Thomas Meyers | 8/03/11 | 46 | Coffield (Tyler) | | X | | | | | X | | | | |
| Robert Webb | 8/04/11 | 50 | Hodge (Tyler) | | | | | | | X | | X | | |
| Alexander Togonidze | 8/08/11 | 44 | Michael (Tyler) | | X | | | | | X | X | | | |
| Charles Cook | 8/08/11 | 53 | Hodge (Tyler) | | | | | | | X | | X | | |
| Micheal Martone | 8/08/11 | 57 | Huntsville | X | X | X | | | | X | | | | |
| Kelly Marcus | 8/12/11 | 36 | Connally (Corpus) | X | X | | | | | | | | | |
| Kenneth James | 8/13/11 | 52 | Gurney (Tyler) | | X | | | | | | | | | |
| Daniel Alvarado | 8/20/11 | 44 | Beto (Tyler) | | | | | | | X | | | X | |
| Rodney Adams | 8/03/12 | 45 | Gurney (Tyler) | | | X | | | | X | | | | |
| Albert Hinojosa | 8/29/12 | 44 | Garza West (Corpus) | | X | X | X | | | | X | | | |

130.    Moreover, it is likely far more TDCJ inmates were killed by heat because hyperthermia is an underreported cause of death by medical examiners.

131.    The twenty-four men in Table 4 above, all shared certain characteristics. As TDCJ knew, they all suffered underlying medical conditions and heat-sensitive disabilities that put them at much greater risk of heat stroke, including taking psychotropic drugs to treat a mental illness, suffering from diabetes, or hypertension.[1]

132.    Unsurprisingly, in a 2012 email, two of TDCJ's top physicians discussed how, "the majority of heat-related deaths involve prescription drugs known to increase the risk."

133.    Many inmates at the Luther Unit, including Plaintiffs Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson suffer from one or more of the above conditions, and/or take one or more of the heat-sensitive medications, and/or are advanced in age.

134.    Upon information and belief, 31 days after the Court approved the final settlement in *Cole v. Collier, supra,* Doc. 1188, an inmate at the Luther Unit died from apparent heat-related illness complicated by asthma. During the week of July 5, 2018, Inmate C., a 37-year-old male resided at the Luther Unit in A-Hall 1 Dorm and complained of shortness of breath. He was taken to the Luther Unit infirmary where he was examined and determined to not be having an asthma attack. He was treated, allowed to cool-down, and a short time later was released and returned to his dorm. Shortly thereafter, he went to the major's hallway for cool-down, (listed as a respite area, the major's hallway had no A/C vents, no A/C returns, no access to water, no restroom, no fan, no movement of air, and no security/supervision) where he was later found non-responsive.

---

[1] Six wrongful death lawsuits brought by the families of eight of these men are recently settled. See McCollum v. Livingston, No. 4:14-cv-3253, (S.D. Tex)., 2017 U.S. Dist. LEXIS 19602; Adams v. Livingston, 4:14-cv-3326, (S.D. Tex).; Webb v. Livingston, 4:14-cv-3302, (S.D. Tex).; Togonidze v. Livingston, 4:14-cv-3324, (S.D. Tex).; Martone v. Livingston, 4:13-CV-3369, WL3534896, (S.D. Tex., 2014), 2014 U.S. Dist. LEXIS 96375; Hinojosa v. Livingston, 4:14-cv-311, (S.D. Tex., 2014), 994F. Supp. 2d 840, (S.D. Tex., 2014).

135.    He was taken to the infirmary again, where he may have been revived and after evaluation was sent via emergency transport to the local hospital. There, he was evaluated and analyzed and eventually placed on life support. TDCJ notified his family who traveled to the hospital to be with him during his final hours. He passed away two days after arriving at the local hospital.

136.    Inmate C. suffered from documented chronic asthma and other comorbidities that TDCJ/UTMB have identified as having a high-risk potential for heat-related illness. He was prescribed and taking TDCJ/UTMB Rx drugs that are listed as increasing heat-related illness.

137.    Each day in July 2018, the Luther Unit experienced Category III, apparent temperatures ranging from 93°F thru at least 121°F, (*See* IV., Facts, D., para. 87, Table 3, July 2018).

138.    Inmate C. resided on the Luther Unit in a dorm with extremely high temperatures and humidity, suffered from at least one disease, and took Rx drugs that placed him at a higher risk when combined. As in the *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, p. 43, testimony about the underreporting of heat-related death. "This number may in fact be larger." But, will the Defendants classify and add Inmate C's death to the long list of heat-related deaths? Inmate C.'s death was surely preventable except for TDCJ's disregard for inmates. Two new non-controlled A/C vents were installed in the major's hallway immediately after the event.

139.    Heat can also cause or aggravate other illnesses, even triggering medical emergencies such as heart attacks. According to the World Health Organization (WHO), "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an already stressed system." Similarly, NIOSH warns that there is substantial evidence that extreme heat is a risk factor for cardiovascular disease and death.

140.    The CDC, NWS, and the EPA recognize that exposure to heat contributes to a variety of

illnesses, including cardiovascular disease, and increases the likelihood of illness and death.

141.    As all Texans know however, it is not just the temperature but also the humidity that

contributes to heat. The heat index is a measure of "apparent temperature", based on ambient

temperature and humidity, which the NWS says closely approximates how air temperature is "felt"

by the human body. The NWS publishes a table which illustrates how exposure to high heat

indexes increases the risk of heat-related illnesses, injuries, and/or death. Table 5 follows:

**Table 5. – National Weather Service Heat Index Chart**

 

### National Weather Service Heat Index Chart

**Temperature (°F)**

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | | | | | | | |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | | | | | | | | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | | | | | | | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | | | | | | | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | | | | | | | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | | | | | | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | | | | | | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | | | | | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | | | | | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | | | | | | | | | | | | |
| 90 | 86 | 91 | 98 | | | | | | | | | | | | | |
| 95 | 86 | 93 | 100 | | | | | | | | | | | | | |
| 100 | 87 | 95 | 103 | | | | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure and/or Strenuous Activity**

Caution        Extreme Caution    ■ Danger    ■ Extreme Danger

| Classification | Heat Index | Effect on the body |
|---|---|---|
| Caution | 80°F - 90°F | Fatigue possible with prolonged exposure and/or physical activity |
| Extreme Caution | 90°F - 105°F | Heat stroke, heat cramps, or heat exhaustion possible with prolonged exposure and/or physical activity |

142.    The NWS warns that exposure to heat indexes greater than 105°F, "may cause increasingly severe heat disorders with continued exposure or physical activity."

143.    TDCJ incorporates a version of the NWS chart into its policies and training materials and is aware of the facts described by the NWS. That chart is included as Appendix B. to the TDCJ policy AD-10.64 (rev 9) entitled *"Excessive and Extreme Temperature Conditions in the TDCJ,"* dated March 26, 2018. The policy and chart are made available to every TDCJ Warden, including Wardens McKey and/or Muniz.

144.    Like the NWS chart, TDCJ's version recognizes that as the heat index increases, the risk of increasingly severe heat-related illnesses goes up. When the heat index exceeds 90°F (a typical occurrence inside the Luther Unit during the summer), according to TDCJ, "heat exhaustion" becomes "possible." Above 105°F, "heat stroke" becomes "possible." Above 130°F, "heat stroke" is "imminent."

145.    Importantly, the NWS and TDCJ charts are designed to predict the risk to people who **DO NOT** suffer from medical conditions that increase their susceptibility to heat-related injuries. These charts predict the risk to **"HEALTHY"** able-bodied people (like Plaintiff Pruitt), **NOT** people who have an increased risk of heat-related illness or injury due to medical conditions, medications, or age.

146.    Both the NWS and TDCJ charts show that inmates living in the Luther Unit are exposed to indoor heat indexes that put inmates at risk of heat exhaustion and heat cramps virtually every day of the summer.

147.    Though TDCJ's policies recognize that escalating extreme temperatures put inmates at increased danger, TDCJ's policies do nothing to provide meaningful protections to inmates in the extremely hot housing, work, program, activity, and service areas as apparent temperatures go up.

148.    UTMB makes mandatory housing recommendations to TDCJ for some inmates with disabilities, but CMHCC, UTMB, and TDCJ policies do not contemplate nor provide for special housing for inmates with heat-sensitive disabilities.

149.    The Plaintiffs claim the Defendants knew the risk and dangers associated with certain medical conditions and medications.

150.    The Defendants knew the Plaintiffs suffered from those conditions and the use of medications, and despite that knowledge, they failed to make reasonable accommodations resulting in the Plaintiffs suffering more pain and punishment than non-disabled inmates.

151.    The facts indicate that UTMB policy permitted housing accommodations for some disabled individuals, "i.e., those with mobility impairments requiring a wheelchair, or lower bunk only," but not for individuals suffering from heat-sensitivities.

152.    The Plaintiffs believe they need not allege that any accommodations were requested by the Plaintiffs and denied by the Defendants to state a claim for relief under the ADA, RA, and ADAAA.

153.    The Plaintiffs believe that UTMB policy, "does not contemplate special housing for inmates with heat-sensitive disabilities" and, "only addresses preventing heat-related illnesses and injuries in the work place," while neglecting to address inmates housing assignments, living, programs, activities, and service areas. Yet, all published inmate rosters will list, under the column "Work Assignment," "**MEDICALLY UNASSIGNED**" as an inmate's occupation. Medically Unassigned inmates also earn full good time and work time credit toward their sentence completion. Yet their "work" takes place in all of the area they occupy, i.e. housing, work, program, activities, and service areas which is not safely provided for by the Defendants.

154.    In fact, before the Pack Unit litigation began, TDCJ had no formal written policy to protect inmates from extreme temperatures in the indoor housing, work, program, activity, and service areas. Now, its policy only provides a handful of vague guidelines, such as directing officers to use "prevailing winds" to allow ventilation, identify respite areas, and by providing ice water to inmates.

155.    TDCJ and UTMB's mandatory annual "identifying and preventing heat-related illnesses and injuries," training, and their posted instructions and warnings have proven to be only partially effective as over the years staff and inmate heat-related illnesses, injuries, and/or death continue to occur.

156.    TDCJ has no policy to lower indoor temperatures in inmate housing, work, program, activity, and service areas on the Luther Unit.

157.    No mitigation measures short of climate control or a policy to relocate inmates to cooler housing, work, program, activity, and service areas can adequately protect people from these extreme temperatures. So long as housing, work, program, activity, and service areas are dangerously hot, inmates will inevitably suffer heat-related illnesses, injuries, and be placed at increased risk of death.

158.    Dr. Charles Adams, M.D., the medical director supervising medical care provided at multiple TDCJ prisons, stated what should be obvious to anyone: "they need cooling."

159.    TDCJ ignored these observations, and has not provided any "cooling" at the Luther Unit.

160.    The *Cole v. Collier, supra,* Doc. 854, Memorandum and Order, pp. 2-3, I.: and p. 3, II.: In the Pack Unit litigation, the Court found the temperature surrounding the Pack Unit extends to Brenham, Tx., which is roughly 18 miles away, *Cole v. Collier, supra.* Doc. 272-1, p. 2, §2. The Luther Unit is located 2 miles from the Pack Unit, closer to, Brenham, Tx. The Court expressed

its findings that within the area, the high summer temperatures are dangerous and warrant expedited precautions as shown below:

I. **THE COURT REAFFIRMS ITS PREVIOUS FINDINGS AND CONCLUSIONS.**

The Court finds that the evidence presented during the hearings in this matter will be applicable during the summer of 2018, in the absence of an order from this Court. The evidence shows that temperatures and the heat index at the Wallace Pack Unit are consistently dangerously hot during summer months, and therefore will be dangerously hot in the summer of 2018.[2] The evidence further shows that a Court order will be necessary to ensure that the same constitutional violations do not recur in 2018.[3] No intervening precedent since the Court's preliminary injunction memorandum and order changes the Court's legal analysis.

II. **THE COURT FINDS THAT THE 88 DEGREE HEAT INDEX RESTRICTION FOR THE HEAT SENSITIVE SUBCLASS SHOULD BE IN EFFECT DURING THE PERIOD THROUGH OCTOBER 30, 2017 AND APRIL 15, 2018 THROUGH OCTOBER 30, 2018.**

The Court finds that the heat index in the area near the Pack Unit seasonally exceeds safe levels for prolonged periods of time. Based upon the "Local Climatological Data" data provided by the National Centers for Environmental Information [NCI], an arm of the National Oceanic and Atmospheric Administration [NOAA], it is evident that the heat index outside of the Wallace Pack Unit often exceeds 88 degrees Farenheit for prolonged periods of time from approximately April 15 through October 30 each year.[4]

Accordingly, the Court finds that the 88 degree Farenheit heat index restriction for the heat sensitive subclass enumerated in its July 19, 2017 order shall be in effect during the annual period of April 15 through October 30 to protect the subclass from a substantital risk of serious harm, including violations of their constitutional rights, as discussed in the prior order. The Court further finds that requiring a specific annual date range for the heat index restriction will assist TDCJ in its planning for compliance and ease the burdens of compliance, thus protecting the constitutional rights of the subclass in a manner that is narrrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

Plaintiffs' motion to extend the preliminary injunction is GRANTED. TDCJ is hereby ORDERED to propose any changes or clarifications to its plan for compliance, consistent with the foregoing, by February 9, 2018. Plaintiffs shall respond no later than March 23, 2018.

