Case No. 4:18-cv-04412

_____

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

_____

JOHN SAIN, DAVID CUMMINGS, MICHAEL CUMMINGS, PHILLIP GULLETT, THYEE MCGRUDER, BRANDON PRUITT, BRIAN QUINTANILLA, JERRY SMITH and DAVID WILSON, individually and on behalf of those similarly situated,
*Plaintiffs*,

*v.*

BRYAN COLLIER, in his official capacity, JAMES MCKEE, in his official capacity, DONALD MUNIZ, in his official capacity, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL MANAGED HEALTH CARE COMMITTEE, and THE UNIVERSITY OF TEXAS MEDICAL BRANCH,
*Defendants*.

_____

## MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS BRYAN COLLIER, JAMES MCKEE, AND THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE

_____

# EXHIBIT A

<u>AFFIDAVIT OF JASON CLARK</u>

STATE OF TEXAS            )
                                      )

COUNTY OF TRAVIS         )

BEFORE ME, the undersigned authority, personally appeared Jason Clark, who, being duly sworn by me, deposed as follows:

"My name is Jason Clark. I am over 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

"I am employed as the Chief of Staff of the Texas Department of Criminal Justice ("TDCJ"). I have been employed by the Texas Department of Criminal Justice since December of 2006. I have worked as the Chief of Staff since May of 2018. Prior to my current position, I held the positions of Deputy Chief of Staff, Director of Public Information, and Public Information Officer within the TDCJ.

"As the Chief of Staff, I have access to and knowledge of agency operations. I am responsible for providing oversight to the Emergency Action Center, Executive Services, Governmental Affairs, Institutional Removal Program, and Communications. During my employment with the TDCJ, my duties have included managing staff, developing and reviewing policies, disseminating information, and overseeing cross division projects.

"I have reviewed the Three-Year Plan. I certify that the attached copy of the TDCJ Three Year Plan is a true and correct copy of the plan which I drafted with the assistance of several individuals, and incorporates information given to me by persons with direct knowledge of those matters.

"The concepts contained in the Three-Year Plan were initially conceived during the negotiation and settlement of the lawsuit *Cole, et al. v. Collier, et al.*, Case No. 4:14-cv-1698. Generally, the TDCJ intends to identify air-conditioned beds within TDCJ ("cool beds"); prioritize those offenders who are most vulnerable to developing heat-stress illness; and relocate those offenders to cool beds. The TDCJ set a goal of moving the group of the most heat-sensitive offenders into cool beds by end of calendar year 2021.

"I was asked to assist in drafting the Three-Year Plan, attached. I incorporated information gathered from many different sources, including from Lorie Davis, Director of the Correctional Institutions Division, which controls all prison unit and security operations including housing assignments; Lannette Linthicum, Director of the Health Services Division, which provides oversight and monitoring of access to and quality of healthcare; Cody Ginsel, Director of the Private Facility Contract Monitoring/Oversight Division, which monitors contracts for privately operated secure facilities; and Frank

1

Inmon, Director of the Facilities Division, which oversees planning, design, construction, and maintenance of TDCJ facilities.

Each had personal knowledge of the information provided to me."

Further, Affiant sayeth not.

_____

Jason Clark
Chief of Staff
Texas Department of Criminal Justice

SWORN TO AND SUBSCRIBED before me on the 21st day of March, 2019.

_____
NOTARY PUBLIC, STATE OF TEXAS

_____
(Printed name)

My Commission expires:

4-7-2022

# THREE YEAR PLAN
## FOR OFFENDERS WHO ARE AT HIGHEST RISK
## OF HEAT-RELATED ILLNESS

## I.     Introduction

The Texas Department of Criminal Justice (TDCJ) recognizes that some offenders are potentially at a heightened risk of heat-related illness because of their age, health conditions, or medications. Mitigating this risk across 104 prison units and 145,000 offenders with varying medical and security needs presents a unique challenge and requires a comprehensive system-wide approach. The TDCJ is committed to making every reasonable effort to reduce the risk of heat-related illness. This three-year plan sets forth how the TDCJ will meet this challenge and provide air-conditioned housing for offenders who are at the highest risk of heat-related illness by the end of 2021.

This plan is informed by extensive data analysis, input from medical professionals, and TDCJ administration with decades of security expertise.  Specific criteria were used to identify offenders who are the most vulnerable to heat-related illness, and a point system was developed to prioritize those offenders by assigning each offender a specific heat sensitivity score (HSS).  As a result of these efforts, the TDCJ has developed an understanding of which offenders should be prioritized to be housed in a cool bed.[1]

The TDCJ has already made significant changes to its operations as part of this three-year plan. The TDCJ has also engaged in an intense, concerted effort to map out a plan of action moving forward.  The TDCJ is committed to devoting the time and resources necessary to successfully complete its goal.

### A.     The Litigation and Mediation

From 2013 to 2018, the TDCJ litigated and settled ten lawsuits based on allegations related to illnesses or death attributed to excessive heat in TDCJ units.  All of the lawsuits involved medical conditions, such as diabetes and hypertension, and the taking of certain prescribed medications that increase heat-sensitivity.  At issue were TDCJ policies and procedures that are intended to mitigate the risk of excessive heat to heat-sensitive offenders.

The plaintiffs' claims fell into three broad categories: constitutional violations under the Eighth and Fourteenth Amendments; claims under the Americans with Disabilities Act and Rehabilitation Act; and negligence claims.  Eight cases[2] were based on offender hyperthermia deaths during the summers of 2011 and 2012.  The other two lawsuits were brought by offenders alleging either a past injury, or the possibility of a future injury, while incarcerated: (1) *Cole v. Collier*[3] (formerly *Bailey v. Livingston*) brought by class action plaintiffs housed at the Pack Unit, and (2) *Caddell v.*

---

[1] The term "cool beds" refers to dormitories or cellblocks in which the air is mechanically-cooled.  This would include housing areas that are air-conditioned, but it would exclude housing areas that are cooled by evaporative coolers.

[2] *James, et al. v. Livingston, et al.*, No. 4:18-cv-975; *Hudson, et al. v. Livingston, et al.*, No. 4:18-cv-976; *McCollum, et al. v. Livingston, et al.*, No. 4:14-cv-3253;  *Webb, et al. v. Livingston, et al.*, No. 4:14-cv-3302; *Hinojosa v. Livingston, et al.*, No. 4:14-cv-3311; *Togonidze, et al. v. Livingston, et al.*, No. 4:14-cv-3324; *Adams, et al. v. Livingston, et al.*, No. 4:14-cv-3326; *Martone, et al. v. Livingston, et al.*, No. 4:13-cv-3369.

[3] *Cole, et al. v. Collier, et al.*, No. 4:14-cv-1698.

*Livingston*[4] brought by a former offender who was previously housed at the Hutchins Unit.  All of the cases were transferred to Judge Keith Ellison in the Southern District of Texas, Houston Division.  A central component of the plaintiffs' cases was that TDCJ facilities must be air conditioned to safeguard the constitutional and statutory rights of certain offenders.

In January 2018, a successful mediation was held for all ten lawsuits.  The TDCJ agreed to install permanent air conditioning within the offender housing areas of the Pack Unit no later than May 1, 2020.  Until then, the TDCJ will provide temporary air conditioning in the Pack Unit housing areas between April 15 and October 15 of each year.  The parties also agreed to a clearly defined class[5] and subclass of plaintiffs who the TDCJ is required to house in the air conditioned housing. The subclass was defined to include offenders residing at the Pack Unit who met or later came to meet one of 26 factors.  Broadly speaking, these factors include having certain medical conditions or taking certain medications.  These factors were selected because they may increase an offender's susceptibility to heat-related illness.

The agreed-upon definition of the subclass is important because it is fundamental to the development of the TDCJ's three-year plan.  As discussed below, these 26 factors were utilized when evaluating the entire TDCJ offender population to identify which offenders should be prioritized to be housed in a cool bed.

## B.    After the Mediation

Following the settlement of the heat litigation, the TDCJ undertook extensive efforts to meet its obligations under the settlement agreement.  The TDCJ formulated a plan identifying several steps to fully implement the settlement agreement, the person(s) responsible for completing the steps, the target date, and the date completed, if applicable.  The TDCJ has installed temporary air conditioning at the Pack Unit and is on track to meet its obligations; the only four outstanding items relate to the installation, design, procurement, and construction of permanent air conditioning at the Pack Unit.  Once completed, the Pack Unit will have 1,478 permanent cool beds.

Additionally, in early 2018, the TDCJ took a significant step in how the entire agency responds to excessive temperatures by modifying agency-wide policy.   Specifically, in February 2018, TDCJ administration solicited from various TDCJ divisions comments and suggestions on Administrative Directive 10.64 ("AD-10.64"), "Excessive and Extreme Temperature Conditions in the TDCJ."[6]  The goal of this revision was to incorporate existing best practices that were in place but had not yet been formally incorporated in agency policy or standard operating procedure. Key revisions to AD-10.64 include the following:

- Adding definitions for "excessive heat," "excessive heat warning," "heat index," "heat wave," "relative humidity," and "wind chill."

---

[4] *Caddell v. Livingston et al*, No. 4:14-cv-3323.
[5] The parties agreed that the class consists of offenders incarcerated at the Pack Unit on or between July 19, 2017 and August 8, 2017, and any offenders housed at the Pack Unit when the settlement was executed.
[6] Attachment A, AD-10.64, "Excessive and Extreme Temperature Conditions in the TDCJ," (rev. 9).

- Identifying April 15 of each year as the commencement date for implementing heat mitigation measures; however, if the need arises based on forecasted temperatures, implementation may begin prior to April 15.

- Requiring that prior to April 15, representatives from all TDCJ divisions meet to review best practices concerning preventive care and precaution. Following this meeting, the annual Seasonal Preparedness Directive is distributed to all unit wardens to inform them of additional mandatory compliance measures in the prevention of heat-related illnesses.

- Requiring that prior to April 15, all preventive maintenance and/or necessary repairs to cooling equipment must be completed.