---

[2] See, e.g., Plaintiffs' 2017 Hearing Exhibit 5; Doc. Nos. 693 & 693-1; National Centers for Environmental Information, Local Climatological Data for Brenham Municipal Airport, available at https://www.ncdc.noaa.gov/cdo-web/datasets/LCD/stations/WBAN:53928/detail (last accessed Nov. 17, 2018). The Court takes judicial notice of the hourly temperature and humidity data for Brenham Municipal Airport for the period from January 1, 2006 through October 4, 2017.

[3] See, e.g., Doc. No. 720-11, p. 15, Deposition of C. Ginsel, p. 57:8-15; Doc. No. 720-13, pp. 10-12, Deposition of L. Linthicum, pp. 206:21-208:10; Doc. No. 721.

[4] See National Centers for Environmental Information, Local Climatological Data for Brenham Municipal Airport, available at https://www.ncdc.noaa.gov/cdo-web/datasets/LCD/stations/WBAN:53928/detail (last accessed Nov. 17, 2018). The local climatological data includes air temperature and relative humidity, measured every twenty minutes. The heat index can be calculated from this data by using the National Weather Service online calculator. See National Weather Service, Heat Index Calculator, https://www.wpc.ncep.noaa.gov/html/heatindex.shtml (last accessed Nov. 17, 2018).

161.   With the near proximity of both the Luther Unit and Pack Unit, it is assumed the weather/climatological conditions are similar if not the same for both units in the past and future.

F.    **Inmates And Officers At The Luther Unit Routinely Suffer Heat-Related Illnesses And Injuries During The Summer**

162.    Every summer, inmates and staff at the Luther Unit suffer heat-related illnesses and injuries.

163.    Upon information and belief, at the Luther Unit, "the trend has been noted that the inmates suffering from heat-related illness are primarily in housing"—as opposed to inmates working outside.

164.    Upon information and belief, TDCJ's medical provider has admitted being "particularly concerned" about the conditions at the Luther Unit. Inmates are seen in the prison's infirmary for some heat-related illnesses, injuries, and/or death. Many of these inmates were taking medications that placed them at increased risk of heat-related illnesses, injuries, and/or death.

165.    Upon information and belief, some of the inmates treated for heat-related illness at the Luther Unit were **NOT** taking any medication that put them at increased risk and **DID NOT** have any medical condition that put them at increased risk of heat-related illness.

166.    Despite the absence of any additional heat-related risk factors, these inmates were still injured by the high apparent temperatures.

167.    Each summer, inmates and officers at the Luther Unit are treated by medical staff for heat-related illnesses and injuries caused by the hot indoor apparent temperatures.

168.    Upon information and belief, it is likely that many additional inmates and staff are not reporting their heat-related illnesses, injuries, and/or death.

169.    TDCJ's primary mitigation measures are water intake, fans, and relocation to a respite area.

170.    Additionally, for the past five years, inmates have requested salt be available on tables at each meal as it is in the ODR. Many grievances have been submitted without long-term results. Salt is necessary in hot weather to complement water intake necessary for the prevention of heat-

related illness. The **UTMB Correctional Managed Healthcare Policy Manual**, D-27.2, II, Heat Cramps, and III, Heat Exhaustion states, "Prevention is accomplished by ample fluid intake during work, proper-rest cycles, and salting of foods during meals if not medically contradicted." Electrolyte replenishment drinks are usually limited and often out of stock and not available at the commissary for inmate and staff purchase.

171.    While gaining entry to the Recreation (Rec) Yards, inmates at the discretion of some Sergeants (Sgt)'s., are allowed to bring their individual water bottles; but they are prevented/not allowed to bring with them small two-inch by two-inch packets of electrolytes/sports drink powder that they purchase (when it is in stock) as an emergency item at the commissary. The morning rec periods generally last an hour and a half. The noon/afternoon periods can last four hours. And the evening rec period ranges from one to two hours. During periods of intensive exercise, replenishing body fluids with both water and electrolytes—during high temperatures, high humidity, direct sunlight, and no shade—is vitally important in the reduction and mitigation of heat-related illnesses, injuries, and/or death. TDCJ does provide ice water in one cooler for each rec yard in use. These often empty prior to the end of the rec period. TDCJ does not supply electrolytes.

172.    On Rec Yards One and Two, TDCJ has woven a plastic, ten-foot-long, pipe into the adjoining cross fence. This pipe has drilled holes/outlets down its length, half toward One Yard and half toward Two Yard. TDCJ has plumbed this pipe into a water source and has made a "mister" that is always on during morning and noon/afternoon rec periods. This mister is not normally on during the evening rec period regardless of the temperature. This was implemented to provide relief from the heat and heat-related illness. It creates a muddy mess as there is no formal drainage or concrete walkway, only the bare ground being constantly watered. This standing water

has become a breeding ground for mosquitos which swarm anybody who approaches. Additionally, when an inmate is facing the misters/fence and the wind is at his back, the mist goes thru the fence with the wind into the unused adjacent rec yard without providing relief to the needy inmate. While the inspiration was thoughtful, the resulting implementation and usefulness are lacking in providing inmates momentary relief from the heat and heat-related illness due to its placement, lack of drainage, lack of concrete walkways, and lack of mosquito/insect control.

173.   There is little to no shade on the Luther Unit Rec Yards.

174.   Because of the miserable conditions created by the heat, many inmates simply languish during the summer. Many spend their summer days avoiding any exertion that could bring on heat-related illness including walking to the chow hall for meals. They endure by drinking water, and sometimes spraying themselves with water to endure the incessant heat.

175.   Even inmates without medical conditions that make them vulnerable to the heat, like Plaintiff Pruitt, suffer intensely during the summer because of the high indoor apparent temperatures.

176.   Likewise, correctional officers who work in the inmate housing, work, program, activity, and service areas also routinely suffer in the heat. Officers routinely sweat through their uniforms and must towel sweat off their faces when leaving the inmate dormitories.

177.   In fact, as in the *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 24, para. 123, expert witnesses have testified during a recent summer a 57-year-old correctional officer at the Pack Unit was taken to the emergency room after becoming dizzy. She was diagnosed with heat exhaustion and dehydration. This has also occurred each year with various officers at the Luther Unit. Data from the *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, p. 44, "…that correctional officers employed by

TDCJ are suffering heat-related illnesses while on duty at the facilities. During this litigation, TDCJ produced records evidencing heat-related illnesses suffered by hundreds of correctional officers. Pls', Ex.16 at 266." The TDCJ has paid over a half-million dollars in workers compensation claims to its employees for illnesses related to excessive heat since 2006.

178.    Thus, in a rare development, the correctional officers' union has found common cause with the inmates, and publicly supported the extreme temperature lawsuits brought against TDCJ.

179.    The correctional officers' union has made numerous public requests for the prison housing, work, program, activity, and service areas to be air conditioned, but TDCJ routinely ignores these requests for safe working conditions.

180.    The Luther Unit undergoes two or three annual lockdowns, with each lockdown averaging nine days. Therefore, inmates must endure 18-27 days annually without the benefit of TDCJ's full respite program, cool-down showers, or a *Luther Unit Lockdown Respite Directive*, in spite of the excessive apparent indoor temperature and humidity.

181.    Most recently, the Luther Unit went on lockdown from August 20, 2018 to August 28, 2018. On all days, the heat index was above 100°F. In just one dorm, several medical emergencies were dealt with; almost all of them involved at-risk inmates and almost all of them were the result of the excessive apparent indoor temperature and humidity, as well as TDCJ not offering its full respite program during lockdowns.

182.    The Luther Unit does not follow its own respite policies during institutional lockdowns. Cool-down showers are not available. Water coolers are not maintained with water and ice regularly. Access to the three specified respite areas is curtailed because the education department is shut down, medical does not readily accept inmates unless for emergencies or appointments, and guards hesitate to allow inmates to go for respite to the only remaining respite area, the major's

hallway, which remains without access to water, a restroom, direct supervision/security, fans, or controlled A/C. Inmate movement outside of the dorms is rarely allowed. When the inmate can gain approval for respite, he must wait until an escort officer is assigned and then becomes available (up to 20 minutes). The inmate, when assembled with a group, is then moved under escort, gate by gate, to the major's hallway.

183.    New on the 2nd day of the lockdown, the Major (Maj)., unofficially, verbally designated the dorm front-dayrooms as respite areas.  A hot inmate could move from his cubicle to the dayroom, sit under a high, near roof, drum fan blowing hot air, and at the end of the allocated five minutes, he must return to his cubicle or seek further respite.  Again, there is no official Directive governing respite options during lockdowns. Several days into the lockdown the five-minute rule was verbally relaxed. On several occasions, due to the high number of inmates seeking respite during lockdown, staff rapidly filled the major's hallway, a listed respite area. They expanded respite into the inmate barber shop (IBS) which is not on the *Luther Unit Respite Directive*, with inmates sitting on the floor. When these two areas filled, education, a listed respite area, was opened, staffed, and utilized.

184.    During lockdown any inmate entering respite is totally stripped out and searched.  Those exiting respite are again stripped out.  This includes requesting a drink of water.  *e.g.* An escort guard must be arranged (sometimes up to 30 minutes), an inmate stripped out and searched, the inmate walked with the guard down the hall to a water fountain, then, returned to the respite area, stripped out again, and then the inmate is finally allowed to continue his period of respite—all part of the rigid process that deters many offenders, especially those who are indigent and can not purchase water bottles from the commissary, or those mobility impaired, from seeking respite during lockdowns. After approximately two days, this non-documented practice was halted.

185.   The chain room (without A/C) and the IBS, both non-listed respite areas, are unofficially being utilized in conjunction with the major's hallway. Inmates are locked in these spaces without access to supervision/security in case of an emergency or if an inmate's health suddenly takes a turn for the worse. Heat-related illnesses are known to progress rapidly. Very few, if any, are allowed entrance to medical for respite and none go to education. Luther Unit staff avoid sending respite seeking inmates to areas which require supervision/security.

186.   Disciplinary cases may be issued to inmates who talk in the respite areas. Depending on the staff, respite areas are no-talking areas. Inmates have been kicked out of respite if found talking. Water bottles (no cups) and chill towels are the only items allowed in respite. This is vastly different from as provided for in the *Cole v. Collier, supra,* Doc., 769, Defendants Response To The Court Findings, p.6: The Pack Unit respite poster allows that, "inmates: may talk quietly, may bring reading and/or writing materials (as allowed in the dayrooms), bring a drink or cup to fill with water, bring a cooling towel."

187.   Plaintiff McGruder (who suffers from advanced multiple sclerosis and utilizes a walker) experienced heat-related illness symptoms during Luther Unit's recent lockdown: severe leg cramps, excessive sweating, dizziness, and mobility issues (he could not move from his bunk).

188.   Upon Plaintiff McGruder's request, Plaintiff Sain, his next-door neighbor, (an inmate that also suffers from multiple sclerosis) notified guards of Plaintiff McGruder's medical crisis, need for immediate medical assistance, and need for respite. All TDCJ instruction and warning materials direct the first responder or the victim to notify staff.

189.   Ten minutes passed with no response and the two assigned hall guards did not enter the dorm to check on Plaintiff McGruder. Again, Plaintiff Sain sounded the alarm. The guard did not even possess the heat-related resource card as dictated by both, the ***Seasonal Preparedness***

*Directive – February 2018*, para. Precautions and Actions Related to Training: "Ensure all employees currently have, or are provided with, *Employee Information Cards* Rev. 11-15 (FN-1181) and carried said cards on their person *while on duty, (emphasis added)* and TDCJ policy AD-10.64 (rev 9) entitled "*Excessive and Extreme Temperature Conditions in the TDCJ*," dated March 26, 2018, Procedures, IV., I., 7., Instate "Ensure all staff currently have, or provided with a FN-1181, …and that cards are carried on their person *while at the unit.*" *(emphasis added)* Therefore, she denied there were any heat-related issues and continued to deny Plaintiff Sain's multiple requests for Plaintiff McGruder's medical emergency. Finally—persistence is key to survival in TDCJ—two utility guards, not medical staff, arrived with a wheelchair and had to physically lift Plaintiff McGruder into the chair. It took a total of 35 minutes to get a response. The two guards assigned to the hallway never checked on him, nor was a medical Incident Command System (ICS) initiated. Plaintiff McGruder was taken to the infirmary.

190.    Plaintiff Sain's efforts to save Plaintiff McGruder's life by pleading for medical assistance were met with a disciplinary case for, according to Sgt. O., "not minding your own business and reading your books." Plaintiff Sain said that he had personally witnessed several inmates die, to which Sgt. O. had no response.