- Requiring that staff and offenders be trained regarding excessive temperature conditions, and training must be electronically documented in the training database for staff and in the Individualized Treatment Plan for each offender. Refresher training is provided on a regular and frequent basis throughout the duration of the excessive heat period.

- Increasing cooperation between TDCJ staff and medical personnel in promptly identifying and communicating needs of offenders susceptible to temperature-related illnesses due to medical conditions. As specified in the revision, and required in each housing area post order, security staff conduct wellness checks for offenders identified as sensitive to heat during normal security checks of the housing areas.

- Incorporating the practice of evaluating all heat-related illnesses, including the conditions surrounding the incident, such as water intake, location, and what the offender was doing before becoming ill. Additionally, the policy reflects tracking and reporting of "cluster illnesses" or illnesses occurring in offenders in the same housing areas.

AD-10.64 was also modified to require additional precautionary measures when excessive heat conditions are predicted to last for three or more consecutive days. Such conditions require activation of the Incident Command System (ICS). The ICS organizational model is based upon the National Incident Management System protocols created in response to "Department of Homeland Security Presidential Directive 5: Management of Domestic Incidents," which identifies steps for improved coordination in response to emergency situations.

Generally, the warden activates ICS and assumes the role of incident commander. The warden must immediately notify the appropriate regional director and deputy director of Prison and Jail Operations for Correctional Institutions Division units, or the appropriate deputy director for the Private Facility Contract Monitoring/Oversight Division for privately-operated units.[7] The ICS provides a system for the effective management of personnel and resources that respond to the incident as it escalates. Once ICS is deactivated, the warden must conduct a debriefing to evaluate unit operations during the excessive heat warning to identify any areas requiring improvement.

---

[7] In July 2018, all units were placed into ICS as a precautionary measure ahead of a heat wave. ICS was systematically deactivated as temperatures fell below the threshold over the course of several days.

Lastly, AD-10.64 includes specific heat-mitigation measures that are intended to protect all offenders regardless of their individual risk level. These measures include:

- Making respite areas available 24 hours per day, seven days per week, for all offenders who are not assigned to a cool bed. Offenders may request access to a respite area 24 hours per day, seven days per week, even if they are not feeling ill at the time of the request, and are permitted to stay in the respite area as long as necessary. Offenders requesting access to a respite area are not required to be seen by medical staff unless they are exhibiting signs or symptoms of a heat-related illness.

- In situations where the heat index is above 90 degrees, units will take extra precautions including, but not limited to:

    o Providing additional water and cups in offender dorms, housing areas, recreational areas, and during meal times, along with ice;

    o Transporting psychiatric inpatient offenders to other facilities via air-conditioned transfer vehicles only;

    o Transporting offenders during the coolest hours of the day, when possible;

    o Allowing offenders to utilize and carry cooling towels;

    o Allowing offenders to wear shorts and t-shirts in dayrooms and recreational areas;

    o Ensuring maintenance of fans, blowers, and showers in offender housing areas;

    o Allowing additional showers for offenders when possible;

    o Lowering the water temperature for single temperature showers in offender housing areas;

    o Placing posters in housing areas reminding offenders of heat precautions and the importance of water intake, and ensuring all posters that have been damaged or destroyed are replaced; and

    o Allowing fans for offenders in all custody levels, to include restrictive housing and disciplinary status, and ensuring the fan program is in place allowing the permanent issuance of fans to indigent offenders.

- Sending a mainframe and email message titled, "Seasonal Preparedness Directive," to inform unit wardens of additional mandatory compliance measures in the prevention of heat-related illness. In February 2018[8] and March 2019,[9] for example, the Seasonal Preparedness Directives included specific precautions and actions relating to:

---

[8] Attachment B, "Seasonal Preparedness Directive – February 2018."
[9] Attachment C, "Seasonal Preparedness Directive – March 2019."

- o   Training;

- o   Offender transport;

- o   Outside activity;

- o   Offender intake;

- o   Offender housing assignments;

- o   Offender housing areas;

- o   Offender fans;

- o   Cooling items available for purchase from commissary; and

- o   Unit maintenance, including verification that ice machines are working properly.

Ultimately, the purpose of AD-10.64 is to assist unit administration in adapting offender housing areas and work assignments to extreme temperatures that cannot be controlled by the TDCJ. The policy establishes a baseline of expectations and reinforces the TDCJ's commitment to making extreme temperatures a priority issue for everyone, both staff and offenders, regardless of their assessed risk. AD-10.64 provides sufficient heat mitigation efforts for all offenders not housed in cool beds. The TDCJ continues to evaluate its policies, practices, and procedures to ensure the safety of those offenders identified as potentially having an increased sensitivity to heat but for which placement in a cool bed may not be appropriate.

## II.     Assignment of Risk

In addition to the policy changes in AD-10.64, the TDCJ has also reformulated its classification process to ensure that the heat sensitivity of individual offenders is more closely analyzed. It is evident that any successful plan to house at-risk offenders in cool beds depends on the TDCJ's ability to accurately identify each offender's individual level of risk. This is why the TDCJ has worked diligently with its medical partners to create a system that identifies the most potentially heat-sensitive offenders.

### A.     Identifying Cool Bed Priority Offenders

As noted above, the list of factors used to define the *Cole* subclass is important to the TDCJ's three-year plan. The 26 *Cole* factors were developed after consultation with medical professionals prior to and during mediation. The factors were selected because their association with increased heat sensitivity is supported by data, studies, and expert opinions from free-world research. Of these 26 factors, some may create a higher probability for increased heat sensitivity. These are

5

referred to as "Group 1 factors."  Offenders who have at least one Group 1 factor are Cool Bed Priority (CBP) offenders.

CBP offenders are the focus of the TDCJ's three-year plan because they are at the highest probability for increased heat sensitivity, and the recommended intervention is to house them in cool beds.  A general categorization of CBP offenders and Group 1 factors is below:

1. Heart and Medical Disease – Offenders are CBP offenders if they have certain conditions, such as:
    a. Coronary artery disease and chronic ischemic heart disease;
    b. Previous myocardial infarction;
    c. Heart failure;
    d. An implantable cardiac device/pacemaker; or
    e. Percutaneous transluminal coronary angioplasty or a stent.

2. Mental Health Disorders – Offenders are CBP offenders if they have one of the following active psychiatric conditions:
    a. Schizophrenia;
    b. Schizo-affective disorder;
    c. Psychosis; or
    d. Bipolar disorder.

3. Dementia and Alzheimer's Disease – Offenders are CBP offenders if they have dementia or Alzheimer's disease.

4. Developmental Disabilities – Offenders are CBP offenders if they are developmentally disabled.  This includes, but is not limited to, offenders in the Developmental Disabilities Program (DDP).[10]

5. 65 Years of Age or Older –  Offenders are CBP offenders if they are 65 years or older and have certain conditions or are prescribed certain medications, such as:
    a. Asthma and are prescribed inhaled or oral steroids and/or long-acting beta-agonist inhalers;
    b. Chronic Obstructive Pulmonary Disease and are prescribed inhaled or oral steroids and/or long-acting beta-agonist inhalers;
    c. Cirrhosis and are also receiving one of the following: a diuretic, daily laxatives, or the non-absorbable antibiotics Rifaximin or Neomycin;
    d. A body mass index (BMI) equal to or greater than 40;
    e. A BMI equal to 35 but less than 40 and are receiving diuretic medication;
    f. Diabetes or hypertension with target organ damage; or
    g. High-activity anticholinergic medications.

Ultimately, every offender is assigned an HSS.  Offenders who do not meet any of the Group 1 factors will have an HSS of "zero."  Offenders in the DDP program are assigned an HSS denoted by "DDP."  All other CBP offenders are assigned an HSS based on the number of Group 1 factors

---

[10] The DDP program is discussed in greater detail in section III.B below.

he or she meets.  Each factor is counted as either one or two points.  This means that every non-DDP CBP offender will have a minimum HSS of one point.

On a separate track, to supplement and validate this methodology, the TDCJ consulted with a PhD in preventive medicine and community health to perform a statistical analysis on the actual heat-related illness data from TDCJ for 2012-2017.  The analysis was focused on whether certain chronic conditions, medications, and demographic characteristics increased TDCJ offenders' risks of experiencing a heat-related illness between May 5, 2012 and October 5, 2017.  Ultimately, it was determined that two conditions (bipolar disorder and cardiovascular disease) were significantly associated with a slightly increased likelihood of a heat-related illness.

Medical providers have made significant progress in reducing the number of prescriptions for medications for certain mental health disorders that are likely to increase an offender's heat sensitivity.  Most notable is the reduction in tricyclic antidepressants (TCAs) which can affect heat sensitivity.  In or around April 2018, the TDCJ's contracted medical providers began a therapeutic conversion to move offenders from TCAs to other medications.  As of April 3, 2018, there were 7,125 patients taking TCAs.  As of December 18, 2018, there are no patients prescribed TCAs.

Lastly, the TDCJ recognizes offenders with certain medical conditions or on certain medications who have not acclimated to the prison system may have a heightened risk of heat-related illness.  Therefore, a new Intake Heat Sensitivity Form and Standard Operating Procedure were created to screen offenders as soon as they are in TDCJ custody.  Medical staff began using this form on June 18, 2018.  This allows for an HSS to be temporarily assigned to a newly received offender and, if needed, for the offender to be assigned to a cool bed.  The offender's HSS can later be adjusted when he or she receives a complete physical exam.

B.    Automation

The TDCJ and its medical partners determined in 2018 that housing offenders based on a medically-determined risk level requires extensive coordination between medical personnel and security staff.  The most effective way to accomplish such seamless communication is through automation.