191.    The TDCJ published *The Echo, Texas Prison News*, volume 90, No 6., August 2018 p. 4, specifically states, "Report all incidents of heat related illness to a staff member immediately." This is outlined and in bold lettering as an except from the article written about Tips for Prevention and Recognition of Heat Illness.

192.    Unfortunately, in TDCJ facilities, inmates are always first responders and first to notify staff. As a first responder they do not expect to be punished because of the Good Samaritan Act/Statute in Texas, see Vernon's Texas Codes Annotated (V.T.C.A.), Civil Practices and

Remedies Code (Civ. Prac. Rem. Code), §74.151 and §74.152. In fact, the Good Samaritan Act/Statute in Texas specifically states, "one can not be punished based on their good faith actions." Courts emphasize, "that the doctrine applies only when the party *Plaintiff Sain [emphasis added]* undertaking the voluntary course of action does so for the benefit of the other party *Plaintiff McGruder [emphasis added]*."

193.     Holding a lockdown in the hottest and most humid part of the year, August in Texas, is counter-productive to insuring the safety of inmates and staff from heat-related illnesses, injuries, and/or death.

194.     "For these reasons, the *Houston Chronicle*[16] *Austin American-Statesman}*[17] *New York Times*[18] and other newspapers[19] have editorialized that Texas prisoners must be protected from the heat.[20]" *Cole v. Collier, supra,* Doc., 321, Plaintiffs' Reply Brief In Support Of Class Certification, p. 19, para. 7.

---

[16] *HOUSTON CHRONICLE, Failure to Communicate,* Apr. 25, 2014 (*available at:* http://www.chron.com/opinion/editorials/article/Failure-to-communicate-5430794.php) (last accessed Sept. 3, 2014) (noting failing to protect inmates is "not how a humane society works").

[17] AUSTIN AMERICAN-STATESMAN, *There's a Difference Between Tough and Brutal,* Sept. 25, 2018 (*available at:* https://www.statesman.com/news/20130615/theres-a-difference-between-tough-and-brutal (last accessed Nov. 17, 2018) ("[E]ven the most violent [inmates] are accorded constitutional protection from cruel and unusual punishment").

[18] *NEW YORK TIMES, Heat Exhaustion in a Texas Prison,* Aug. 8, 2012 (*available at:* https://www.nytimes.com/2012/08/09/opinion/heat-exhaustion-in-a-texas-prison.html?%20r=0) (last accessed Nov. 17, 2018).

[19] Even editorial boards that oppose air conditioning prisons concede "a safe limit might be reached some day, a point at which temperatures get so high and remain so that it becomes cruel and unusual punishment" to not air condition the prisons. *MARSHALL NEWS MESSENGER, Neither Prisoners Nor Pigs Should Get Air Conditioning,* Aug. 23, 2013 (*available at:* http://www.marshallnewsmessenger.com/opinion/editorials/neither-prisoners-nor-pigs-should-get-air-conditioning/articlee6b05278-eld5-5bb8-9924-c7903793b7f6.html) (last accessed Sept. 4, 2014). The *News Messenger* editorial is the only one counsel could locate taking this position.

[20] And though Plaintiffs do not suggest inmates are entitled to free-world comfort levels, it is notable that according to the U.S. Department of Housing and Urban Development, over 98 percent of housing units in the South have some form of air conditioning. U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT, AMERICAN HOUSING SURVEY FOR THE UNITED STATES: 2011, p. 12 (2013) (*available at:* https://www.census.gov/content/dam/Census/programs-surveys/.../2011/h150-11.pdf) (last accessed Nov. 17, 2018).

195.   "Likewise, the American Bar Association's Standards on the Treatment of Prisoners suggests prisons must provide "cooling ... appropriate to maintain humane comfort and safety in all living and working areas."[14]" *Cole v. Collier, supra,* Doc., 321, Plaintiffs' Reply Brief In Support Of Class Certification, p. 19, para. 5.

---

[14] AMERICAN BAR ASSOCIATION, STANDARDS FOR CRIMINAL JUSTICE: TREATMENT OF PRISONERS (3rd Ed.), p. 69.

196.   "Tellingly, Texas has even sent people to prison for leaving dogs in "hot, very hot" cars. *Lopez* v. *State*, 720 S.W.2d 201, 202 (Tex. App. - San Antonio 1986) (pet. denied).[15]" *Cole v. Collier, supra,* Doc., 321, Plaintiffs' Reply Brief In Support Of Class Certification, p. 19, para. 6.

---

[15] Minimal standards for animal shelters in Texas require "fans or air conditioning" "in indoor facilities when the ambient temperature is 85 degrees Fahrenheit... or higher." 25 Tex. ADMIN. CODE § 169.26(9).

197.   While TDCJ knows about and ignores the hazards to inmates and correctional officers, TDCJ officials (including the former Executive Director, Brad Livingston) approved spending $750,000 to install A/C in a building that raises hogs, which are raised by inmates. The justification being a climate-controlled hog barn protecting the welfare of TDCJ's agricultural products. TDCJ's detailed policies require that pigs live in a, "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74°F to keep the pigs "comfortable." TDCJ policy requires temperatures be kept no higher than 85°F to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95°F because temperatures above 95°F, according to TDCJ policies, negatively affect pigs' "health" and "some form of cooling" is required above this "critical limit." High-ranking TDCJ officials even told the press these climate-

controlled barns were necessary to protect vulnerable pigs from heat stroke. TDCJ has no similar policies to protect humans.

198.    Even former TDCJ Institutional Division Director Rick Thaler acknowledged this is unacceptable, and that human inmates deserve more protections than swine raised for slaughter.

199.    Plaintiffs believe the conditions at the Luther Unit mirror those of the Pack Unit and the effects upon its inmates. In its order of July 19, 2017 granting Plaintiffs preliminary injunctive relief,

> "...the Court made a preliminary finding that Plaintiffs were substantially likely to prevail on claims that conditions at the Pack Unit violated Class and Subclass members' federal rights. The Court incorporates the factual findings in its July 19, 2017 order granting the second preliminary injunction and, in its October 12, 2017, order extending the preliminary injunction. (Doc. Nos. 737 at 8-71, 854.) *Cole v. Collier, supra,* Doc. 1188, Final Order And Judgement Approving Class Action Settlement And Attorney Fees, p. 25, III., D., para. 2.

> ***Exposure to extreme heat will continue to cause a substantial risk of serious injury or death to members of the Class (emphasis added)***, absent the mitigation measures required by the Settlement. The Court finds that, absent the relief agreed to in this Settlement, ***the extreme heat conditions described in the July 19, 2017 order will continue to exist every year between April 15 and October 15 in perpetuity (emphasis added)***. The provision of temporary air conditioning during the summer months is necessary to mitigate the risk sufficient to correct the alleged violation of the Class and Subclass' federal rights, until permanent air conditioning is installed. The relief afforded extends no further than is necessary to correct the constitutional harms, and the relief will not adversely impact public safety or the operation of the criminal justice system. The parties concur that the Settlement meets the requirements of the PLRA." *Cole v. Collier, supra,* Doc. 1188, Final Order And Judgement Approving Class Action Settlement And Attorney Fees, pp. 25-26, III., D., para. 3.

**G.    Many Plaintiffs' Disabilities Put Them At Increased Risk Of Heat-Related Illnesses, Injuries, And/Or Death**

**1.    Cummings, D. Suffers from Heat-Related Disabilities and is at Increased Risk**

200.    David Cummings suffers from several medical conditions and/or disabilities that increase his risk of heat-related illnesses, injuries, and/or death. For example, he suffers from hypertension, obesity, and prostate cancer. He has had a stent placed in his urinary tube.

201.    Cummings, D's. hypertension requires treatment with an ACE inhibitor (Lisinopril). He takes Lupron Injections for his prostate cancer, and an alpha blocker (Terazosin), to control his urinary disorder. These medications are considered to promote heat-sensitivity.

202.    These disabilities and medications impair Cummings, D's. thermoregulatory system, a major life activity. During extreme temperatures, his hypertension impairs his respiratory, circulatory, and cardiovascular system.

203.    Cummings, D. takes a diuretic that negatively affects his ability to retain fluids necessary for hydration to minimize the effects of heat-related illness.

204.    Cummings, D. being classified as obese, based on body mass index, coupled with the excessive indoor heat and humidity at the Luther Unit, interferes with major life activities, such as walking, climbing stairs, standing, lifting, sedentary activities such as reading or writing, and attending recreation and/or programs in the gym.

205.    The heat makes it difficult to sleep; specifically, he gets so hot at night that his mattress always seems soaked through with sweat. He has attempted to sleep on the sometimes-cooler concrete floor, but this is a violation of TDCJ written policy and he is subjecting himself to a possible disciplinary case. Compounding the strain of sleepless nights, the oppressive daytime heat taxes his body even further, leaving him exhausted.

206.    Cummings, D. meets all the criteria per the ADA, RA, and the ADAAA, as a qualified individual with at least one disability. He:

        a.   has a physical or mental impairment that substantially limits one or more major life activities of this individual;

        b.   along with TDCJ, CMHCC, UTMB, and his free-world physicians have records and knowledge of his impairments; and/or

      c.  has been regarded as having such an impairment and establishes that he has been subjected to an action prohibited under the ADA, RA, and/or ADAAA because of an actual or perceived physical and mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

207.    TDCJ, CMHCC, and UTMB officials knew of personal heat issues and selectively did not give him relief, and as such he has not been provided equal accommodations, programs, and services per the ADA, RA, and ADAAA.

208.    Prior to coming to TDCJ this inmate was eligible for and received Supplemental Security Income (SSI) disability payments.

### 2.    Cummings, M. Suffers from Heat-Related Disabilities and is at Increased Risk

209.    Michael Cummings suffers from several medical conditions and/or disabilities that increase his risk of heat-related illnesses, injuries, and/or death. For example, he suffers from: left ventricle dysfunction, systolic dysfunction, mitral valve regurgitation, and atrial fibrillation—all symptoms of pre-congestive heart failure. Due to these health issues, he has a surgically implanted defibrillator.

210.    Cummings, M's. cardiac-related symptoms require treatment with: an anti-coagulant (Warfarin), a beta-adrenergic blocking agent (Carvedilol), a cardiotonic agent (Digoxin), and an ACE inhibitor (Lisinopril). These medications are considered to promote heat-sensitivity.

211.    These disabilities and medications impair Cummings, M's. thermoregulatory system, a major life activity. During extreme temperatures, his hypertension impairs his respiratory, circulatory, and cardiovascular system.

212.    When Cummings, M. is overwhelmed by the heat, he is weakened, must take numerous rests while walking, feels light-headed, and gets dizzy.

213.    The heat makes it difficult to sleep, a major life activity, because he stays so hot at night. With the strain of sleepless nights, the oppressive daytime heat taxes his body even further, leaving him exhausted.

214.    Due to his restrictions of: "No Temperature Extremes," "No Humidity Extremes," and "No Work in Direct Sunlight" on his HRS-18, he is unable to go outside for recreation or work outside or in areas of temperature and/or humidity extremes, where he would be more susceptible to suffering from heat-related illness. Without regard to these restrictions, he was assigned to work in the hot and humid trustee laundry. Now he works in the main building laundry enduring longer hours in the hot and humid conditions.

215.    Cummings, M. meets all the criteria per the ADA, RA, and the ADAAA, as a qualified individual with at least one disability. He:

    a.  has a physical or mental impairment that substantially limits one or more major life activities of this individual;

    b.  along with TDCJ, CMHCC, UTMB, and his free-world physicians have records and knowledge of his impairments; and/or

    c.  has been regarded as having such an impairment and establishes that he has been subjected to an action prohibited under the ADA, RA, and/or ADAAA because of an actual or perceived physical and mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

216.    TDCJ, CMHCC, and UTMB officials knew of personal heat issues and selectively did not give him relief, and as such he has not been provided equal accommodations, programs, and services per the ADA, RA, and ADAAA.

217.    Prior to coming to TDCJ this inmate was eligible for and received SSI disability payments.

### 3.     Gullett Suffers from Heat-Related Disabilities and is at Increased Risk

218.    Phillip Gullett suffers from several medical conditions and/or disabilities that increase his risk of heat-related illnesses, injuries, and/or death. For example, he suffers from: diabetes, hypertension, and for what TDCJ/UTMB – Hospital Galveston (HG) diagnosed for years as cirrhosis of the liver (with only six months to live) and who have now determined to be cirrhosis and a very rare liver virus. He also suffers from recently discovered and surgically patched stomach ulcers, chronic staph infections, and depression.

219.    Gullett's psychiatric conditions require treatment with an SSRI (Citalopram) and an atypical anti-psychotic (Risperidone). His chronic staph infections are treated with an anti-histamine (Benadryl), an anti-fungal topical cream (Clotrimazole), and a steroidal topical cream (Triamcinolone). For his diabetes, he receives insulin (Novolin) injections two or three times per day. Gullett's liver condition requires a liver pill (Ursodiol), an ammonia detoxicant (Lactulose), a water pill (Spironolactone), and a proton pump inhibitor (Omeprazole). He also takes a statin (Atorvastatin) and an anti-anemia drug (Ferrous Sulfate) for hypertension. For his diabetes, he takes a loop diuretic (Furosemide). For his thyroid, he takes an agent (Levothyroxine). Most of these medications are considered to promote heat-sensitivity.