The road to automation has its roots in the *Cole* litigation, but for purposes of the TDCJ's three-year plan, the first significant step occurred in May 2018.  After the first list of offenders with an HSS was generated, the TDCJ developed a mainframe computer identification code to ensure each offender could be identified and tracked.  In August 2018, additional changes were made to the TDCJ's mainframe system to include fields for heat sensitivity and the offender's HSS.  Shortly thereafter in the same month, the TDCJ, in coordination with the University of Texas Medical Branch (UTMB), implemented a new algorithm within the electronic health record (EHR) system to automatically populate the mainframe system.  The algorithm captures changes made in an offender's EHR that affect the offender's HSS and delivers those changes daily to the TDCJ's mainframe system.  The result is that the TDCJ now has reliable, up-to-date information about every CBP offender's heat sensitivity and is able to track and assign housing to offenders based on the HSS.

Additionally, the TDCJ has developed and implemented various mechanisms and reports to identify and track all CBP offenders and cool beds. The TDCJ made modifications to the daily chain report and count board tags to display each offender's HSS. The TDCJ also developed a new mainframe system – the "HG00" Cool Bed System – which identifies every cool bed in the TDCJ. The HG00 system can also be used to locate vacant cool beds or cool beds that are occupied by non-CBP offenders.

The algorithm and automation solved two of the biggest obstacles of the three-year plan: capturing updates to an offender's EHR that result in a change to the offender's HSS, and communicating that update from medical personnel to correctional staff. The newly created mechanism and reports give TDCJ correctional staff additional tools to accurately identify and find cool beds for CBP offenders.

## III.    Housing Cool Bed Priority Offenders

Now that the TDCJ has developed the tools to identify potentially heat-sensitive offenders, the next step is to relocate those offenders at highest risk. The relocation and housing of CBP offenders is complex because of the number of variables that must be taken into consideration, including offender medical and security needs and infrastructure limitations. In fact, with an aging offender population, the need for additional specialized housing has led the TDCJ to seek funding[11] for the creation of new sheltered housing[12] beds at the Stiles Unit and Lane Murray Unit. If approved, the TDCJ expects to have an additional 343 cool beds available for use.

However, the plan to provide cool beds for CBP offenders is not contingent on legislative approval of the expansion of sheltered housing. Rather, the TDCJ will convert existing housing areas and repurpose existing units to provide cool beds for all CBP offenders.

### A.    Significant Progress in 2018

Since July 2018, the TDCJ has made significant progress in moving CBP offenders into cool beds. As of December 2018, there were approximately 4,900 CBP offenders in cool beds, which leaves approximately 6,800 CBP offenders who need a cool bed.[13] Notably, excluding male offenders in the DDP program, approximately 61% of CBP offenders with an HSS of 3 or higher are housed in a cool bed.

The first large-scale movement of offenders started in July 2018 when the TDCJ began relocating CBP offenders to the LeBlanc Unit. As of December 18, 2018, a total of 745 CBP offenders were assigned to the LeBlanc Unit. However, before additional CBP offenders are assigned to the LeBlanc Unit, the TDCJ and UTMB need to enhance the unit's medical capabilities. This is because many of the CBP offenders require more extensive medical treatment than an average offender.

---

[11] The request for funding is included in the TDCJ's FY 2020-2021 Legislative Appropriations Request.
[12] Sheltered housing is for vulnerable offender populations, such as the geriatric population or offenders with mobility impairments, who need additional accommodations.
[13] Excluding 620 male DDP offenders. Male DDP offenders are discussed in the following section.

Although the TDCJ prioritizes offenders based on their HSS, there are situations where an offender with a higher HSS cannot be placed immediately in a vacant cool bed. As discussed later, the unique medical and security needs of the remaining 6,800 non-DDP CBP offenders requires extensive planning to repurpose existing housing areas and units to accommodate all CBP offenders.

### B.     Hodge Unit

The 620 male DDP offenders, who were excluded from the section above, constitute the highest concentration of CBP offenders not housed in cool beds.[14]  The DDP program is specifically designed to help offenders with developmental disabilities.  The services offered include specialized case management, basic school work, job training, psychological (mental health) help, counseling, recreation, and work opportunities.

Rather than dividing up the DDP program or moving it to another unit, the DDP program will remain at the Hodge Unit, and the TDCJ will install permanent air conditioning in all housing areas.  The TDCJ expects the design to be completed by January 2020 and the bidding and awarding of the construction contract to immediately follow.  Construction is expected to be completed by May 2021.

Until the air conditioning is installed, the TDCJ will remain particularly focused on its DDP offender population.  This is because most of the TDCJ's heat mitigation measures are dependent on the basic self-care ability of each offender.  This includes, for example, proactively drinking water throughout the day, paying close attention to urine color for signs of dehydration, and knowing when to request respite or take a cold shower.  DDP offenders may lack the mental capacity to reliably exercise regular, normal self-care as a non-DDP offender would to help mitigate the risk of heat-related illness.

Until all DDP offenders can be housed in cool beds, additional mitigation efforts will be implemented.  Specifically, UTMB has two positions dedicated to distributing ice water and monitoring offenders.  One of these positions is a new full-time Certified Medication Aide, and the other is filled by medical staff from the Skyview Unit.[15]  The goal is to ensure that the DDP offenders will be properly monitored and provided extra assistance to mitigate the risk of heat-related illness.

### C.     Repurposing Existing Facilities

It is important to realize that not all cool beds are created equal.  In other words, simply because a cool bed is vacant does not mean that a CBP offender can be assigned to that bed.  This is because a facility must be able to meet the medical and security needs of an offender before that offender is moved to the unit.  Many facilities in the TDCJ are simply not staffed or equipped with the

---

[14] As of December 18, 2018, there were 620 male DDP offenders at the Hodge Unit.  Female DDP offenders are permanently housed in cool beds at the Crain Unit.
[15] The Skyview Unit is co-located on the same property as the Hodge Unit.

9

necessary infrastructure to accommodate the various medical[16] and security needs of all CBP offenders.

Of the CBP offenders, there are 29 different custody levels ranging from the lowest security (outside trusty) to the highest security (level three administrative segregation).  Each custody has specific privileges and restrictions.  For example, there is a significant difference in security needs between an outside trusty offender who is permitted to live outside the perimeter fence and an offender in administrative segregation with a history of escape attempts, staff assaults, and other serious infractions. Similarly, CBP offenders have a wide range of medical needs that may require housing at a particular unit.  For example, some offenders require housing at units with daily access to Hospital Galveston,[17] whereas some offenders may require housing at a Type 4 Chronic Care Facility that houses offenders undergoing a specific type of drug therapy for Hepatitis C.

Therefore, in order to provide enough cool beds for the remaining 6,800 non-DDP CBP offenders, the TDCJ must repurpose certain state and privately-operated units.  The repurposing of certain housing areas and units is necessary because many of these housing areas and units were built for a specific purpose, such as housing lower-security offenders with shorter sentences or housing high-security offenders for extended periods of incarceration.  Thus, not every housing area or unit can meet the needs of the CBP offenders without undergoing modifications.

### 1. Repurposing Housing Areas in 2019

There are seven housing areas that the TDCJ expects to utilize by the end of 2019 to primarily house CBP offenders.  These housing areas already have cool beds in existence and include:

> Expansion cell blocks (ECBs) at the:
> a.  Clements Unit;
> b.  Allred Unit;
> c.  Smith Unit; and
> d.  Gib Lewis Unit.
>
> The 12-Buildings at the:
> e.  Robertson Unit;
> f.  McConnell Unit; and
> g.  Polunsky Unit.

The ECBs and 12-Buildings will generally require minor infrastructure modifications to accommodate the various custody levels of the CBP offenders.  This is because ECBs and 12-Buildings are already air-conditioned and were built to house high-security offenders.  Therefore, the ECBs and 12-Buildings need certain modifications in order to house lower custody offenders who have more privileges and freedom to move outside their cells.  Some of the necessary changes

---

[16] It is not coincidental that many of the CBP offenders have chronic health conditions that require them to be housed at a unit that has 24-hour medical facilities.  In fact, their chronic health condition is likely to be the reason that they must be housed in cool beds under the HSS system.

[17] Hospital Galveston is the TDCJ's hospital for offenders and is operated by UTMB and TDCJ.  It is an acute care inpatient and outpatient facility accredited by the Joint Commission on Accreditation of Health Care Organizations.

will include the installation of dayroom tables, benches, TVs, cabling/power outlets, and offender telephone system stations. The units will also have to prepare for staffing changes to accommodate changes to visitation schedules.

The TDCJ expects changes to these four ECBs and three 12-Buildings to provide an additional 3,723 cool beds to house CBP offenders.

### 2. Repurposing Units in 2020-2021

Unlike the units identified in the previous section, there are 10 units that require significantly more effort to repurpose before they are suitable for the CBP offenders. These units include:

> State-Operated Units
> a. Cotulla Unit;
> b. Tulia Unit;
> c. Fort Stockton Unit;
> d. Ney State Jail; and
> e. Chase Field Work Camp.
>
> Privately-Operated Units
> f. Willacy County State Jail;
> g. B. Moore Unit;
> h. Diboll Unit;
> i. Cleveland Unit; and
> j. Estes Unit.

Many of these units have traditionally housed lower custody offenders for short periods of time. Converting them to house a diverse group of CBP offenders requires changes to the security, education, and medical capabilities of the units.

First, a security evaluation will be conducted to determine which security enhancements will be performed. These enhancements could include the installation of perimeter stun fences, additional razor wire, and the installation and/or improvement of the video surveillance systems. Improvements like these require time, planning, and resources.

Second, the units' abilities to provide education will be evaluated to determine the need for any additional resources. The TDCJ will work in cooperation with the Windham School District[18] to ensure that appropriate educational programs are available to all offenders at each unit.

Third, the medical staffing and medical capabilities of these units will be evaluated and, if needed, enhanced. The TDCJ is working closely with its medical partners to meet the staffing and medical resources necessary to repurpose these units to house CBP offenders. Much like the security improvements, these plans will require time, planning, and resources.

---

[18] The Windham School District (WSD) is an entity that is separate and distinct from the TDCJ. WSD provides educational programs to the offender population in state-operated units and works with the privately-operated units to ensure the same level of education is provided to their offender populations.