220.    These disabilities and medications impair Gullett's thermoregulatory system, a major life activity. During extreme temperatures, his hypertension impairs his respiratory, circulatory, and cardiovascular system.

221.    Because of his diabetes, the excessive heat and humidity makes him feel dizzy, impairs his ability to walk, stand properly, concentrate, think, and/or read—all major life activities. His diabetes also interferes with the operation of several of his major bodily systems, including his circulatory system, endocrine system, and digestive system.

222.   Gullett takes a diuretic that negatively affects his ability to retain fluids necessary for hydration to minimize the effects of heat-related illness.

223.   The heat makes it very difficult to sleep, a major life activity; specifically, he gets so hot during the day and at night that his mattress always seems soaked through with sweat. Compounding the strain of sleepless nights, the oppressive daytime heat taxes his body even further, leaving him exhausted. He wakes up feeling either extremely hot or extremely cold due to the combination of medications and excessive heat.

224.   In the summer, his psychiatric medications make him feel dizzy and light-headed because of the excessive heat and he is very susceptible to heat-related illnesses due to a failure in the thermoregulation systems. This prevents him from engaging in multiple major life activities such as sleeping, which causes him to have "low-energy", and have negative thoughts about his surroundings and himself.

225.   Gullett recently had holes in his stomach patched. The numerous medications resulted in serious ulcers. He lost over 31 pounds in a period of months and is now medically underweight at 133 lbs.

226.   Due to his restrictions of: "No Temperature Extremes," "No Humidity Extremes," and "No Work in Direct Sunlight" on his HRS-18, he is unable to go outside for recreation or work outside or in areas of temperature and/or humidity extremes, where he would be more susceptible to suffering from heat-related illness. Without regard to these restrictions, he works in the main building laundry enduring long hours in the hot and humid conditions.

227.   Gullett meets all the criteria per the ADA, RA, and the ADAAA, as a qualified individual with at least one disability. He:

   a.  has a physical or mental impairment that substantially limits one or more major life activities of this individual;

   b.  along with TDCJ, CMHCC, UTMB, and his free-world physicians have records and knowledge of his impairments; and/or

   c.  has been regarded as having such an impairment and establishes that he has been subjected to an action prohibited under the ADA, RA, and/or ADAAA because of an actual or perceived physical and mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

228.   TDCJ, CMHCC, and UTMB officials knew of personal heat issues and selectively did not give him relief, and as such he has not been provided equal accommodations, programs, and services per the ADA, RA, and ADAAA.

### 4. McGruder Suffers from Heat-Related Disabilities and is at Increased Risk

229.   Thyee McGruder suffers from several medical conditions and/or disabilities that increase his risk of heat-related illnesses, injuries, and/or death. For example, he suffers from M.S., hypertension, COPD, and double vision. He also has a history of strokes (three) and was shot three times in the leg. He uses a walker to assist with mobility.

230.   McGruder's M.S. requires treatment with: a skeletal muscle relaxant (Baclofen), an immune system suppressant (Copaxone), to reduce nerve neuropathy (Gabatentin), a nerve activity suppressant (Nortriptyline), an anti-depressant (Duloxetine), and a non-steroidal anti-inflammatory agent (Ibuprofen). He takes a non-steroidal anti-inflammatory agent (Aspirin) and an angiotensin-converting enzyme inhibitor (Lisinopril) to control his blood pressure. Most of these medications are considered to promote heat-sensitivity.

231.     McGruder's thermoregulatory systems, characterized as a major life activity, are impaired by his disabilities and medications. During extreme temperatures, his hypertension impairs his respiratory, circulatory, and cardiovascular system.

232.     McGruder takes a diuretic that negatively affects his ability to retain fluids necessary for hydration to minimize the effects of heat-related illness.

233.     The heat makes it difficult to sleep, a major life activity; day or night it is unrelenting. Compounding the strain of sleepless days and nights, the oppressive heat taxes his body even further, leaving him exhausted and frustrated.

234.     Due to his restrictions of: "No Temperature Extremes," "No Humidity Extremes," and "No Work in Direct Sunlight" on his HRS-18, he is unable to go outside for recreation or work outside or in areas of temperature and/or humidity extremes, where he would be more susceptible to suffering from heat-related illness. As it is, his M.S. has reduced his movements so severely, he will never work again in his life, a major life activity.

235.     McGruder's M.S. is very heat and humidity sensitive. Heat causes the effects of M.S. to accelerate, causing additional permanent damage. M.S. has no cure. M.S. causes his immune system to attack and destroy the myelin (the insulation) covering the nerve fibers. It produces plaques on the brain and optic nerves which disrupt normal commands to the body and its extremities. The more heat and humidity he's exposed to, the more damage occurs such as his extensive nerve neuropathy "bee stings", muscle spasms, extreme fatigue, loss of balance, degenerative eyesight, and toe drag syndrome where nerve loss in each leg prevents the raising of the toes upon each step. Stress and excessive heat are the major issues inducing M.S. The disease continues to progress and damage additional parts of his body. There is no cure for M.S.

236.    McGruder must not only contend with an M.S. condition that is exacerbated by the heat and humidity, but he must also deal with his lack of motor skills (M.S. induced) in virtually all of his extremities which means that he must utilize a walker to get from place to place, a major life activity, and his movements can be described as slow and robotic, and at all times painful.

237.    Travel to TDCJ/UTMB-HG for Neurology or any other appointment is very problematic. He has specific Rx's that are non-formulary and very expensive. Via the chain bus, a normal round trip to HG will involve a minimum of five days of travel and "lodging" at other units.

238.    Travel includes: the stress of inventorying all possessions, packing up, movement starting at 0230 in the morning, transport after 0600, arriving and residing at a transfer unit until the HG appointment day arrives. Then, the process begins again at the transfer unit to HG. Then, return from HG to the transfer unit, and in-process. Then, on the future day when transportation is available, do the process again and return to the Luther Unit for in-processing, bunk assignment, and property transfer/pickup. Once he is at his bunk, he must unpack everything and arrange his cubicle.

239.    He is not allowed to be transported with his Luther-pharmacy-only Rx's. The "lodging" unit pharmacies do not stock the specific M.S. Rx's that he utilizes multiple times per day for pain and spasm relief, nor the immune system suppressant that must be injected on a rigid schedule, several times per week.

240.    As a roundtrip; from the Luther Unit to the transfer unit, from the transfer unit to HG, from the transfer unit, and finally back to the Luther Unit normally requires at least five days, he must endure this trip without pain or immune system suppressant Rx's, and the stress and excessive heat during the trip cause additional pain and damage to his body.

241.    McGruder meets all the criteria per the ADA, RA, and the ADAAA, as a qualified individual with at least one disability. He:

        a.  has a physical or mental impairment that substantially limits one or more major life activities of this individual;

        b.  along with TDCJ, CMHCC, UTMB, and his free-world physicians have records and knowledge of his impairments; and/or

        c.  has been regarded as having such an impairment and establishes that he has been subjected to an action prohibited under the ADA, RA, and/or ADAAA because of an actual or perceived physical and mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

242.    TDCJ, CMHCC, and UTMB officials knew of personal heat issues and selectively did not give him relief, and as such he has not been provided equal accommodations, programs, and services per the ADA, RA, and ADAAA.

243.    Prior to coming to TDCJ this inmate was eligible for and received SSI disability payments.

### 5.    Quintanilla Suffers from Heat-Related Disabilities and is at Increased Risk

244.    Brian Quintanilla suffers from several medical conditions and/or disabilities that increase his risk of heat-related illnesses, injuries, and/or death. For example, he suffers from Post Traumatic Stress Disorder (PTSD), migraines, mood disorders, nightmares, and flashbacks—all mainly attributed to his military service (Operation Enduring Freedom (OEF), Afghanistan, 2006-2008).

245.    Quintanilla's psychiatric disorders require treatment with an anti-depressant (Sertraline) and an anti-convulsant (Carbamazepine). These medications are considered to promote heat-sensitivity.

246. These disorders and medications impair Quintanilla's thermoregulatory system, a major life activity.

247. In the summer, his psychiatric medications make him feel dizzy and light-headed because of the excessive heat and he is very susceptible to heat-related illnesses due to a failure in the thermoregulation systems. This prevents him from engaging in multiple major life activities such as sleeping, which causes him to have "low-energy" and have negative thoughts about his surroundings and himself.

248. Quintanilla has other major life activities that are impaired by his psychiatric disorders. He experiences problems with his motor skills, which are compounded by excessive heat. Worse, the heat stresses him, further frustrating him and exacerbating his psychiatric condition.

249. Due to his restrictions of: "No Temperature Extremes," "No Humidity Extremes," and "No Work in Direct Sunlight" on his HRS-18, he is unable to go outside for recreation, work outside, or in areas of temperature and/or humidity extremes, where he would be more susceptible to suffering from heat-related illness.

250. Quintanilla meets all the criteria per the ADA, RA, and the ADAAA, as a qualified individual with at least one disability. He:

      a. has a physical or mental impairment that substantially limits one or more major life activities of this individual;

      b. along with TDCJ, CMHCC, UTMB, and his free-world physicians have records and knowledge of his impairments; and/or

      c. has been regarded as having such an impairment and establishes that he has been subjected to an action prohibited under the ADA, RA, and/or ADAAA because of

an actual or perceived physical and mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

251.   TDCJ, CMHCC, and UTMB officials knew of personal heat issues and selectively did not give him relief, and as such he has not been provided equal accommodations, programs, and services per the ADA, RA, and ADAAA.

### 6.   Sain Suffers from Heat-Related Disabilities and is at Increased Risk

252.   John Sain suffers from several medical conditions and/or disabilities that increase his risk of heat-related illnesses, injuries, and/or death. For example, he suffers from M.S., hypertension, obesity, vitamin deficiencies, prostate problems, major depression, numerous medicinal and food allergies, and hypoglycemia. He has had several surgeries with one resulting in the disconnection and removal of his stomach and a large portion of his small intestine.

253.   For Sain's M.S. he takes an immune system suppressant (Avonex injections), to reduce nerve neuropathy (Gabapentin), to reduce muscle spasms (Baclofen), and pain reduction from his M.S. and arthritis (Acetaminophen). For his hypertension he takes a diuretic (Hydrochorothiazide). To reduce gastric bleeding (Omeprazole) and for blood chemistry problems, B-12 (Cyanocobalamin) and low vitamin D (Calcium). For his prostate he takes an Alpha Blocking agent (Terazosin). He takes an anti-depressant (Sertraline). He also takes an anti-histamine for some allergies (Loratadine). Most of these medications are considered to promote heat-sensitivity.

254.   Sain's thermoregulatory systems, categorized as a major life activity, are impaired by his disabilities and medications. During extreme temperatures, his hypertension impairs his respiratory, circulatory, and cardiovascular system.

255.   Sain takes a diuretic that negatively affects his ability to retain fluids necessary for hydration to minimize the effects of heat-related illness.

256.   Sain being classified as obese, based on body mass index, coupled with the excessive indoor heat and humidity at the Luther Unit, interferes with major life activities, such as walking, climbing stairs, standing, lifting, or even sedentary activities such as reading or writing.

257.   The heat makes it difficult to sleep, a major life activity; specifically, he gets so hot at night that his mattress always seems soaked through with sweat. Compounding the strain of sleepless nights, the oppressive daytime heat taxes his body even further, leaving him exhausted and frustrated.

258.   In the summer, his psychiatric medications make him feel dizzy and light-headed because of the excessive heat and he is very susceptible to heat-related illnesses due to a failure in the thermoregulation systems. This prevents him from engaging in multiple major life activities such as sleeping, which causes him to have, "low-energy" and have negative thoughts about his surroundings and himself.

259.   Due to his restrictions of: "No Temperature Extremes", "No Humidity Extremes", and "No Work in Direct Sunlight" on his HRS-18, he is unable to go outside for recreation or work outside, both major life activities, or in areas of temperature and/or humidity extremes, where he would be more susceptible to suffering from heat-related illness.

260.   Sain's M.S. is very heat and humidity sensitive. Heat causes the effects of M.S. to accelerate causing additional permanent damage. M.S. has no cure. M.S. causes his immune system to attack and destroy the myelin (the insulation) covering the nerve fibers. It produces plaques on the brain and optic nerves which disrupt normal commands to the body and its extremities. The more heat and humidity he is exposed to, the more damage occurs such as his extensive nerve neuropathy "bee stings", muscle spasms, extreme fatigue, loss of balance, degenerative eyesight, and toe drag syndrome where nerve loss in each leg prevents the raising of the toes upon each step. Stress and

excessive heat are the major issues inducing M.S. The disease continues to progress and damage additional parts of his body. There is no cure for M.S.

261.    Travel to TDCJ/UTMB-HG for Neurology or any other appointment is very problematic. He has specific Rx's that are non-formulary and very expensive. Via the chain bus, a normal round trip to HG will involve a minimum of five days of travel and "lodging" at other units.