The repurposing of these particular state-operated and privately-operated units will play a significant role in housing the remaining CBP offenders. The state-operated units will provide 1,664 cool beds, and the privately-operated units will provide 1,801 cool beds, for a collective total of 3,465 cool beds for CBP offenders.

Once finished, repurposing the housing areas at the ECBs and 12-buildings and the state and privately-operated units will provide a total of 7,188 cool beds.

## IV.    Conclusion

The TDCJ is resolute in its commitment to make every reasonable effort to reduce the risk of heat-related illness. To that end, the TDCJ will have a cool bed available for every CBP offender by the end of 2021.

At the same time, the TDCJ will keep at the forefront its number one mission to provide for the public safety. This mission can only be accomplished if the units are secure. The TDCJ takes pride in being flexible and able to accommodate different needs as they arise, but the TDCJ will not compromise the security of its staff or offenders. The TDCJ will also not compromise the healthcare of offenders by transferring them to a facility that is ill-equipped to meet their needs.

This three-year plan advances the TDCJ's goal while keeping the public and offenders safe.

# ATTACHMENT A



| | |
|---|---|
| **TEXAS DEPARTMENT** | **NUMBER:** AD-10.64 (rev. 9) |
| **OF** | **DATE:** March 26, 2018 |
| **CRIMINAL JUSTICE** | **PAGE:** 1 of 17 |
| | **SUPERSEDES:** AD-10.64 (rev. 8) May 12, 2017 |

# ADMINISTRATIVE  DIRECTIVE

**SUBJECT:**     EXCESSIVE AND EXTREME TEMPERATURE CONDITIONS IN THE TDCJ

**AUTHORITY:**     Tex. Gov't Code §§ 493.001, 493.006

Reference:  TDCJ *Risk Management Program Manual,* CMHC D-27.2, "Heat Stress"

**APPLICABILITY:**  Texas Department of Criminal Justice (TDCJ)

**POLICY:**

The TDCJ shall establish guidelines to assist unit administration in adapting offender housing areas and work assignments to temperatures that cannot be controlled by the TDCJ.  Guidelines for outside recreation are found in the *Recreation Program Procedures Manual*.

Every reasonable effort shall be made to prevent injuries related to excessive or extreme temperatures in the TDCJ.  TDCJ offenders may be required to work in conditions of excessive heat or extreme cold when situations occur requiring specific work be completed regardless of the temperature or weather conditions.  The decision to require offenders to work in excessive heat or extreme cold temperatures shall be made by the appropriate on-site staff in order to address the conditions specific to the area in which the facility is located.

The TDCJ shall work closely with medical staff to immediately identify offenders at risk from excessive or extreme temperatures.  Incidents related to excessive or extreme temperatures shall be reported to TDCJ administration.

**DEFINITIONS:**

"Excessive Heat" occurs from a combination of significantly higher than normal temperatures and high humidity."

"Excessive Heat Warning" is issued by the National Weather Service within 12 hours of the onset of the following criteria: temperature of at least 105ºF for more than three hours per day for two consecutive days, or heat index of 113ºF or greater for any period of time.

"Heat Index," also referred to as the "apparent temperature," is a measure of how hot it actually feels when the Relative Humidity (RH) is added to the actual air temperature.

"Heat Wave" is a prolonged period (three or more days) of excessively hot and unusually humid weather that meets the following criteria: temperature of at least 105ºF or heat index of 113ºF.

"Relative Humidity" is a dimensionless ratio, expressed in percent, of the amount of atmospheric moisture present relative to the amount that would be present if the air were saturated. Since the latter amount is dependent on temperature, relative humidity is a function of both moisture content and temperature.

"Wellness Check" is when a correctional officer performing routine security rounds goes to an offender's cell or bunk to visually inspect or observe the offender for wellness due to the offender previously being identified as having a condition or being on a medication that makes the offender more susceptible to temperature-related issues.

"Wind Chill" is a quantity expressing the effective lowering of the air temperature caused by the wind, especially as affecting rate of heat loss from an object or human body, or as perceived by an exposed person.

## PROCEDURES:

Before requiring offenders to work in excessive or extreme temperature conditions, the warden and applicable departmental supervisors shall ensure appropriate measures are taken to prevent excessive or extreme temperature-related injuries, including consulting medical staff to identify specific hazards. In all cases of temperature-related incidents or injuries, unit medical staff and the unit risk manager shall be notified immediately. Medical staff shall remove the distressed offender from the environment by the most expeditious means available to receive proper medical treatment.

I.      Monitoring Procedures

        Procedures and exposure charts, Wind Chill Index (Attachment A), and Heat and Humidity Index (Attachment B), are provided to assist unit administration in determining safe conditions in excessive or extreme temperatures.

        A.      Unit staff shall monitor and announce over the radio the temperature, heat index or wind chill, and advisory category once every hour between 12:30 a.m. and 11:30 p.m. The outside air temperature, humidity or wind speed, and heat index or wind chill shall be documented 24 hours a day on the Temperature Log (Attachment C).

B.    Temperature Log

1.    The warden shall designate a central location to maintain the Temperature Log.

2.    The wind chill or heat index shall be documented on the Temperature Log.

3.    Temperature information is available through the following:

a.    The National Oceanic and Atmospheric Administration (NOAA) website (www.noaa.gov);

b.    NOAA Weather Radio;

c.    Local weather radio and television stations; or

d.    Onsite weather instrumentation, if available.

4.    Temperature Logs shall be maintained in accordance with the TDCJ *Records Retention Schedule*.

II.    Extreme Cold Conditions

A.    Determination

1.    The warden shall use the Wind Chill Index, the local news and weather media, and weather conditions recorded by instruments located at the unit in determining the safety of cold weather working conditions.

2.    Clothing considered appropriate for offenders working in cold weather includes: thermal underwear, insulated jackets, cotton or leather gloves, insulated hoods, work shoes, and socks.  The Wind Chill Index shall be used to determine the need for insulated hoods and leather gloves.  Appropriate clothing shall be issued even when the Wind Chill Index indicates little danger of exposure injury.

3.    If guidance is needed, medical staff shall be consulted to assist in determining appropriate clothing and footwear needed to prevent cold injury.

4.    Care shall be taken to prevent perspiration, which could soak clothing and thus compromise the insulating value of the clothing.

5.    Layers of clothing shall be removed or added according to the temperature and level of physical activity.

B.   Symptoms

    1.   Hypothermia is a condition occurring when the body loses heat faster than it can produce heat.  With the onset of this condition, blood vessels in the skin tighten in an attempt to conserve vital internal body heat, affecting the hands and feet first.

    2.   If the body continues to lose heat, involuntary shivers begin.  This reaction is the way the body produces more heat and is usually the first real warning sign of hypothermia.

    3.   Further heat loss produces speech difficulty, forgetfulness, loss of manual dexterity, collapse, and possibly death.

C.   Types of Hypothermia

Hypothermics are divided into the following three categories, depending on the degree of injury.

    1.   Category One

        Injured individuals are conscious, but cold, with a rectal temperature above 90 degrees Fahrenheit (ºF).  These individuals shall be handled carefully, insulated from further heat loss, and transported to the unit Medical Department for additional care.

    2.   Category Two

        Injured individuals are unconscious and with a rectal temperature of 90ºF or below.  These individuals shall be handled carefully, insulated from further heat loss, and transported to the unit Medical Department for additional care.

    3.   Category Three

        Injured individuals are comatose with no palpable pulse and no visible respiration.  Although these individuals appear to be deceased, there may be a slight chance of recovery if the rectal temperature is 60.8ºF or higher. If indicated, medical staff shall proceed with life-saving measures.

        If medical staff is unavailable, correctional staff shall follow the procedures outlined in Section V.A of this directive and contact emergency medical services.

III.    Excessive Heat Conditions

    A.    Determination

        1.    Guidelines to assist the warden in making the determination that an excessive heat condition is occurring can be found in the Heat and Humidity Index. Weather conditions recorded by instruments at the unit, and reports by the local news media shall be used to confirm temperature and humidity conditions.

        2.    When the National Weather Service issues an excessive heat warning or notice of an impending heat wave, the TDCJ Office of Incident Management shall send the applicable division directors an email notification. When excessive heat conditions last for three consecutive days, the division directors and warden(s) of units in the affected area(s) shall immediately implement additional precautionary measures, as outlined in Section IV.J of this directive.

        3.    At any point when the Heat and Humidity Index indicates the possibility of heat exhaustion, the warden shall instruct the appropriate staff to immediately initiate the precautionary measures identified in the Heat and Humidity Index.

        4.    If guidance is needed, medical staff shall be consulted before exposing offenders to excessive heat conditions in the work area to evaluate the hazards of the current temperatures and humidity, including indoor work areas, such as a boiler room. The hazard of sunburn and other results of ultraviolet (UV) radiation shall also be closely monitored.

        5.    Offenders shall be provided and required to wear clothing appropriate for the temperatures and hazards imposed by UV radiation. For example, light-colored hats can be used to an advantage in high heat and direct sunlight.

        6.    Drinking water and cups shall always be available to offenders in conditions of excessive heat. A cup will be provided to all indigent and newly received offenders. Offenders will be permitted to have one cup in their possession. In the event an offender does not have a personal cup, a cup shall be provided. High water intake shall be encouraged during periods of excessive heat. According to individual medical advice, liquids containing sodium may be used depending on an offender's state of acclimatization to hot weather conditions. Offenders newly-assigned to jobs that require strenuous work under conditions with an apparent air temperature of 90ºF or greater must be acclimatized before assuming a full workload. These offenders shall work no more than four hours at a time, separated by at least one hour of rest in a cooler environment, for the first week. After the first week, offenders newly-assigned to jobs may assume a normal work

schedule.  Acclimatization can be lost in as little as two weeks; therefore, if offenders are away from a hot work environment for more than two weeks, they shall be reacclimatized.  Acclimatization is not necessary for individuals assigned to the same job when temperatures vary with seasonal change.  Offenders and staff working at apparent air temperatures above 90ºF shall be provided access to and encouraged to consume water before their work assignment and as needed during the workday.  Offenders and staff working at apparent air temperatures above 90ºF should maintain an intake of at least 16 ounces of fluids per hour of work.  Under excessive heat conditions, work should be interrupted every 15-20 minutes and offenders encouraged to drink fluids even if they are not thirsty. Drinking water will always be available to workers in hot weather conditions.