262.    Travel includes: the stress of inventorying all possessions, packing up, movement starting at 0230 in the morning, transport after 0600, arriving and residing at a transfer unit until the HG appointment day arrives. Then, the process begins again at the transfer unit to HG. Then, return from HG to the transfer unit, and in-process. Then, on the future day when transportation is available, do the process again and return to the Luther Unit for in-processing, bunk assignment, and property transfer/pickup. Once he is at his bunk, he must unpack everything and arrange his cubicle.

263.    He is not allowed to be transported with his Luther Unit-pharmacy-only Rx's. The "lodging" unit pharmacies do not stock the specific M.S. Rx's that he utilizes multiple times per day for pain and spasm relief, nor the immune system suppressant that must be injected on a rigid schedule.

264.    As a roundtrip; from the Luther Unit to the transfer unit, from the transfer unit to HG, from the transfer unit, and finally back to the Luther Unit normally requires at least five days, he must endure this trip without pain or immune system suppressant Rx's, and the stress and excessive heat during the trip cause additional pain and damage to his body.

265.    Sain meets all the criteria per the ADA, RA, and the ADAAA, as a qualified individual with at least one disability. He:

a. has a physical or mental impairment that substantially limits one or more major life activities of this individual;

b. along with TDCJ, CMHCC, UTMB, and his free-world physicians have records and knowledge of his impairments; and/or

c. has been regarded as having such an impairment and establishes that he has been subjected to an action prohibited under the ADA, RA, and/or ADAAA because of an actual or perceived physical and mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

266.   TDCJ, CMHCC, and UTMB officials knew of personal heat issues and selectively did not give him relief, and as such he has not been provided equal accommodations, programs, and services per the ADA, RA, and ADAAA.

267.   Prior to coming to TDCJ this inmate was eligible for and received SSI disability payments.

268.   Additionally, Sain qualified for and continues to receive from the Veteran's Administration, monthly service connected disability payments.

**7.    Smith Suffers from Heat-Related Disabilities and is at Increased Risk**

269.   Jerry Smith suffers from several medical conditions and/or disabilities that increase his risk of heat-related illnesses, injuries, and/or death. For example, he suffers from shortness of breath and dizziness due to a combination of age and heat. Additionally, a hip replacement (with pin inserted) has left him with a shorter right leg. He does not/cannot go to Luther Unit's communal shower-box as the facility does not incorporate handicap showers in quantity or in serviceable condition with attachments to prevent long waits or non-useable status. It's only with the use of a cane that he can walk, stand, or maintain his balance.

270.    These disabilities, coupled with his age of 66, along with the heat and humidity, impair Smith's thermoregulatory system, a major life activity. His restrictions reflect the need for a sedentary lifestyle.

271.    The heat makes it difficult to sleep, a major life activity; day and night the heat is unrelenting. Compounding the strain of sleepless days and nights, the oppressive heat taxes his body even further, leaving him exhausted.

272.    Smith meets all the criteria per the ADA, RA, and the ADAAA, as a qualified individual with at least one disability. He:

      a.   has a physical or mental impairment that substantially limits one or more major life activities of this individual;

      b.   along with TDCJ, CMHCC, UTMB, and his free-world physicians have records and knowledge of his impairments; and/or

      c.   has been regarded as having such an impairment and establishes that he has been subjected to an action prohibited under the ADA, RA, and/or ADAAA because of an actual or perceived physical and mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

273.    TDCJ, CMHCC, and UTMB officials knew of personal heat issues and selectively did not give him relief, and as such he has not been provided equal accommodations, programs, and services per the ADA, RA, and ADAAA.

274.    Prior to coming to TDCJ this inmate was eligible for and received SSI disability payments.

**8.    Wilson Suffers from Heat-Related Disabilities and is at Increased Risk**

275.    David Wilson suffers from several medical conditions and/or disabilities that increase his risk of heat-related illnesses, injuries, and/or death. For example, he suffers from obesity, poor vision, and cellulitis in his lower legs.

276.    Wilson's medical conditions require treatment with a topical dermatological ointment and an NSAID/Oxicam.

277.    These disabilities impair Wilson's thermoregulatory system, a major life activity.

278.    Wilson being classified as obese, based on body mass index, coupled with the excessive indoor heat and humidity at the Luther Unit, interferes with major life activities, such as walking, climbing stairs, standing, lifting, or even sedentary activities such as reading and writing.

279.    Wilson is obese but he has NO restrictions of: "No Temperature Extremes," "No Humidity Extremes," and "No Work in Direct Sunlight" on his HRS-18. Being obese he is more susceptible to suffering from heat-related illness. Without regard to this lack of restrictions, he works in the main building laundry enduring long hours in the hot and humid conditions.

280.    Wilson has other major life activities that are impaired by his poor vision and cellulitis, which are also severely limited by heat. He cannot stand, walk, lift, or otherwise exert himself physically without feeling fatigued, especially during the summer when the indoor apparent temperatures are very high.

281.    The heat makes it difficult to sleep, a major life activity; and oppressive daytime heat taxes his body even further, leaving him exhausted.

282.    Wilson meets all the criteria per the ADA, RA, and the ADAAA, as a qualified individual with at least one disability. He:

a.   has a physical or mental impairment that substantially limits one or more major life activities of this individual;

b.   along with TDCJ, CMHCC, UTMB, and his free-world physicians have records and knowledge of his impairments; and/or

c.   has been regarded as having such an impairment and establishes that he has been subjected to an action prohibited under the ADA, RA, and/or ADAAA because of an actual or perceived physical and mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

283.   TDCJ, CMHCC, and UTMB officials knew of personal heat issues and selectively did not give him relief, and as such he has not been provided equal accommodations, programs, and services per the ADA, RA, and ADAAA.

**H.     Other Inmates At The Luther Unit Are At Increased Risk Of Heat-Related Injuries**

284.   The medical conditions of Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson are typical of other inmates at the Luther Unit. Like these Plaintiffs, many other inmates at the Luther Unit suffer from physiological conditions including: amyotrophic lateral sclerosis, arthritis, asthma, cardiovascular disease, cerebral palsy, chronic obstructive pulmonary disease (COPD), cirrhosis of the liver, cystic fibrosis, depression, diabetes, hypertension, multiple sclerosis (M.S.), muscular dystrophy (M.D.), obesity, seizure disorders, Sjogren's syndrome, spastic hemiplegia, spinal cord injuries, sweat gland dysfunction, thyroid dysfunction, psychiatric conditions and mental illness treated with psychotropic Rx's, and others as recommended that place them at increased risk of heat-related illnesses, injuries, and/or death. Like these Plaintiffs, many other inmates at the Luther Unit are prescribed Rx's such as: anti-cholinergics, anti-convulsants, anti-depressants, anti-histamines, anti-psychotics, beta blockers,

diuretics, immune system suppressants, psychotropics, and others as recommended. Like Smith, many other inmates at the Luther Unit are over age 65.

285.    Because TDCJ classifies the Luther Unit as a "24/7 Medical" facility, the Unit houses a disproportionate number of inmates with chronic health needs. Upon information and belief, approximately 472 inmates housed there suffer from physiological and psychological conditions or take medications that increase their risk of heat-related illnesses, injuries, and/or death.

286.    Plaintiffs take their Rx medications to protect their health from their disabilities.

287.    Plaintiffs believe the conditions at the Luther Unit mirror those of the Pack Unit and the effects upon its inmates.

> "Accordingly, the Court finds and concludes that, during the summer months, the men incarcerated in the Pack Unit face, on a daily basis, temperatures that substantially increase their risk of heat-related illness, aggravate any underlying medical conditions, or both. While this risk is pronounced even for young and healthy individuals, the risk increases significantly for individuals with certain medical conditions, who are on certain medications, and/or who are above the age of 65." *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, p. 42, I., D., 4., para. 6.

**I.    Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, Wilson, And Many Others At The Luther Unit Suffer From Qualifying Heat-Related Disabilities**

288.    There are hundreds of otherwise qualified inmates with heat-sensitive disabilities housed at the Luther Unit, including the following:

### 1.    The Effects of Heat on an Individual with Comorbidities

289.    "Individuals with certain conditions are at higher risk for heat-related illnesses, as those conditions impede thermoregulatory functioning. Conversely, heat stress often exacerbates the underlying condition, which can lead to permanent injury and/or death. Dr. Vassallo contends that "many more people die each year from heat-induced exacerbations of underlying medical vulnerabilities than die from heat stroke." Docket Entry No. 340-18 at 10. The diseases or conditions that are widely believed to increase the risk of heat illness are described below, in no particular order. The majority of these conditions are already recognized in CMHCC's list of *Common Comorbidities That May Affect Heat Tolerance.*" (*emphasis added*) Defs.' Ex. 4 at 10. The document indicates that the list is not all-inclusive, and notably absent from the list is obesity, which both Plaintiffs' and Defendants' experts averred should be included on the list. Docket Entry No. 465 at 62; Hearing Tr. 7 at 73-74." *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, p. 32, 1., para. 1.

#### a)    Advanced Age

"Individuals who are over the age of 65 are at increased risk for heat-related illness for several reasons. Docket Entry No. 465 at 89. One reason is that, as a person ages, his cardiovascular reserve decreases, limiting the ability of the heart to pump as hard and fast as required by heat stress. *Id.* A person's ability to sense temperature will also decrease with age. *Id.* Furthermore, sweat gland functioning decreases, impeding the body's ability to cool itself through perspiration. *Id.* Thus, both of the major physiological systems responsible for thermoregulating are negatively

impacted by advanced age. *Id.* at 90." *Cole v. Collier, supra,* Doc. 737, p. 34, 1., e.

b)      **Cardiovascular Disease**

"Cardiovascular disease, which includes chronic hypertension and arteriosclerosis, causes a decrease in a person's "cardiac reserve"—the ability to increase cardiac output. Hearing Tr. 7 at 18; Docket Entry No. 340-18 at 14. This means that the heart of an individual with cardiovascular disease cannot pump as hard or as fast as necessary to dissipate heat through vasodilation, impacting the individual's ability to thermoregulate. Hearing Tr. 7 at 18. The stress that is placed on the heart from having to pump harder and faster than normal can also cause damage to the heart, and in some cases can cause the heart to fail. *Id.*" *Cole v. Collier, supra,* Doc. 737, p. 33, 1., c.

c)      **Hypertension**

(1)      Hypertension is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems.

(2)      Hypertension also causes severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

(3)      Consequently, TDCJ policy recognizes patients taking diuretics or beta blockers to treat hypertension are at increased risk

of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95°F or higher."

(4)     Hypertension can substantially limit a patient's ability to walk, stand, and breathe, and limit the operation of his respiratory, circulatory, and cardiovascular systems, especially when the patient is exposed to extreme temperatures.

(5)     A patient with hypertension will be at additional risk of heat-related injuries and suffer additional pain and punishment **ABOVE AND BEYOND** what an able-bodied inmate at the Luther Unit experiences.

(6)     As in the *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 33, para. 175, expert witnesses have testified that hypertension increases the risk of heat-related illness.

(7)     The Defendants are aware that hypertension increases patients' risk of heat-related illness.

(8)     Upon information and belief, approximately 210 inmates at the Luther Unit suffer from hypertension.

**d)     Diabetes**

"Diabetes causes microcirculatory changes that result in blood vessels that are unable to dilate adequately (a condition known as arteriosclerosis). Hearing Tr. 7 at 18-19; Docket Entry No. 340-18 at 14. This impairs the body's ability to circulate blood to the brain and heart,

disrupting the vasodilatory response to heat. Docket Entry No. 340-18 at 14. Diabetes may also impair kidney function, and the kidneys' ability to maintain salt-water balance is an important part of the body's response to heat. *Id.*" *Cole v. Collier, supra,* Doc. 737, p. 32, 1., a.

(1)     Diabetes is a chronic disease caused by an insulin imbalance. Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from improper insulin levels. Diabetes is a physical condition affecting the endocrine, digestive, circulatory, and nervous systems.

(2)     Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

(3)     As in the *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 34, para. 186, expert witnesses have testified that diabetes increases the risk of heat-related illness.

(4)     The Defendants are aware that diabetes increases the risk of heat-related illness.

(5)     Upon information and belief, approximately 105 inmates at the Luther Unit suffer from diabetes.

e)      **Obesity**

"Obesity causes an increased risk of heat-related illness because excess fat beneath the skin can impair the skin's ability to dissipate heat. Docket Entry No. 465 at 117. The connection between obesity and heat-related illness has been demonstrated in scientific studies, and Defendants' expert does not deny the association. *Id.*; Hearing Tr. 7 at 74. The Court thus finds and concludes that obesity is a common comorbidity that affects heat tolerance, despite its absence from CMHCC's list." *Cole v. Collier, supra,* Doc. 737, p. 33, 1., b.

(1)      The Defendants are aware that obesity increases the risk of heat-related illness.