7.    TDCJ and medical staff shall work together to identify offenders susceptible to temperature-related illness due to medical conditions.  As offenders arrive on intake facilities, a staff member from the medical department shall conduct an initial screening to determine if the offender has any conditions or is on any medication that would make the offender more susceptible to heat.  If medical staff determines an offender has a condition or is on a medication that would make the offender more susceptible to heat, correctional staff shall be instructed to perform wellness checks on the offender until a full medical evaluation may be conducted.

8.    Offenders under treatment with diuretics or medications that inhibit sweating require special medical evaluation before being assigned to work in excessive heat.  These offenders shall receive wellness checks in offender housing areas when the Heat and Humidity Index indicates the possibility of heatstroke, heat cramps, or heat exhaustion.

B.    Symptoms

1.    Heat cramp symptoms include:

a.    Painful, intermittent, and involuntary muscle spasms following hard physical work in a hot environment; and

b.    Cramps usually occurring after heavy perspiring, and often beginning at the completion of hard physical work.

2.    Heat exhaustion symptoms include:

a.    Profuse perspiration, weakness, rapid pulse, dizziness, and headaches;

b.    Cool skin, sometimes pale and clammy, with perspiration;

      c.      Normal or subnormal body temperature; and

      d.      Possible nausea, vomiting, and unconsciousness.

    3.      Heatstroke symptoms include:

      a.      Diminished or absent perspiration (sweating);

      b.      Hot, dry, and flushed skin; and

      c.      Increased body temperatures, which if uncontrolled, may lead to delirium, convulsions, seizures, and possibly death.  Medical care is urgently needed.

## IV.    Preventive Care and Precautions

A.    Before April 15th each year, wardens shall review with unit staff the status of shower temperatures, fans, ice machines, ventilation systems, exhaust fans, and respite areas throughout the unit.  Wardens shall coordinate with unit maintenance staff to immediately address any deficiencies.

B.    Offenders incarcerated within the TDCJ shall be assessed for medical and mental impairments by qualified healthcare personnel who will assign each offender appropriate restrictions related to physical activities, transportation, and work. Appropriate limitations and restrictions shall be assigned and entered on the Health Summary for Classification.  Restrictions may indicate:

    1.      No Work in Direct Sunlight – This applies to individuals taking certain medications or who have conditions that are significantly aggravated by exposure to direct sunlight for which sunscreen, protective clothing, or equipment is inadequate.  Refer to CMHC policy D-27.3, "Photosensitivity."

    2.      No Temperature Extremes – This applies to individuals prescribed certain heat-sensitive medications or those who have a condition causing them to be sensitive to excessive temperatures, such as Reynaud's Phenomenon, or a history of heatstroke.  Heat index and chill factor shall be taken into account when considering excessive temperatures.  Refer to CMHC policy D-27.2, "Heat Stress," for a list of heat-sensitive medications.

C.    TDCJ and medical staff shall work together to identify offenders susceptible to temperature-related illness due to medical conditions.  Upon identification, medical staff shall promptly provide correctional staff with additions to the Medical Heat Restriction List, which indicates offenders who are susceptible to temperature-related illness due to medical conditions, including offenders on prescribed diuretics or other medications known to inhibit the dissipation of heat.

D.   During each security round, staff shall use the Medical Heat Restriction List to conduct wellness checks for those offenders.  Staff shall immediately seek care for any and all offenders requesting medical assistance or exhibiting signs of illness, even if they are not listed on the Medical Heat Restriction List.

E.   During work assignments, offenders shall be exposed to no more than four hours of excessive or extreme temperature conditions at a time, until acclimated to existing weather conditions.  Work periods may then be extended as offenders physically acclimate to weather conditions.  Appropriate clothing shall be worn at all times to protect offenders from excessive temperature conditions.

F.   Offenders shall be allowed access to respite areas during periods of excessive heat.

   1.   Offenders may request access to a respite area 24 hours per day, seven days per week, even if they are not feeling ill at the time of the request.

   2.   Offenders requesting access to a respite area are not required to be seen by medical staff unless they are exhibiting signs or symptoms of a heat-related illness.

   3.   Offenders shall be permitted to stay in the respite area as long as necessary.

   4.   Any area with air conditioning may be used for respite, as determined by the warden.

   5.   The warden or designee shall determine the order of use for respite areas, ensuring areas capable of accommodating the greatest number of offenders are utilized first, while maintaining the safety and security of the unit.

   6.   Offenders shall not be permitted to choose the respite area to which they will have access.

G.   Representatives from various divisions shall meet annually to review best practices concerning preventive care and precautions with excessive or extreme temperatures.  A mainframe and email message titled, "Seasonal Preparedness Directive," shall be sent from the Correctional Institutions Division (CID) director and the Private Facility Contract Monitoring/Oversight Division (PFCMOD) director to inform unit wardens of additional mandatory compliance measures in the prevention of heat-related injuries and illness.

H.   Training will be conducted at units as outlined in Section VI.

I.    In situations where the heat index is above 90ºF, units will initiate the following steps:

    1.    Provide additional water and cups in offender dorms, housing areas, recreational areas, and during meal times, along with ice;

    2.    Transport psychiatric inpatient offenders to other facilities via air-conditioned transfer vehicles only;

    3.    Transport offenders during the coolest hours of the day, when possible;

    4.    Allow offenders to utilize and carry cooling towels;

    5.    Allow offenders to wear shorts and t-shirts in dayrooms and recreational areas;

    6.    Ensure maintenance of fans, blowers, and showers in offender housing areas;

    7.    Ensure all staff currently have, or are provided with a FN-1181, Employee Information Pocket Card, obtained through the Prison Store and available at the units, and that the cards are carried on their person while at the unit;

    8.    Allow additional showers for offenders when possible.  Lower the water temperature for single temperature showers in offender housing areas;

    9.    Place posters in housing areas reminding offenders of heat precautions and the importance of water intake, ensuring all posters that have been damaged or destroyed are replaced; and

    10.    Allow fans for offenders in all custody levels, to include restrictive housing and disciplinary status.  Ensure fan program is in place allowing the permanent issuance of fans to indigent offenders.  Fans shall only be confiscated if altered or stolen.

J.    In addition to the precautions outlined in Section IV.I. of this directive, the warden shall instruct the appropriate staff to immediately implement the following precautionary measures when excessive heat or heat wave conditions last more than three consecutive days:

    1.    Initiate the Incident Command System (ICS) and immediately notify the appropriate regional director and the deputy director of Prison and Jail Operations for CID units, or the appropriate deputy director for PFCMOD for privately operated units, of the impending excessive heat conditions;

    2.    Restrict, and potentially cancel, outside work and recreation;

3.     Reduce kitchen and dish room operations as needed.  Offenders may be served cold cuts and other food items that do not require heating, as conditions warrant; and

4.     Permit offenders to purchase electrolyte sports drinks from the unit commissary without affecting their spending limit.

5.     When conditions giving rise to the excessive heat warning cease, the warden may deactivate the ICS, with the approval of the appropriate regional director for CID units, or the appropriate deputy director for PFCMOD for privately operated units.

6.     After deactivating the ICS for an excessive heat warning, the warden shall conduct a prompt and thorough debriefing to evaluate unit operations during the excessive heat warning.  This review shall take into consideration any actions that could improve operations during future incidents of a similar nature, and any identification of training needs.

V.     Emergency Treatment

Correctional staff shall monitor and seek care for offenders requesting medical assistance or exhibiting signs of illness during periods of excessive or extreme temperatures.

A.     In all cases of temperature-related incidents or injuries, the first aid process shall be initiated immediately by correctional or other unit staff.

1.     If an injury is sustained in extreme cold conditions, staff shall:

a.     Bring the distressed offender out of the cold and restrict any further duties or activities until the severity of the injury is evaluated.

b.     Remove any wet clothing and insulate the offender with dry, warm blankets or clothing, ensuring all constricting items of clothing and footwear are removed from injured areas and the injured areas are covered.

c.     If frostbite exists, gently heat the affected area with warm water or towels, a heating pad, or hot water bottles.  Do not rub the affected area or rupture blisters.

d.     If a lower extremity is affected, treat by slightly elevating the affected area.

e.     If the offender is conscious, encourage consumption of warm, sweetened liquids.

f.    If necessary, initiate the "CAB" of life support - restore Circulation, open Airway, and assist Breathing.

g.    If evacuation from cold requires travel on foot, do not thaw the affected area until the offender reaches medical help.

h.    Transport the offender to medical care as soon as possible and continue treatment after arriving at the site or when the offender is delivered to medical staff's care.

2.    If an injury is sustained in excessive heat conditions, staff shall:

a.    Immediately begin an attempt to decrease the offender's temperature by placing the offender in a cool area.

b.    Only force oral fluid intake if the offender is conscious and able to safely swallow.

c.    Remove heavy clothing or excess layers of clothing; saturate remaining lightweight clothing with water.  Position the offender in the shade, allowing air movement past the offender, and if necessary, fan the offender to create air movement.

d.    If ice is available, place ice packs in armpit and groin areas.

e.    Take all of these measures while moving the offender in the most expeditious means available to continue with and obtain proper medical treatment.

f.    Ensure, whenever medical staff are on-site, treatment is continued as directed by the physician or medical staff.

B.    Notification

1.    Medical staff and the unit risk manager shall be immediately notified regarding all cases of temperature-related incidents or injuries.  If there is no on-site medical staff, 911 shall be called immediately.

2.    Any temperature-related incident or injury shall be reported to the Emergency Action Center in accordance with AD-02.15, "Operations of the Emergency Action Center and Reporting Procedures for Serious or Unusual Incidents."