(2)      Upon information and belief, approximately 125 inmates at the Luther Unit suffer from obesity.

f)      **Psychiatric Conditions**

"Individuals suffering from psychiatric diseases are at an increased risk of heat-related illnesses because they may have impaired behavioral responses to heat stress. Docket Entry No. 340-18 at 15. They may not have the ability to reason or to help themselves during a period of heat stress, because their illness may adversely affect their mood, thinking, or behavior. *Id.* More specifically, individuals suffering from depression or anxiety may be unable to communicate well with others or may experience apathy in the face of challenging circumstances, such as heat stress. *Id.* In sum, individuals with psychiatric conditions may not be able to take advantage

of mitigating measures, recognize the symptoms of heat-related illness when they occur, or ask for help when needed. *Id.*" Cole *v. Collier, supra,* Doc. 737, pp. 33-34, 1., d.

**(1)   Schizoaffective Disorder**

a.   Schizoaffective disorder is a chronic mental illness in which a person suffers from both symptoms of schizophrenia and a mood disorder (such as major depression or bipolar disorder). Symptoms include paranoia, delusions, hallucinations, severe depression, mania, and thoughts of suicide.

b.   Schizoaffective disorder requires treatment with psychotropic drugs.

c.   Schizoaffective disorder impairs the operation of the brain.

d.   Schizoaffective disorder limits patients' ability to think, concentrate, work, care for themselves, see, hear, and sleep.

e.   According to TDCJ's medical policies, psychotropic drugs increase a patient's vulnerability to heat-related medical conditions, like heat exhaustion and heat stroke.

f.   The Defendants are aware that schizoaffective disorder (and the medications used to treat it) increase the risk of heat-related illness.

g.   Upon information and belief, approximately 45 inmates at the Luther Unit are treated for this disease.

(2)     **Major Depression**

a.  Major depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, and problems concentrating.

b.  Depression is a physiological condition affecting body systems, including the brain.

c.  As in the *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, pp. 36-37, para. 205-207, expert witnesses have testified patients with depression may experience difficulty caring for themselves. TDCJ does not dispute this.

d.  TDCJ's medical provider identifies anti-depressant medications, like Prozac, as putting patients at much higher risk of heat-related illness. In fact, when a patient is prescribed an anti-depressant, the physician should inform the patient that these medications, "can affect the manner in which the body relates to excessive heat especially in the summer." The patient is told to, "contact nursing/security if they feel dizzy, confused, or over heated" so their vital signs can be checked. The patient is warned, "excessive heat can cause life threatening conditions," and should be told to,

"drink plenty of water when the heat is extreme." Despite this explicit warning, the Defendants do nothing to protect inmates taking such medications from the extreme temperatures inside the housing, work, program, activity, and service areas.

e. The Defendants are aware that depression (and the medications used to treat it) increases the risk of heat-related illness.

**(3)    Psychotropic Drug Usage**

a. The Defendants are aware that psychotropic drug usage increases the risk of heat-related illness.

b. Upon information and belief, approximately 165 inmates at the Luther Unit take psychotropic drugs.

**g)    Pulmonary Disease**

"People with pulmonary disease, such as Chronic Obstructive Pulmonary Disease ("COPD"), have diseased lungs that cause problems with oxygenation and ventilation. Docket Entry No. 340-18 at 14. COPD is an umbrella term for various lung diseases, including emphysema and asthma. People with COPD have a limited ability to oxygenate the body, and any stressor to the lungs, such as heat and humidity, will worsen their underlying condition. *Id.* Furthermore, pollutants are worse in hot weather, and pollutants exacerbate asthma. *Id.* These conditions also make people

more susceptible to illnesses precipitated by excessive heat. *Id.*" *Cole v. Collier, supra,* Doc. 737, p. 34, 1., para. f.

**(1)    Asthma**

    a. Asthma is a chronic lung disease that inflames and narrows the airways. It substantially limits sufferers' ability to breathe, causing recurring periods of wheezing, chest tightness, shortness of breath, and coughing. Asthma also substantially limits the operation of the respiratory system.

    b. Pollutants, heat, and humid air can trigger asthma symptoms, causing asthma patients to suffer more pain and punishment in hot environments than people without asthma.

    c. TDCJ's medical provider recognizes that asthma is a condition that places patients at increased risk of heat-related illnesses, injuries, and/or death. As in the *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 34, para. 180-181, expert witnesses have testified that asthma increases the risk of heat-related illness.

    d. The Defendants are aware that asthma places patients at increased risk of heat-related illness.

    e. Upon information and belief, approximately 80 inmates at the Luther Unit suffer from asthma.

(2) **Chronic Obstructive Pulmonary Disease (COPD)**

    a.  COPD is a disease that makes it difficult to breathe. It includes chronic bronchitis and emphysema.

    b.  COPD causes frequent coughing, shortness of breath, tightness in the chest, and difficulty breathing, among other symptoms.

    c.  COPD impairs the operation of the respiratory, circulatory, and cardiovascular systems.

    d.  Heat and humidity exacerbate COPD because the body needs to breathe in additional oxygen to help cope with the heat.

    e.  As in the *Cole v. Collier, supra,* Doc., 629, 3rd Amended Class Action Complaint, p. 35, para. 193 expert witnesses have testified that COPD increases the risk of heat-related illness.

    f.  The Defendants are aware that COPD increases the risk of heat-related illness.

    g.  Upon information and belief, approximately 75 inmates at the Luther Unit suffer from COPD.

h) **Sweat Gland Dysfunction**

    "Although sweat gland dysfunction was not discussed by Plaintiffs' expert or Defendants' expert, it is on CMHCC's list of common comorbidities that affect heat tolerance. It is clear to the Court, based on

other testimony, that if a person's sweat glands do not function properly, the body's ability to cool itself through perspiration will be impeded, leading to an increased risk of heat-related illness." *Cole v. Collier, supra,* Doc. 737, pp. 34-35, 1., g.

i)      **Cirrhosis of the Liver, Cystic Fibrosis, & Thyroid Dysfunction**

"Despite their presence on CMHCC's list of common comorbidities, neither party's expert discussed the physiological reasons why cirrhosis of the liver, cystic fibrosis, and thyroid dysfunction lead to an increased risk of heat-related illness. However, both experts testified that these conditions create an increased risk, and the Court has no grounds on which to question this assertion." *Cole v. Collier, supra,* Doc. 737, p. 35, 1., h.

2.      **The Effects of Heat on an Individual Taking Certain Medications**

290.    "In addition to underlying conditions that exacerbate the effect of heat on the body, certain medications can impede the body's ability to thermoregulate, thereby increasing the likelihood of heat-related illness. This can occur in a variety of ways, usually by impacting the two major heat regulation systems—perspiration and vasodilation—or by affecting the body's "thermostat"—the hypothalamus. There is very little dispute among the parties about the effects of certain medications on the body's ability to thermoregulate. Indeed, the categories of drugs described below come from CMHCC's own list of *Drugs Associated with Heat Stress. (emphasis added)* Defs.' Ex. 4 at 7." *Cole v. Collier, supra,* Doc. 737, p. 35, 1., para. 2.

a)      **Anticonvulsants**

"Anticonvulsants increase the likelihood of heat illness by affecting the neurotransmitters that allow the hypothalamus to function. Docket Entry

No. 465 at 63-64. The hypothalamus is then impeded in its ability to monitor and regulate body temperature through perspiration and vasodilation. *Id.*" *Cole v. Collier, supra,* Doc. 737, p. 35, 2., a.

**b)**      **Anticholinergics & Antihistimines**

"Anticholinergics and antihistimines are used to treat a variety of conditions, including respiratory disorders. They work by blocking acetylcholine, which is the neurotransmitter that drives sweat glands. *Id.* at 64-65. Thus, anticholinergics and antihistimines increase the likelihood of heat illness by interfering with the body's ability to sweat. Anticholinergics and antihistimines also impact the hypothalamus, though those effects are less understood. *Id.*" *Cole v. Collier, supra,* Doc. 737, at 66. p. 35, 2., b.

**c)**      **Antipsychotics**

"Antipsychotics block acetylcholine, similar to anticholinergics and antihistimines. Thus, antipsychotics inhibit the body's ability to sweat. *Id.* at 65. Antipsychotics also affect dopamine, which is one of the major neurotransmitters involved with the hypothalamus. *Id.* Like anticonvulsants, antipsychotics impede the hypothalamus's ability to monitor and regulate body temperature. *Id.* Finally, antipsychotics can affect the body's ability to vasodilate properly. *Id.* Thus, antipsychotics negatively impact the bodily systems used to regulate temperature, as well as the part of the brain responsible for those systems. All antipsychotics come with a specific warning from the manufacturers to avoid heat and dehydration, as noted in CMHCC's heat policy. Defs.' Ex. 4 at 7.

Additionally, CMHCC's policy states that "offenders on antipsychotic drugs should not be allowed to work or recreate in environments where the apparent air temperature is 95 degrees or higher." *Id.*" *Cole v. Collier, supra,* Doc. 737, p. 36, 2., c.

**d)**   **Antidepressants**

"The antidepressants listed in CMHCC's heat policy are all cyclic antidepressants, which means they are strongly anticholinergic, and therefore impede the body's ability to perspire. Docket Entry No. 465 at 66. They also impact the hypothalamus. *Id.*" *Cole v. Collier, supra,* Doc. 737, p. 36, 2., d.

**e)**   **Antimanics**

"According to Dr. Vassallo, lithium, which is the primary drug prescribed to treat mania, does affect the body's ability to thermoregulate, by impacting electrolytes, renal effects, and the kidney system. Docket Entry No. 465 at 66. CMHCC states, on the other hand, that lithium does not disrupt the body's ability to thermoregulate. Defs.' Ex. 4 at 7. However, lithium is on CMHCC's list of drugs associated with heat stress because, "if an offender treated with lithium becomes dehydrated, they are at an increased risk of lithium toxicity." *Id.* Because both parties recognize that individuals taking lithium are at an increased risk from heat stress, the Court finds that it does not need to resolve the issue of whether lithium affects the body's ability to thermoregulate." *Cole v. Collier, supra,* Doc. 737, p. 37, 2., e.

**f)      Beta Blockers & Calcium Channel Blockers**

"Beta blockers and calcium channel blockers are used to treat cardiovascular disease. Docket Entry No. 340-18 at 15. They work by impairing the heart's ability to squeeze, and reducing the speed at which the heart beats, thereby lowering cardiac output. *Id.* However, this also means that the heart cannot pump as fast or as hard as it would need to in order to dissipate heat through vasodilation. Docket Entry No. 465 at 67." *Cole v. Collier, supra,* Doc. 737, p. 37, 2., f.

**g)      Diuretics**

"Diuretics—also known as "water pills"—cause a loss of fluid from the body and can be dehydrating. *Id.*" *Cole v. Collier, supra,* Doc. 737, p. 37, 2., g.

**3.      The Effects of Heat on an Individual with Multiple Comorbidities and/or Who Takes Certain Medications**

291.    "Dr. McGeehin credibly testified that an individual with any one of the above-described medical conditions, or taking any of the above medications, will be at an increased risk for heat-related illness. Docket Entry No. 460 at 62. This risk is further heightened, Dr. McGeehin stated, when an individual has some combination of the conditions and/or medications, particularly those individuals over the age of 65. *Id.* Indeed, CMHCC's own policy states that offenders who take medications on the ***"Drugs Associated with Heat Stress" (emphasis added)*** list should not be allowed to work or recreate in environments where the apparent air temperature is 95 degrees or higher if they are on more than one such medication, or if they also have an underlying medical

condition that places them at increased risk.[17] Defs.' Ex. 4 at 7." *Cole v. Collier, supra,* Doc. 737, pp. 37-38, 3., para. 1.

---

[17] The policy also mandates that individuals on antipsychotics be given a heat restriction. Defs.' Ex. 4 at 7. The Court notes and discusses in more detail in Section I.G.1.c, that heat restrictions in TDCJ apply to work assignments, but have no impact on the placement of an inmate in one of the 32,000 air-conditioned beds that exists in TDCJ. Hearing Tr. 5 at 85

292. "The Court finds and concludes that heat stress can lead to heat-related illnesses even in young and healthy individuals. However, this risk is heightened when an individual is over the age of 65, has a condition that impedes the body's ability to thermoregulate, or takes a medication that impedes the body's ability to thermoregulate. This risk is further heightened when these conditions and medications are combined in any way." *Cole v. Collier, supra,* Doc. 737, p. 38, 3., para. 3.

### J.    Though Plaintiff Pruitt Does Not Suffer From Heat-Related Disabilities, He Still Experiences Symptoms Of Heat-Related Illness Each Summer

293. Brandon Pruitt has not been diagnosed with any medical conditions that make him sensitive to the heat. He also does not take any medications that make him more heat sensitive.

294. Nevertheless, Pruitt suffers from the heat inside his dorm during summers at the Luther Unit. He reports sweating excessively during most summers, even at rest. He also reports feeling exhausted far more easily, and has difficulty sleeping during the summer.