3.    All heat-related illnesses shall be evaluated to include the conditions surrounding the offender, such as water intake, location, and what the offender was doing before becoming ill; and any "cluster illnesses" or

illnesses occurring in offenders in the same housing areas shall be documented and reported to the appropriate regional director and the deputy director of Prison and Jail Operations for CID units, or the appropriate deputy director for PFCMOD for privately operated units.

VI.   Training

    A.   Annual Training

        1.   A standardized training program shall be developed by the TDCJ in conjunction with the University of Texas Medical Branch Clinical Education Department.  Each unit shall be provided a copy of the training program in the form of a DVD to facilitate the required training.

            a.   The training is given in a group setting, when possible.

            b.   All units are responsible for conducting an annual standardized training program using unit-based medical staff.

            c.   The facility health administrator for each unit shall submit documentation of excessive heat and extreme cold temperature training for TDCJ staff, medical staff, and offenders to the Health Services Division Office of Health Services Monitoring annually by April 15th (heat) and October 1st (cold).

        2.   Each warden shall ensure training in the prevention of injuries due to excessive or extreme temperatures is provided by unit medical staff to all supervisors designated by the warden.  Training concerning excessive heat shall be completed no later than April 15th, and training concerning cold extremes shall be completed in September of each year.

            a.   Supervisors shall be responsible for training staff and work assigned offenders.

            b.   Offenders who are not work assigned shall also be trained.

            c.   All offenders shall be notified of cold and heat awareness via Peer Education training, the dayroom bulletin boards and other common use areas, or through publications such as the Incoming Offender Heat, Cold, Safe Prisons/PREA, and Suicide Prevention flyer; *The Echo*; or the TDCJ *Offender Orientation Handbook*.

        3.   Training shall be documented as outlined in the TDCJ *Risk Management Program Manual*.  Documentation of completed training shall be maintained by the facility health administrator.  Copies of all rosters from staff training shall be provided to the human resources representative and

unit risk manager.  The unit risk manager shall forward a copy of the training roster to the respective regional risk manager.

The regional risk manager shall forward the total number of staff and offenders trained to the Risk Management Central Office.

B.     Pre-Service, On-the-Job, and In-Service Training

    1.     Staff shall be provided with initial training regarding excessive or extreme temperature conditions as part of the Pre-Service Training Academy.

    2.     Additional training shall be provided during the On-the-Job Training Program and annual In-Service Training sessions.

C.     Additional Training

    1.     Staff Training

        a.     Each unit shall be provided with a DVD to facilitate ongoing excessive or extreme temperature conditions training sessions.

        b.     This training shall be conducted on a regular and frequent basis during shift turnout, departmental meetings, or other similar times.

        c.     Training shall be documented in the TDCJ Training Database. PFCMOD shall ensure documentation is completed and maintained for all privately operated facilities.

        d.     Heat training shall be conducted beginning in March and ending in November.  If the need arises based on forecasted temperatures, training may be conducted before March and after November.

        e.     Cold training shall be conducted beginning in September and ending in February.  If the need arises based on forecasted temperatures, training may be conducted before September and after February.

    2.     Offender Training

        a.     Offenders shall be provided with training regarding excessive or extreme temperature conditions as part of the Offender Peer Education Program during intake and upon transfer to their unit of assignment.

        b.     Each unit shall be provided with a DVD to facilitate ongoing excessive or extreme temperature conditions training sessions.

       (1)      The training DVD shall be played on dayroom and common area TVs on a regular and frequent basis.

       (2)      Training shall be documented within the Individual Treatment Plan for each offender.

       (3)      Offenders shall be provided with an I-204, "Incoming Offender Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer and provided with unit-specific heat mitigation measures upon arrival at a new unit.

    c.      Heat training shall be conducted beginning in March and ending in November.  If the need arises based on forecasted temperatures, training may be conducted before March and after November.

    d.      Cold training shall be conducted beginning in September and ending in February.  If the need arises based on forecasted temperatures, training may be conducted before September and after February.

## VII.   Review of Offender Deaths

    A.      Offender deaths during periods of excessive or extreme temperatures, when the cause of death is unknown, shall be treated as accidental deaths as defined in AD-02.15 until ruled otherwise by a medical professional through an autopsy or subsequent evaluation.  An administrative incident review is required for all offender deaths, except natural cause attended deaths, in accordance with AD-02.15, during a period of excessive or extreme temperatures until affirmatively reclassified as a natural cause attended death by a medical professional.

    B.      An annual review of all deaths occurring during periods of excessive or extreme temperatures shall be conducted during the last quarter of the calendar year by representatives from the CID, PFCMOD, Administrative Review and Risk Management Division, Health Services Division, Executive Services, the Office of the General Counsel, and any other divisions, as appropriate for the incident.

_____
Bryan Collier[*]
Executive Director

_____
[*] Signature on file

# WIND CHILL INDEX

| Wind Speed in MPH | ACTUAL THERMOMETER READING (°F) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 |
| | EQUIVALENT TEMPERATURE (°F) | | | | | | | | | |
| CALM | 50 | 40 | 30 | 20 | 10 | 0 | -10 | -20 | -30 | -40 |
| 5 | 48 | 37 | 27 | 16 | 6 | -5 | -15 | -26 | -36 | -47 |
| 10 | 40 | 28 | 16 | 4 | -9 | -21 | -33 | -46 | -58 | -70 |
| 15 | 36 | 22 | 9 | -5 | -18 | -36 | -45 | -58 | -72 | -85 |
| 20 | 32 | 18 | 4 | -10 | -25 | -39 | -53 | -67 | -82 | -96 |
| 25 | 30 | 16 | 0 | -15 | -29 | -44 | -59 | -74 | -88 | -104 |
| 30 | 28 | 13 | -2 | -18 | -33 | -48 | -63 | -79 | -94 | -109 |
| 35 | 27 | 11 | -4 | -20 | -35 | -49 | -67 | -82 | -98 | -113 |
| 40 | 26 | 10 | -6 | -21 | -37 | -53 | -69 | -85 | -100 | -116 |
| Over 40 MPH (little added effect) | CAT 1 (for properly clothed person) | | | | CAT 2 | | | CAT 3 | | |
| | | | | | (Danger from freezing or exposed flesh) | | | | | |

**Category 1 (Little Danger):** Risk of possible hypothermia with prolonged exposure, absent mitigating measures. Staff and offenders are encouraged to wear appropriate clothing, adding or removing layers according to the temperature and level of physical activity. The warden shall make appropriate determinations based on the Wind Chill Index, the local news and weather media, and weather conditions recorded by instruments located at the unit regarding the safety of working conditions during such temperatures.

**Category 2 (Increasing Danger):** Increasing risk of hypothermia and possible death from freezing or exposed flesh, absent mitigating measures. Staff and offenders are encouraged to wear appropriate clothing. Outside work and recreation shall be restricted.

**Category 3 (Great Danger):** High risk of hypothermia and possible death from freezing or exposed flesh, absent mitigating measures. Staff and offenders are encouraged to wear appropriate clothing. Outside work and recreation shall be restricted.

# NOAA's National Weather Service
# Heat and Humidity Index

| | | ACTUAL AIR TEMPERATURE (°F) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAT 1 | | | | | CAT 2 | | | | CAT 3 | | | | | CAT 4 | |
| | | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
| RELATIVE HUMIDITY (%) | 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| | 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| | 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| | 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| | 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| | 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 126 | 130 | | | | | |
| | 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| | 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| | 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| | 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| | 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| | 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| | 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Category 1 (Caution):** Risk of possible fatigue with prolonged exposure, absent mitigation measures. Staff shall encourage high water intake and look for signs of exhaustion. Staff and offenders are encouraged to utilize respite areas as needed. Offender workers shall be provided with five minute rest breaks every hour.

**Category 2 (Extreme Caution):** Risk of heat-related illness with prolonged exposure, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for offenders exhibiting signs of illness.  Staff and offenders are encouraged to utilize respite areas as needed. Offender workers shall be provided with five minute rest breaks every one-half hour, and staff shall encourage offenders to lie down with feet up during such breaks. Staff shall also reduce work pace by one-third.

**Category 3 (Danger):** Risk of heat stroke possible and heat-related illness likely, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for offenders exhibiting signs of illness. Staff and offenders are encouraged to utilize respite areas as needed. Staff shall restrict outside work or reduce work pace by one-half to two-thirds, provide 10 minute rest breaks every one-half hour, and encourage offenders to lie down with feet up during such breaks.

**Category 4 (Extreme Danger):** High risk of heat stroke, absent mitigation measures. Staff shall encourage high water intake and monitor and seek care for offenders exhibiting signs of illness. Staff and offenders are encouraged to utilize respite areas as needed. Outside work and recreation shall be restricted.

AD-10.64 (rev. 9)
Attachment C
Page 17 of 17

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### Temperature Log

### Unit: _____

| Date: | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | | | | |
| 1:30 a.m. | | | | |
| 2:30 a.m. | | | | |
| 3:30 a.m. | | | | |
| 4:30 a.m. | | | | |
| 5:30 a.m. | | | | |
| 6:30 a.m. | | | | |
| 7:30 a.m. | | | | |
| 8:30 a.m. | | | | |
| 9:30 a.m. | | | | |
| 10:30 a.m. | | | | |
| 11:30 a.m. | | | | |
| 12:30 p.m. | | | | |
| 1:30 p.m. | | | | |
| 2:30 p.m. | | | | |
| 3:30 p.m. | | | | |
| 4:30 p.m. | | | | |
| 5:30 p.m. | | | | |
| 6:30 p.m. | | | | |
| 7:30 p.m. | | | | |
| 8:30 p.m. | | | | |
| 9:30 p.m. | | | | |
| 10:30 p.m. | | | | |
| 11:30 p.m. | | | | |

\* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B).  Indicate (N/A) in these fields when applicable.