295. Pruitt has suffered from painful heat cramps while incarcerated at the Luther Unit.

296. Thus, even inmates without heat-sensitive medical conditions suffer at the Luther Unit due to the high indoor apparent temperatures and cruel conditions. Plaintiffs believe the conditions at the Luther Unit mirror those of the Pack Unit and the effects upon its inmates.

"But for purposes of litigation, the Court has no basis upon which to question Dr. Vassallo's choice of 88 degrees as a threshold above which the risk of heat-related illness increases, and the Court finds that this choice is sound. Specifically, with regard to

Plaintiffs in this case, Dr. Vassallo concluded that all of the inmates at the Pack Unit, "including young and healthy men with no known medical problems, are at substantial risk for serious heat-related disorders during periods of persistent exposure to a heat index above 88 degrees." Docket Entry No. 340-18 at 11. The Court agrees. [18]" *Cole v. Collier, supra,* Doc. 737, Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, p. 40, I., D., 4., para. 2.

---

[18] Defendants do not appear to dispute this finding. They presented no evidence at the 2017 hearing alleging that inmates are not placed at a risk of harm by the temperatures and humidity at the Pack Unit. Although Dr. Kathryn Means, who testified at the 2016 hearing, took issue with Dr. Vassallo's application of epidemiological studies to the population at the Pack Unit, the Court found her testimony to be biased and not credible. Docket Entry No. 473 at 10. Instead, Defendants contend that any risk has been effectively mitigated by the measures currently in place at the Pack Unit. Docket Entry 641 at 9 ("The protective measures currently in place at the Pack Unit are effective and ameliorate the risk that inmates might otherwise face in the summer temperatures without the measures.").

## V.  CLASS ACTION

297.  Pursuant to Fed. R. Civ. P. Rule 23(a), Rule 23(b)(2), Rule 23(g)(3), Rule 23(g)(1) Plaintiffs bring this action on behalf of themselves and all similarly-situated persons.

### A.  Classes—Qualifying Attributes

298.  Plaintiffs seek to certify a class and two sub-classes for injunctive and declaratory relief under the ***Eighth*** and ***Fourteenth Amendments***. Plaintiffs also seek to certify one of the two sub-classes for injunctive and declaratory relief under the ADA, RA, ADAAA.

299.  Plaintiffs propose to represent a **General Class** composed of all inmates who:

1.  are currently incarcerated at the Luther Unit (or will be in the future), and

2.  are subjected to TDCJ's policy and practice of failing to regulate high, apparent indoor temperatures in the housing, work, program, activity, and service areas.

3.  Each Plaintiff is typical of the class members.

300.  Plaintiffs also seek to represent the following sub-classes of inmates who:

1. are currently incarcerated at the Luther Unit (or will be in the future), and

2. are subjected to TDCJ's policy and practice of failing to regulate high, apparent indoor temperatures in the housing, work, program, activity, and service areas, and either:

    a. **Heat-Sensitive Subclass who:**

        i. have a physiological condition that places them at increased risk of heat-related illnesses, injuries, and/or death including, but not limited to those who suffer from: amyotrophic lateral sclerosis, arthritis, asthma, cardiovascular disease, cerebral palsy, chronic obstructive pulmonary disease (COPD), cirrhosis of the liver, cystic fibrosis, depression, diabetes, hypertension, multiple sclerosis (M.S.), muscular dystrophy (M.D.), obesity, seizure disorders, Sjogren's syndrome, spastic hemiplegia, spinal cord injuries, sweat gland dysfunction, thyroid dysfunction, psychiatric conditions and mental illness treated with psychotropic Rx's, and others as recommended; and/or,

        ii. are prescribed, but not limited to, Rx's such as: anti-cholinergics, anti-convulsants, anti-depressants, anti-histamines, anti-psychotics, beta blockers, diuretics, immune system suppressants, psychotropics, and others as recommended; and/or

        iii. are over the age 65.

        iv. Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson are typical members of this subclass.

     b.    **Disability Subclass who:**

        i.    suffers from one or more disabilities that substantially limits one or more of their major life activities; and/or

        ii.    who are at increased risk of heat-related illnesses, injuries, and/or death due to their disability; and/or

        iii.    have or had any medical treatment necessary to treat their disability; and/or

        iv.    stand regarded as having such an impairment or disability.

        v.    Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson are typical members of this subclass.

## B.    Numerosity

301.    The joinder of each class member would be impracticable because each class is so numerous. The approximate number of class members exceeds 1,263 as the Luther Unit can house over 1,316 inmates and many other inmates could potentially be housed at the Luther Unit during some point during this litigation, or in the future. Joining all members of the class is impracticable due to the minimum 1,263-person size (from July 2018 inmate roster) and the fluctuating population of the Luther Unit.

302.    The subclasses are also sufficiently numerous to satisfy Fed. R. Civ. P. Rule 23(a). The Luther Unit is a "24/7 Medical" facility. TDCJ identifies approximately 249 inmates restricted by no extreme temperature, 148 inmates restricted by no extreme humidity, 213 inmates restricted by no direct sunlight, and 51 inmates as medically unassigned on their forced labor assignments. Although these numbers are probably under-inclusive, this would make them a class member. Approximately 472 inmates suffer from at least one medical condition or disability that would

make them a class member. Likewise, upon information and belief, TDCJ houses a high number

of inmates with qualifying disabilities at the Luther Unit.

303.     Approximately 11 inmates over age 65 live at the Luther Unit. Joining all inmates over age

65, with addition of the other multiple physiological conditions and Rx usages would be

impracticable.

304.     Identifying every inmate at the Luther Unit who is a subclass member would require

interviewing hundreds of inmates and reviewing each of their medical records. Disposition of this

matter as a class action will provide substantial benefits and efficiencies to the parties and the

Court.

305.     The Prison Litigation Reform Act (PLRA), 42 United States Code Annotated (U.S.C.A)

§1997e(a), requires exhaustion of administrative remedies (Step 1 & Step 2). But, noting the

following, Plaintiffs believe in this case, a class action, they have met the requirements of Fed. R.

Civ. P. Rule 23(a), based on the Courts findings below.

306.     Defendants have argued that:

           "Plaintiffs fail to satisfy the elements of numerosity in light of the PLRA's

           exhaustion requirement and there is no significant history of serious heat related illnesses."

           (Doc. No. 307 at 38.) It is not, however, necessary for each class member to have satisfied

           the exhaustion requirement. *See Gates v. Cook*, 376 F.3d at 323, 330, (5th Cir. 2004)

           ("Russell was the only class member who had [exhausted the administrative remedy] ....

           [T]his is enough to satisfy the requirement for the class."). Defendants' argument regarding

           "no significant history of serious heat related illnesses" is unclear, but the Court finds as a

           factual matter that there is such a history within the Pack Unit, and that it is not necessary

           for each member of the class actually to have experienced a heat related illness —the class

is defined by exposure to risk, not by past illnesses. The Court finds that the General Class and both subclasses are sufficiently numerous to satisfy Rule 23(a)(1)." *Cole v. Collier, supra,* Doc. 473, Memorandum And Order, p. 14, IV., B., 1., para. 3.

307.    While only one class Plaintiff need exhaust administrative remedies to satisfy the requirements for the class, five Plaintiffs; Cummings D., Gullet, Pruitt, Quintanilla, and Wilson have fully exhausted their administrative remedies. Plaintiffs believe they have met and exceeded the exhaustion requirements of the PLRA.

### C.    Commonality

308.    Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.

1.    The common questions of law and fact for the proposed **General Class** are:

a.    Do the summer temperatures experienced by the members of the class in their housing, work, program, activity, and service areas at the Luther Unit pose a substantial risk of serious harm to the health of the class members?

b.    Do the measures taken by TDCJ to mitigate the effects of the heat fail to acceptably reduce the health risk caused by the high apparent temperatures to the class members?

c.    Are the Defendants deliberately indifferent to the health risks posed by the summer temperatures in the Luther Unit housing, work, program, activity, and service areas?

d.    What measures are feasible and appropriate to acceptably reduce the heat-based health risk to the class members?

e. Will the class members face similar high temperatures and health risks in future summers?

f. Does exposing inmates to the high apparent temperatures in the housing, work, program, activity, and service areas at the Luther Unit violate the Eighth Amendment, by denying inmates safe housing and shelter from the elements?

g. Are the members of the General Class entitled to declaratory and injunctive relief?

2. The common questions of law and fact for the **Heat-Sensitive Subclass** are:

a. Is the risk of heat-related injuries for the Heat-Sensitive Subclass increased when members are exposed to the high apparent temperatures in housing, work, program, activity, and service areas of the Luther Unit?

b. Are Defendants deliberately indifferent to the increased risk of heat-related injuries posed to the members of the Heat-Sensitive Subclass?

c. Does exposing members of the Heat-Sensitive Subclass to the high apparent temperatures in the housing, work, program, activity, and service areas at the Luther Unit violate their Eighth Amendment rights to safe housing, work, program, activity, and service area conditions and shelter from the elements?

d. Are the members of the Heat-Sensitive Subclass entitled to declaratory and injunctive relief?

3.      The common questions of law and fact for the **Disability Subclass** are:

    a.      Do the members of the Disability Subclass:

        i.      suffer from a disability that substantially limits one or more of their major life activities?

        ii.      suffer from a disability that increases the risk of heat-related illnesses, injuries, and/or death?

        iii.      receive any medical treatment necessary to treat their disability that increases the risk of heat-related illnesses, injuries, and/or death?

        iv.      stand regarded as having such an impairment?

        v.      have a record of such an impairment?

    b.      Does TDCJ provide reasonable accommodations to inmates with heat-related disabilities exposed to high apparent temperatures in the housing, work, program, activity, and service areas at the Luther Unit?

    c.      Is TDCJ immune from claims for injunctive and declaratory relief brought under the ADA and Rehabilitation Act?

    d.      Are members of the Disability Subclass entitled to declaratory and injunctive relief?

**D.      Typicality**

309.    Plaintiffs' claims are typical and representative of each class and subclass member's claims against Defendants, as identified above. The claims of Plaintiffs and the class all arise from the same conduct by Defendants (exposing them to unsafe temperatures in the housing, work,

program, activity, and service areas at the Luther Unit), are based not only on identical legal theories, and seek identical remedies (injunctive and declaratory relief requiring Defendants to lower the temperatures at the Luther Unit to safe levels). The Luther Unit's housing, work, program, activity, and service areas all reach roughly the same temperature levels; the high indoor apparent temperatures threaten all inmates' well-being. Plaintiffs' interest in reducing the danger of heat-related illnesses, injuries, and/or death is identical to every other inmate's interest. All members of the class are similarly injured by Defendants' wrongful conduct.

     **E.**    **Adequacy Of Class Counsel**

310.    Due to the extensive similarities of the Luther Unit and the Pack Unit, as the Pack Unit litigated in *Cole v. Collier*, Civil Action No. 4:14-cv-01698 (S.D., Tex., Houston, 2018), within this same District and Division Court, both units are near identical in their facilities, conditions, location, demographics, atmospheric/climatological conditions, and complaints in which expert witnesses testified. The Plaintiffs seek that the Court sees the wisdom of the Federal Rules of Civil Procedures (Fed. R. Civ. P.) Rule 23(g)(3), and (g)(1) in assigning the same Court and Plaintiffs' Class Counsel that successfully litigated the *Cole v. Collier* suit. The Plaintiffs request, due to the complexity and complications within the case, large expenditure of time and expense, the massive undertaking of securing expert witness testimony, the four plus years of litigation taxing the Court's resources, the time the Court and attorneys spent gaining knowledge and expertise of the facts of the case, all being persuasive in regard to the economization of expenses and expediting proceeding, thus saving time for the Court and the litigants as detailed in Fed. R. Civ. P. Rule 23(g)(3), and (g)(1), that the same Court, and Plaintiffs' Class Councils may be assigned to litigate this complex and complicated case to conclusion.

311.  **Appointing Class Counsel**, Fed. R. Civ. P. Rule 23(g): unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the Court:

    1)    Must consider:

        (a)    the work counsel has done in identifying or investigating potential claims in this action;

        (b)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

        (c)    counsel's knowledge of the applicable law; and

        (d)    the resources that counsel will commit to representing the class;

    2)    May consider any other matter pertinent to counsel's ability to fairly and adequately represent the interest of the class;

    3)    May order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and non-taxable costs;

    4)    May include in the appointing order provisions about the award of attorney's fees and/or non-taxable costs under Rule 23(h); and

    5)    May make further orders in connection with the appointment.

312.  A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all class members is impracticable. Each class member is irreparably harmed because of Defendants' wrongful conduct. Litigating this case as a class action will reduce repetitious litigation relating to the Defendants' conduct.

313.   Plaintiffs do not seek damages, except as may be incidental to declaratory or injunctive relief.

## VI.   CAUSES OF ACTION

### A.   Eighth And Fourteenth Amendment: Conditions Of Confinement
(Against Defendants - Collier, McKey, And/Or Muniz In Their Official Capacities)

314.   Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

315.   Pursuant to 42 U.S.C. §1983, Collier, McKey, and/or Muniz, in their official capacities, are deliberately indifferent to the substantial risk of serious harm to inmates at the Luther Unit caused by their choice to expose inmates to high apparent temperatures inside the housing, work, program, activity, and service areas, unnecessarily, and want only to cause the Plaintiffs pain.