# ATTACHMENT B

"Seasonal Preparedness Directive – February 2018"

The Texas Department of Criminal Justice (TDCJ) is committed to ensuring every reasonable effort is made to prevent injuries related to excessive and extreme temperatures.  Due to the potential for excessive heat conditions in the coming months, it is imperative everyone be familiar with procedures found in AD-10.64, "Excessive and Extreme Temperature Conditions in the TDCJ," and CMHC Policy D-27.2, "Heat Stress," and take precautions to help prevent or reduce heat-related illnesses.  Hot weather training shall be conducted by April 15, 2018, or the first available date an employee returns to work, and each unit must ensure the training is documented in the TDCJ Training Database using course code HEATUNT for each employee. Employee Information Cards FN-1181 Rev. 11/15 (Prison Store Stock #700-01-06370-5) that include tips for the recognition, treatment, and prevention of heat-related illnesses, are available for units to order from the prison store.  All employees are required to carry this card on their person at all times while on duty.

On February 22, 2018, staff from the following divisions and departments: Administrative Review and Risk Management Division; Business and Finance Division; Correctional Institutions Division, including the following departments: Classification and Records, Correctional Training and Staff Development, Laundry, Food and Supply, Offender Transportation, Plans and Operations, Safe Prisons/PREA, and Security Operations; Commissary & Trust Fund; Emergency Action Center; Executive Services; Facilities; Health Services Division; Incident Management; Manufacturing, Agribusiness, and Logistics Division; Office of the General Counsel; Private Facility Contract Monitoring/Oversight Division; Public Information Office; and Windham School District met to review precautions and actions taken last year and to discuss actions for the upcoming spring and summer months.  Below is a list of mandatory precautions and actions to be implemented by the warden or department head beginning April 15, 2018, and ending October 31, 2018.  If the need arises based on forecasted temperatures, implementation may begin prior to April 15, 2018 and may end after October 31, 2018.

POSTERS AND FLYERS:
- Ensure posters "Survival Guide," "Drink Water," and "Refresh. Rehydrate. Replenish." FN-1182, 1183, and 1184 are placed throughout the unit in high traffic, high visibility areas. Posters that have been damaged or destroyed must be replaced.
- Ensure offenders are provided with an "Incoming Offender Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer I-204 upon arrival at a new unit, and upon request thereafter.

WELLNESS CHECKS AND RESPITE AREAS:
- TDCJ staff and medical providers must work closely together to identify each offender who may be susceptible to heat-related issues due to the offender's current medical condition.
- The Medical Heat Restriction List, a list of offenders identified as heat sensitive, must be provided to officers assigned to housing areas.
- During normal security checks, officers must use the Medical Heat Restriction List to conduct wellness checks for those offenders and immediately seek care for all offenders requesting medical assistance or exhibiting signs of illness.
- During periods of excessive heat, offenders must be allowed access to respite areas 24 hours per day, 7 days per week, even if he or she is not feeling ill, and offenders shall be allowed to stay as long as necessary.

PRECAUTIONS AND ACTIONS RELATED TO TRAINING:
- Conduct training to ensure employees and offenders are aware of the signs of and treatment for heat-related illnesses.
- Ensure employees and offenders are trained and are compliant with heat precaution procedures including knowledge of respite area locations and offender access. Employee training must be documented in the TDCJ Training Database using course code HEATUNT. Offender training must be documented on a roster and entered on the Individualized Treatment Plan (ITP) for each offender. Offenders shall be provided with an I-204, "Incoming Offender Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer and provided with unit specific heat mitigating measures upon arrival at a new unit.
- Ensure all employees currently have, or are provided with, Employee Information Cards Rev. 11-15 (FN-1181) and carry said cards on their person while on duty.
- Ensure all employees are aware of the procedures found in AD-10.64.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER TRANSPORT:
- Transport offenders during the coolest hours of the day, when possible.
- Only transport psychiatric inpatient offenders to another facility via air conditioned transport vehicles.
- Prioritize the use of air conditioned buses for transporting offenders with medical conditions that would make them more susceptible to the heat.
- Ensure transport officers are provided a list of offenders with heat sensitivity.  Transport officers must monitor these offenders for signs of heat-related illness.
- Allow offenders to take fans when being transported off the unit for a medical appointment.
- Load and unload transport vehicles as quickly as possible.
- Security is the first priority at every back gate; however, heat-related issues may arise when transport vehicles occupied by offenders are stationary for any length of time.  Transport vehicles may circle the perimeter or utilize a fan to cool the vehicle if the unit foresees an extended wait time.  Every reasonable effort must be made to ensure transport vehicles get into and out of the backgate in a safe and expedient manner.
- Water coolers on transport vehicles must be refilled at various times during the trip to ensure water is available.  Cups must be available to offenders on transport vehicles.
- Store paper towels that may be saturated with water and used during emergency situations when transporting offenders.

PRECAUTIONS AND ACTIONS RELATED TO OUTSIDE ACTIVITY:
- Restrict outside activity (work hours) in accordance with AD-10.64, "Excessive and Extreme Temperature Conditions in the TDCJ."
- Restrict outside recreation in accordance with SM-06.07 "Inclement Weather."
- Heat sensitive restrictions must be considered when making work assignments.
- Ensure all staff and offenders working in areas of excessive heat, such as, field, maintenance, and yard squads, are provided frequent water breaks.
- Coordinate with Maintenance and Food Service when necessary to ensure additional water, including ice, is provided to employees and offenders in work areas and encourage high water intake throughout the day during periods of excessive heat.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER INTAKE:

- As each offender arrives at an intake facility a staff member from the medical department must conduct an initial screening to determine if the offender has any conditions or is on any medication that would make them more susceptible to the heat.
- If the medical department determines an offender has a condition or is on a medication which makes them more susceptible to the heat, medical staff must promptly inform correctional staff and the offender will be placed on the Medical Heat Restriction List.
- Newly received offenders will be provided with a cup at the time of intake.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER HOUSING ASSIGNMENTS:

- Medical staff must ensure all medical restrictions on the IMF Medical Screen or HSIN Sensitive Medical Restrictions, including but not limited to an offender on psychotropic medications, are current to facilitate the appropriate methods of transportation and housing assignment for each offender.
- Heat sensitive restrictions must be considered when making housing assignments.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER HOUSING AREAS:

- Water and cups must be available at all times, to include during meal times.
- Ensure each offender has a cup when distributing water.  Indigent offenders will be provided with a cup one time per year. Offenders shall be permitted to have one cup in their possession. In the event an offender does not have a personal cup, a cup will be provided. The Food Service Department will provide items as needed.
- Provide additional water, including ice, to employees and offenders in the housing areas and encourage high water intake throughout the day during periods of excessive heat.  Staff and offenders shall be encouraged to drink fluids even if they are not thirsty during periods of excessive heat.
- During normal security checks, officers must use the Medical Heat Restriction List to conduct wellness checks for those offenders and immediately seek care for all offenders requesting medical assistance or exhibiting signs of illness.
- Allow offenders access to cold water showers.  Allow additional showers for offenders unless security is negatively impacted by staffing.  Lower the water temperature for single-temperature showers in offender housing areas.
- Allow offenders to wear t-shirts and shorts in dayrooms and recreational areas.
- When using fans, air should be drawn through the structure and exhausted outside.  Take full advantage of the fresh air exchange system or prevailing winds to assist in the movement of air as applicable.
- Increase air flow by using blowers, normally used to move hot air in the winter, when appropriate.  Attach ribbons to vents to ensure blowers are used appropriately.  Make sure window screens are clean so air flow is not restricted.
- Posters must be placed in housing areas reminding offenders of heat precautions and the importance of water intake.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER FANS:

- Offender fans must not be confiscated due to property restriction during periods of excessive heat.  Fans may only be confiscated if they are altered or stolen.
- All offenders may purchase a fan if they do not already have one.
- Fans are allowed to all custody levels, to include restrictive housing and disciplinary status.  Offenders with fans stored based on these restrictions must have their fans re-issued during periods of excessive heat.

- Ensure the fan programs are in place allowing the permanent issue of a fan to an indigent offender, on a first come first serve basis.  An offender who has a significant medical need, based on a condition or medication that is negatively impacted by heat, must be given priority.

COOLING ITEMS AVAILABLE FOR PURCHASE FROM COMMISSARY:
- Fans, cooling towels and electrolyte drink mixes are available for purchase in the commissary on each unit and are available for all custody levels, to include restrictive housing.

PRECAUTIONS AND ACTIONS RELATED TO MAINTENANCE:
- Coordinate with the Food Service and Maintenance departments to ensure ice machines are working properly and all needed preventive maintenance has been completed.
- Ensure all needed preventive maintenance to blowers, fans, evaporative coolers, and vehicles has been completed.

The above measures provide the baseline.  The wardens must allocate all available resources to ensure safety of staff and offenders during periods of excessive heat.  If additional resources are needed, wardens must contact their respective regional director.

Following the February Seasonal Preparedness meeting, during the month of March, each warden must have a meeting with the following unit department heads: risk management, maintenance, medical/health services, count room, security supervisors, and any other applicable employees to ensure all necessary actions are taken and precautions are in place.  The warden must personally conduct an audit using the checklist and report findings to the appropriate regional director.  The regional director shall forward findings to the deputy director of Prison and Jail Operations and the CID director no later than April 15, 2018.

Additionally, following the February Seasonal Preparedness meeting, the CID Director will host a system-wide conference call with wardens to discuss this directive and reiterate the importance of these measures.

Each department must post this notice in common areas on the facility.  Your attention to this matter is greatly appreciated.

Authority:   Lorie Davis, Director
             Correctional Institutions Division

# ATTACHMENT C

"Seasonal Preparedness Directive – March 2019"

The Texas Department of Criminal Justice (TDCJ) is committed to ensuring every reasonable effort is made to prevent injuries related to excessive and extreme temperatures.  Due to the potential for excessive heat conditions in the coming months, it is imperative everyone be familiar with procedures found in AD-10.64, "Excessive and Extreme Temperature Conditions in the TDCJ," and CMHC Policy D-27.2, "Heat Stress," and take precautions to help prevent or reduce heat-related illnesses.  Hot weather training shall be conducted by April 15, 2019, or the first available date an employee returns to work, and each unit must ensure the training is documented in the TDCJ Training Database using course code SEASONP for each employee.  Employee Information Cards FN-1181 Rev. 11/15 (Prison Store Stock #700-01-06370-5) that include tips for the recognition, treatment, and prevention of heat-related illnesses, are available for units to order from the prison store.  All staff are required to carry this card on their person at all times while on duty.