316.   The high indoor apparent temperatures at the Luther Unit pose an unreasonable risk to inmates' health.

317.   Defendants are aware inmates suffer power outages that prevent and disable the use of personal fans for cooling. These outages also disable the roof mounted exhaust fans which normally provide limited air circulation while exhausting hot air, and should the new FAS be activated, dispense smoke and toxic gases from the living areas along with any other areas with connected exhaust fans. The extreme heat in their facilities' housing, work, program, activity, and service areas poses substantial risk of serious injury to inmates, including Plaintiffs. Defendants' knowledge is demonstrated by TDCJ policies and practices, as well as the well-documented history of injuries to inmates and employees at the Luther Unit. Defendants remain indifferent to the risk, failing to take obvious steps to mitigate it.

318.   Considering the numerous public warnings about the risk posed by extreme temperatures from government agencies, scientific studies of the risk, warnings within TDCJ's own policy,

knowledge of TDCJ's medical providers, and the history of inmate and staff injuries, Defendants know of the risk of heat-related illnesses, injuries, and/or death that exists at the Luther Unit.

319.    Defendants are acting with deliberate indifference to Plaintiffs' constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing, work, program, activity, and service areas that protect inmates from exposure to extreme heat, and which annually cause injuries to inmates and staff alike.

320.    Defendants' deliberate indifference to Plaintiffs' risk of serious medical problems puts Plaintiffs at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat exhaustion, as well as the myriad symptoms associated with these conditions.

321.    Defendants' policies, practices, acts, and omissions violate the Cruel and Unusual Punishments Clause of the *Eighth Amendment*, made applicable to the States through the *Fourteenth Amendment* to the *United States Constitution*.

322.    As a proximate result of Defendants' unconstitutional policies, practices, acts, and omissions, Plaintiffs and class members have suffered and will continue to suffer immediate and irreparable injury, including physical injury, and/or risk of death.

### B.    The Americans With Disabilities Act, Rehabilitation Act, And ADA Amendment Act

### (Against The Defendants - TDCJ, CMHCC, And UTMB)

323.    For purposes of the ADA, RA, and the ADAAA, Plaintiffs Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson, and other similarly situated inmates, are qualified individuals regarded as having a physiological or mental impairment that substantially limits one or more of their major life activities.

324.    The Defendants fail to reasonably accommodate inmates with heat-sensitive disabilities. These disabilities include: amyotrophic lateral sclerosis, arthritis, asthma, cardiovascular disease,

cerebral palsy, chronic obstructive pulmonary disease (COPD), cirrhosis of the liver, cystic fibrosis, depression, diabetes, hypertension, multiple sclerosis (M.S.), muscular dystrophy (M.D.), obesity, seizure disorders, Sjogren's syndrome, spastic hemiplegia, spinal cord injuries, sweat gland dysfunction, thyroid dysfunction, psychiatric conditions and mental illness treated with psychotropic Rx's, and others as recommended or, who take certain Rx's such as: anti-cholinergics, anti-convulsants, anti-depressants, anti-histamines, anti-psychotics, beta blockers, diuretics, immune system suppressants, psychotropics, and others as recommended. These place inmates at increased risk of heat-related illnesses, injuries, and/or death, and their disabilities cause them to suffer more pain and punishment than able-bodied inmates.

325.    The Defendants acknowledge in internal documents that people with certain disabilities including: amyotrophic lateral sclerosis, arthritis, asthma, cardiovascular disease, cerebral palsy, chronic obstructive pulmonary disease (COPD), cirrhosis of the liver, cystic fibrosis, depression, diabetes, hypertension, multiple sclerosis (M.S.), muscular dystrophy (M.D.), obesity, seizure disorders, Sjogren's syndrome, spastic hemiplegia, spinal cord injuries, sweat gland dysfunction, thyroid dysfunction, psychiatric conditions and mental illness treated with psychotropic Rx's, and others as recommended, that their medical conditions, Rx usage, and advanced age prevent their bodies from regulating their temperature, putting them at much greater risk of illness, injury, and/or death from exposure to high temperatures, and high humidity.

326.    Plaintiffs Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson, as well as other similarly-situated inmates, suffer from these heat-sensitive disabilities.

327.    The Defendants have been, and are, recipients of federal funds, and thus covered by the mandate of the RA. The RA requires recipients of federal monies to reasonably accommodate

persons with disabilities in their facilities, programs, activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.

328.    Further, Title II of the ADA, and the ADAAA apply to the Defendants, and have the same mandate as the Rehabilitation Act. 42. U.S.C. §12131 *et seq.*

329.    Title II of the ADA, and the ADAAA guarantees protection to inmates with disabilities because exposure to extreme temperatures violates the ***Eighth*** and ***Fourteenth Amendments*** of the ***U.S. Constitution***.

330.    The Luther Unit and other TDCJ units are facilities, and their operation comprises a program and service for RA, ADA, and ADAAA purposes. Plaintiffs Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson, and similarly situated inmates with disabilities, are presently qualified to participate in programs, activities, and services in TDCJ facilities at the Luther Unit, such as incarceration in the inmate housing, work, program, activity, and service areas.

331.    The Defendants know that Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson, and other similarly situated inmates with disabilities, suffer from heat-sensitive disabilities, and were prescribed medications to treat their disabilities, and have advanced in age. Despite their knowledge, the Defendants' officers and staff intentionally discriminate against them, under the meaning of the ADA, RA, and AADAAA, by failing and refusing to protect them from the extreme temperatures in their housing, work, program, activity, and service areas.

332.    As alleged above, the Defendants fail and refuse to reasonably accommodate Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson, and other similarly situated inmates with disabilities, while in custody, in violation of the ADA, RA, and the ADAAA.

333.    As shown above, the Defendants failed, and refused, to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Plaintiffs Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson's disabilities, as well as similarly situated inmates.

## VII.   INJUNCTIVE AND DECLARATORY RELIEF

334.    Plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. §1983, the ADA, RA, and ADAAA, against Defendants, for themselves and the class, to require TDCJ to provide safe housing, work, program, activity, and service area conditions at the Luther Unit.

335.    Without permanent injunctive relief, Defendants will continue their same perilous practices and conduct, disregarding federal legal mandates, and endangering the lives and the welfare of current and future inmates at the Luther Unit, causing every inmate to suffer each summer.

336.    Plaintiffs have no plain, adequate, or complete remedy at law to address the wrongs described herein.

337.    Plaintiffs ask that the Court enjoin Defendants to provide 24/7 electrical power, this includes during power outages, to each cubicle outlet and to the dorm/buildings mounted exhaust fans. This is requested to ensure fire safety and the maintenance of air circulation and flow. Also to maintain a safe indoor apparent temperature (*e.g.* maintaining a heat index of 88°F or lower calculated using the NWS heat index table) inside all areas inmates congregate including: housing, work, program, activity, and service areas, dining areas, the gymnasium, dayrooms, hallways, laundry areas, and kitchen work areas inside the Luther Unit, (calculated using the NWS heat index table) or enter other injunctive relief enough to protect the health and safety of the inmates where they live, work, dine, attend programs, participate in activities, and receive services with equal

accommodations with regard to the A/C at the Pack Unit, and their respite accommodations at the Luther Unit.

338.    Plaintiffs request an order declaring the conditions under which they are incarcerated and housed are unconstitutional.

339.    Plaintiffs Cummings D., Cummings M., Gullett, McGruder, Quintanilla, Sain, Smith, and Wilson request an order declaring the Defendants violate the Americans with Disabilities Act and Rehabilitation Act by failing to reasonably accommodate inmates with disabilities.

340.    Plaintiffs and members of the class are entitled to injunctive and declaratory relief to end this unlawful discrimination.

341.    Plaintiffs and members of the class request that no retaliation for participation or any actions arising from this suit be enacted/placed on them.

342.    Plaintiffs do not seek damages.

## VIII.    ATTORNEYS' FEES

343.    Pursuant to 42 U.S.C. §1988, and 42 U.S.C. §12205, Plaintiffs are entitled to recover attorneys' fees, litigation expenses, and Court costs, including, expert costs.

## IX.    PRAYER FOR RELIEF

344.    **THEREFORE**, Plaintiffs respectfully request that the Court award the following relief:

    a.  That the Court assign and fund an Interim Counsel and/or Class Counsel within the same venue as the *Cole v. Collier* litigation;

    b.  Certify this action as a class action, as described above;

    c.  Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out in this Original Complaint, on behalf of the Plaintiffs, and the class;

d.  Permanently enjoin Defendants to abate the risk of serious harm described above by taking steps including, but not limited to:

    i.  providing 24/7 electrical power, this includes during power outages, to each cubicle outlet, and to the dorm and buildings roof mounted exhaust fans. This is requested to ensure fire safety and the maintenance of air circulation and flow;

    ii.  copying and implementing as an equitable or better accommodation, regarding the Pack Unit Respite program;

    iii.  keeping indoor apparent temperatures below dangerous levels. It is requested they be ordered to mechanically lower the indoor apparent temperatures to a safe level maintaining a heat index of 88°F or lower (calculated using the NWS heat index table), as an equitable or better accommodation with regard to the Pack Unit A/C implementation, inside all areas inmates congregate including: housing, work, program, activity, and service areas, dining areas, the gymnasium, dayrooms, hallways, new building construction, laundry areas, and kitchen work areas inside the Luther Unit; and

    iv.  providing equal access and accommodation to all programs, activities, and services;

e.  Prohibit Defendants from placing retaliatory actions upon the Plaintiffs or Class Members for participating in or actions caused by this litigation;

f.  Find that Plaintiffs are the prevailing parties in this litigation and award them attorneys' fees, Court costs, expert costs, and litigation expenses;

g. Grant such other and further relief as appears reasonable and just, to which Plaintiffs

may be entitled, separately or collectively.

Respectfully submitted this 19th day of November 2018,

John Sain

John Sain

JOHN SAIN, Pro Se
TDCJ ID# 01373168
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

DAVID CUMMINGS, Pro Se
TDCJ ID# 02153663
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

MICHAEL CUMMINGS, Pro Se
TDCJ ID# 02079838
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

PHILLIP GULLETT, Pro Se
TDCJ ID# 01672020
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

THYEE MCGRUDER, Pro Se
TDCJ ID# 02158413
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

BRANDON PRUITT, Pro Se
TDCJ ID# 02141885
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

BRIAN QUINTANILLA, Pro Se
TDCJ ID# 02110859
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

JERRY SMITH, Pro Se
TDCJ ID# 02171841
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

DAVID WILSON, Pro Se
TDCJ ID# 01648041
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

## CERTIFICATE OF SERVICE

I, John Sain, TDCJ# 01373168, do hereby certify that on this 19th day of November 2018, true and correct copies of the foregoing <u>Plaintiffs' Class Action Complaint And Jury Demand</u> was forwarded by U.S. First Class Mail, postage pre-paid, certified return receipt, to the following parties:

a.  Bryan Collier
    Texas Department of Criminal Justice
    TDCJ Executive Director
    209 W. 14th St.
    5th Floor, Price Daniel Building
    Austin TX, 78701-1615
    Certified Mail Return ID# 7008 1300 0001 4317 3864

b.  James McKey
    Warden
    O.L Luther Unit
    1800 Luther Dr.
    Navasota, Texas 77868-4714
    Certified Mail Return ID# 7005 1160 0001 3904 9569

c.  Donald Muniz
    Warden
    O.L Luther Unit
    1800 Luther Dr.
    Navasota, Texas 77868-4714
    Certified Mail Return ID# 7008 1300 0001 4317 3871

d.   Texas Department of Criminal Justice
c/o Bryan Collier
TDCJ Executive Director
209 W. 14th St.
5th Floor, Price Daniel Building
Austin TX, 78701-1615
Certified Mail Return ID# 7008 1300 0001 4317 2928

e.   Correctional Managed Health Care Committee
Margarita De La Garza-Graham, M.D.
Chairperson
2 Financial Plaza, Suite 625
Huntsville Tx 77340-3508
936-437-3125
Certified Mail Return ID# 7008 1300 0001 4317 2850

f.   University of Texas Medical Branch
Correctional Managed Healthcare
Quality Improvement Plan
Owen Murray, D.O.
V.P. Offender Care Services
301 University Blvd.
Galveston, TX 77555-1006
409-747-2600
Certified Mail Return ID# 7008 1300 0001 4317 2843

## INMATE DECLARATION

I, John Sain, TDCJ# 01373168, pursuant to 28 U.S.C. §1746, do hereby declare under penalty of perjury that the foregoing statements are true and correct.

Executed this 19th day of November 2018

*John Sain*

JOHN SAIN, Pro Se
TDCJ ID# 01373168
O.L. Luther Unit (P2)
1800 Luther Dr.
Navasota, TX 77868-4714

JS/TAS
CC/Files

Doc 1.1 – Clerk Civil Action Sheet