On February 25, 2019, staff from the following divisions and departments: Administrative Review and Risk Management Division; Business and Finance Division; Communications Department; Correctional Institutions Division, including the following departments: Classification and Records, Laundry, Food and Supply, Offender Transportation, Plans and Operations, Safe Prisons Management Office, and Security Operations; Commissary & Trust Fund; Emergency Action Center; Executive Services; Facilities Division; Health Services Division; Incident Management; Manufacturing, Agribusiness and Logistics Division; Office of the General Counsel; Private Facility Contract Monitoring/Oversight Division; Training and Leader Development Division; and Windham School District met to review precautions and actions taken last year and to discuss actions for the upcoming spring and summer months.  Below is a list of mandatory precautions and actions to be implemented by the warden or department head beginning April 15, 2019, and ending October 31, 2019.  If the need arises based on forecasted temperatures, implementation may begin prior to April 15, 2019 and may end after October 31, 2019.

POSTERS AND FLYERS:
- Ensure posters "Survival Guide," "Drink Water," and "Refresh. Rehydrate. Replenish." FN-1182, 1183, and 1184 are placed throughout the unit in high traffic, high visibility areas.  Posters that have been damaged or destroyed must be replaced.
- Ensure offenders are provided with an "Incoming Offender Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer I-204 upon arrival at a new unit, and upon request thereafter.

WELLNESS CHECKS AND RESPITE AREAS:
- TDCJ staff and medical providers must work closely together to identify each offender who may be susceptible to heat-related issues due to the offender's current medical condition.
- All staff, including Windham School District staff, contractors, and volunteers, who work with offenders must work closely together to communicate regarding offenders who may be more susceptible to heat-related illnesses.
- The Heat Restriction List, a list of offenders identified as heat sensitive, must be provided to officers assigned to housing areas.
- During normal security checks, officers must use the Heat Restriction List to conduct wellness checks for those offenders and immediately seek care for all offenders requesting medical assistance or exhibiting signs of illness, in accordance with their training on preventing, recognizing, and treating heat-related illnesses.

Page 1 of 4

- During periods of excessive heat, offenders must be allowed access to respite areas 24 hours per day, 7 days per week, even if he or she is not feeling ill, and offenders shall be allowed to stay as long as necessary.

PRECAUTIONS AND ACTIONS RELATED TO TRAINING:
- Conduct training to ensure staff and offenders are aware of the signs of and treatment for heat-related illnesses.
- Ensure staff and offenders are trained and are compliant with heat precaution procedures including knowledge of respite area locations and offender access. Employee training must be documented in the TDCJ Training Database using course code SEASONP. Offender training must be documented on a roster and entered on the Individualized Treatment Plan (ITP) for each offender. Offenders shall be provided with an I-204, "Incoming Offender Heat, Cold, Safe Prisons/PREA, and Suicide Prevention" flyer and provided with unit specific heat mitigating measures upon arrival at a new unit.
- Ensure all staff currently have, or are provided with, Employee Information Cards Rev. 11-15 (FN-1181) and carry said cards on their person while on duty.
- Ensure all staff are aware of the procedures found in AD-10.64.
- Volunteers receive training information via email. They are encouraged to familiarize themselves with preventative measures and applicable first aid responses.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER TRANSPORT:
- Transport offenders during the coolest hours of the day, when possible.
- Only transport psychiatric inpatient offenders to another facility via air conditioned transport vehicles.
- Prioritize the use of air conditioned buses for transporting offenders with medical conditions that would make them more susceptible to the heat.
- Ensure transport officers are provided a list of offenders with heat sensitivity. Transport officers must monitor these offenders for signs of heat-related illness.
- Allow offenders to take fans when being transported off the unit for a medical appointment.
- Load and unload transport vehicles as quickly as possible.
- Security is the first priority at every back gate; however, heat-related issues may arise when transport vehicles occupied by offenders are stationary for any length of time. Transport vehicles may circle the perimeter or utilize a fan to cool the vehicle if the unit foresees an extended wait time. Every reasonable effort must be made to ensure transport vehicles get into and out of the backgate in a safe and expedient manner.
- Water coolers on transport vehicles must be refilled at various times during the trip to ensure water is available. Cups must be available to offenders on transport vehicles. In the event of a breakdown requiring deployment of a rescue transportation vehicle, a fresh supply of water and ice must accompany the rescue vehicle.
- Store paper towels that may be saturated with water and used during emergency situations when transporting offenders.

PRECAUTIONS AND ACTIONS RELATED TO OUTSIDE ACTIVITY:
- Restrict outside activity (work hours) in accordance with AD-10.64.
- Restrict outside recreation in accordance with SM-06.07 "Inclement Weather."
- Heat sensitive restrictions must be considered when making work assignments.
- Ensure all staff and offenders participating in programmatic or non-programmatic activities, or working in areas of excessive heat, such as, field, maintenance, and yard squads, are

provided frequent water breaks.  Staff and offenders are permitted to bring electrolyte drink mix with them to outside recreation and work assignments.
- Coordinate with Maintenance and Food Service when necessary to ensure additional water, including ice, is provided to staff and offenders in work areas and encourage high water intake throughout the day during periods of excessive heat.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER INTAKE:
- As each offender arrives at an intake facility a staff member from the medical department must conduct an initial screening to determine if the offender has any conditions or is on any medication that would make them more susceptible to the heat.
- If the medical department determines an offender has a condition or is on a medication which makes them more susceptible to the heat, medical staff must promptly inform correctional staff and the offender will be placed on the Heat Restriction List.
- Newly received offenders will be provided with a cup at the time of intake.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER HOUSING ASSIGNMENTS:
- Medical staff must ensure all medical restrictions on the IMF MEDI Medical Screen or HSIN Sensitive Medical Restrictions, including but not limited to an offender on psychotropic medications, are current to facilitate the appropriate methods of transportation and housing assignment for each offender.
- Heat sensitive restrictions must be considered when making housing assignments.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER HOUSING AREAS:
- Water and cups must be available at all times, to include during meal times.
- Ensure each offender has a cup when distributing water.  Indigent offenders will be provided with a cup one time per year. Offenders shall be permitted to have one cup in their possession. In the event an offender does not have a personal cup, a cup will be provided. The Food Service and/or Supply Departments will provide items as needed.
- Provide additional water, including ice, to staff and offenders in the housing areas and encourage high water intake throughout the day during periods of excessive heat.  Staff and offenders shall be encouraged to drink fluids even if they are not thirsty during periods of excessive heat.
- During normal security checks, officers must use the Heat Restriction List to conduct wellness checks for those offenders and immediately seek care for all offenders requesting medical assistance or exhibiting signs of illness, in accordance with their training on preventing, recognizing, and treating heat-related illnesses.
- Allow offenders access to cold water showers.  Allow additional showers for offenders unless security is negatively impacted by staffing.  Lower the water temperature for single-temperature showers in offender housing areas.
- Allow offenders to wear t-shirts and shorts in dayrooms and recreational areas.
- When using fans, air should be drawn through the structure and exhausted outside.  Take full advantage of the fresh air exchange system or prevailing winds to assist in the movement of air as applicable.
- Increase air flow by using blowers, normally used to move hot air in the winter, when appropriate.  Attach ribbons to vents to ensure blowers are used appropriately.  Make sure window screens are clean so air flow is not restricted.
- Posters must be placed in housing areas reminding offenders of heat precautions and the importance of water intake.

PRECAUTIONS AND ACTIONS RELATED TO OFFENDER FANS:
- Offender fans must not be confiscated due to property restriction during periods of excessive heat.  Fans may only be confiscated if they are altered or stolen.
- All offenders may purchase a fan if they do not already have one.
- Fans are allowed to all custody levels, to include restrictive housing and disciplinary status.  Offenders with fans stored based on these restrictions must have their fans re-issued during periods of excessive heat.
- Ensure the fan programs are in place allowing the permanent issue of a fan to an indigent offender, on a first come first serve basis.  An offender who has a significant medical need, based on a condition or medication that is negatively impacted by heat, must be given priority.

COOLING ITEMS AVAILABLE FOR PURCHASE FROM COMMISSARY:
- Fans, cooling towels, and electrolyte drink mixes are available for purchase in the commissary on each unit and are available for all custody levels, to include restrictive housing.

PRECAUTIONS AND ACTIONS RELATED TO MAINTENANCE:
- Coordinate with the Food Service and Maintenance departments to ensure ice machines are working properly and all needed preventive maintenance has been completed.
- Ensure all needed preventive maintenance to blowers, fans, evaporative coolers, and vehicles has been completed.

The above measures provide the baseline.  The wardens must allocate all available resources to ensure safety of staff and offenders during periods of excessive heat.  If additional resources are needed, wardens must contact their respective regional director.

Following the February Seasonal Preparedness meeting, during the month of March, each warden must have a meeting with the following unit department heads: risk management, maintenance, medical/health services, count room, security supervisors, as well as Windham School District staff, Rehabilitation Programs Division staff, Manufacturing, Agribusiness and Logistics Division staff, and any other applicable staff to ensure all necessary actions are taken and precautions are in place.  The warden must personally conduct an audit using the checklist and report findings to the appropriate regional director.  The regional director shall forward findings to the deputy director of Prison and Jail Operations and the CID director no later than April 15, 2019.

Additionally, following the February Seasonal Preparedness meeting, the CID Director will host a system-wide conference call with wardens to discuss this directive and reiterate the importance of these measures.

Each department must post this notice in common areas on the facility.  Your attention to this matter is greatly appreciated.

Authority:     Lorie Davis, Director
               Correctional Institutions Division