United States District Court
Southern District of Texas

**ENTERED**

August 30, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN SAIN (TDCJ #01373168), et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-18-4412 |
| BRYAN COLLIER, et al., | § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Sain filed Plaintiffs' Class Action Complaint and Jury Demand ("Complaint") (Docket Entry No. 1) on behalf of himself and several other inmates confined by the Texas Department of Criminal Justice ("TDCJ") at the Luther Unit in Navasota. Thereafter, Sain and several other inmates filed Plaintiffs' First Amended Class Action Complaint and Jury Demand ("First Amended Complaint") (Docket Entry No 25). The defendants named in the First Amended Complaint, which seeks injunctive and declaratory relief from conditions resulting in exposure to extreme heat during the summer, include TDCJ Executive Director Bryan Collier, Warden James McKee, TDCJ, the TDCJ Correctional Managed Health Care Committee ("CMHCC"), and the University of Texas Medical Branch ("UTMB").[1]

---

[1]Warden Donald Muniz, who is no longer assigned to the Luther Unit facility, was dismissed previously and is no longer a party in
(continued...)

Now pending before the court are the following motions: UTMB's Motion to Dismiss (Docket Entry No. 19); CMHCC's Motion to Dismiss (Docket Entry No. 21); Plaintiffs' First Amended Motion for Class Certification and, in the Alternative, Motion for Expedited Discovery ("Plaintiffs' First Amended Motion for Class Certification") (Docket Entry No. 31); Motion for Summary Judgment on Behalf of Defendants Bryan Collier, James McKee, and TDCJ ("Defendants' MSJ") (Docket Entry No. 59); Plaintiffs' Supplement to Motion for Class Certification and Response to Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification with Order and Appendix (Docket Entry Nos. 72-73); Defendants' Motion to Strike Plaintiffs' Supplement to Motion for Class Certification (Docket Entry No. 82); Defendants' Motion to Strike Exhibits to Plaintiffs' First Amended Response to Defendants' Motion for Summary Judgment ("Defendants' Motion to Strike Exhibits") (Docket Entry No. 111); and Defendants' Motion for Leave to File Motion to Strike Exhibits to Docket Entry No. 112: Plaintiffs' Supplement to Plaintiffs' Rejoinder to Defendants' Reply in Support of Defendants' Motion for Summary Judgment ("Defendants' Motion for Leave to File Motion to Strike Exhibits") (Docket Entry No. 119).

---

[1](...continued)
this case. <u>See</u> Order, Docket Entry No. 68, pp. 1-2.  For purposes of identification, all page numbers reference the pagination imprinted by the court's electronic filing system, CM/ECF.

The court has considered all of the pleadings, motions, responses, replies, and supplements.  For reasons explained below, the court will deny the plaintiffs' motion for class certification. The court will grant the motions to dismiss filed by UTMB and CMHCC.  In addition, the defendants' motions to strike evidence will be denied and the motion for summary judgment filed by Collier, McKee, and TDCJ will be granted in part and denied in part.

## I.  <u>Background</u>

### A.   The Plaintiffs

The original Complaint, which was executed by the lead plaintiff, John Sain (TDCJ #01373168), asserts civil rights claims on behalf of himself and other inmates at the Luther Unit.[2]  In addition to Sain, the First Amended Complaint was executed by four other named plaintiffs who are assigned to the Luther Unit:  David Cummings (TDCJ #02153663), Phillip Gullett (TDCJ #01672020), Jerry Smith (TDCJ #02171841), and David Wilson (TDCJ #01648044).[3]  The plaintiffs have requested leave to add three other inmates at the Luther Unit:  Eugene Boston (TDCJ #02075115);  Salvador Capuchino

---

[2]Complaint, Docket Entry No. 1, pp. 107-108.

[3]First Amended Complaint, Docket Entry No. 25, pp. 108-09. Plaintiffs Michael Cummings (TDCJ #02079838), Brian Quintanilla (TDCJ #02110859), and Brandon Pruitt (TDCJ #02141885) were terminated from the case previously on April 29, 2019.  <u>See</u> Order, Docket Entry No. 67, p. 3.  Likewise, the claims of plaintiff Thyee McGruder (TDCJ #02158413) were dismissed on August 21, 2019.  <u>See</u> Order, Docket Entry No. 118, pp. 1-2.

(TDCJ #01675667); and Jesse Snearly (TDCJ #02042412).[4]  Although the court previously denied leave to add these proposed plaintiffs as parties, the court will consider their claims for purposes of resolving the pending motions.[5]

Sain describes himself as a 62-year-old inmate with "multiple sclerosis (M.S.), hypertension, prostate problems, major depression, arthritis, obesity, hypoglycemia, nerve neuropathy, vitamin and mineral deficiencies, multiple food and medicinal allergies, and difficulty processing food due to the removal of [his] stomach and a length of [his] intestine."[6]  Sain takes a variety of medications and supplements for these conditions, including an "immune system suppressant which must be received as an injection once per week, an alpha blocker, a diuretic, an anti-depressant, nerve and muscle system suppressants, and vitamin/mineral supplements."[7]  Due to his medical condition Sain

---

[4]Plaintiffs' Motion for Leave to Amend Named Plaintiffs, With Appendix and Orders, Docket Entry No. 92, p. 2.

[5]Order, Docket Entry No. 104, p. 2 (denying leave to amend subject to reconsideration after ruling on the defendants' pending motion for summary judgment).  As discussed further below, the record shows that Boston and Snearly did not exhaust administrative remedies before filing suit.  Therefore, the court will not reconsider its decision to deny leave to add them as plaintiffs. To the extent that there is a fact issue regarding whether Capuchino exhausted his administrative remedies as required, the court will grant leave to add him as a plaintiff on a provisional basis until the issue of exhaustion is resolved.

[6]Declaration of John Sain, Docket Entry No. 6-2, p. 16 ¶ 2.

[7]Id. ¶ 3.

has been "medically unassigned" for the past ten years, meaning that he is not allowed to work.[8]

Cummings describes himself as a "morbidly obese" 50-year-old inmate with "prostate cancer, high blood pressure[.]"[9] Cummings takes vitamins, an antacid, an "anti-lipemic agent, a non-steroidal anti-inflammatory agent, an ACE inhibitor, and an alpha blocker" for these conditions.[10] Like Sain, Cummings is medically unassigned for purposes of performing work.[11]

Gullett, who is 59 years of age, suffers from "type I diabetes, cirrhosis of the liver, depression, hyper-thyroid, stomach ulcers, hypertension, chronic staph infections, and various heat and humidity induced skin rashes."[12] Gullett receives insulin "two or three times per day" to treat his diabetes.[13] He also takes as prescribed "an anti-depressant, an atypical anti-psychotic, a bi-annual Hepatitis A vaccine, an anti-histamine, a non-steroidal anti-inflammatory agent, a statin, a topical dermatological anti-fungal cream, an anti-anemia drug, a loop diuretic, an ammonia detoxicate, a thyroid agent, a proton-pump inhibitor, a

---

[8] Id. ¶ 4.

[9] Declaration of David Cummings, Docket Entry No. 6-1, p. 40 ¶ 2.

[10] Id. ¶ 3.

[11] Id. ¶ 4.

[12] Declaration of Phillip Gullett, Docket Entry No. 6-2, p. 2 ¶ 2.

[13] Id. ¶ 3.

sympathomimetic agent, a mineral corticoid receptor antagonist, an adrenal topical ointment, and ursodiol for [his] liver."[14]  Due to his liver condition, Gullett reports that he is jaundiced and must make frequent trips to the prison hospital in Galveston.[15]  Gullett does not mention having a job assignment.

Smith, who reports that he is 66 years old, does not suffer from any medical conditions (other than having a pin in his right hip and one leg shorter than the other), but states that he "suffer[s] a lot just due to [his] age."[16]  He does not take any medication, but he uses "a cane for all movement."[17]  Smith does not mention having a job assignment, but notes that he is restricted to "sedentary work only," with no lifting over 20 pounds and no walking over 100 yards.[18]

Wilson describes himself as a 51-year-old inmate with "obesity, poor vision, and cellulitis in [his] lower legs."[19]  His medical conditions "require the use of both special shoes and a cane for ambulatory movement."[20]  Wilson's medications include "a

---

[14]Id.

[15]Id.

[16]Declaration of Jerry Smith, Docket Entry No. 6-3, p. 2 ¶ 2.

[17]Id. ¶¶ 3 and 2.

[18]Id. ¶ 4.

[19]Declaration of David Wilson, Docket Entry No. 6-3, p. 5 ¶ 2.

[20]Id.

topical dermatological ointment and an NSAID/Oxicam."[21]  Wilson is assigned to work in the prison laundry, where "the apparent temperature . . . is higher than other sections of [the] Luther Unit."[22]

Boston describes himself as a 65-year-old inmate with high blood pressure, tinnitus, and depression.[23] His medications include "an ACE inhibitor (Lisinopril), a calcium channel blocking agent (Verapamil), an alpha blocker (Terazosin), a statin (Atorvastatin), and a Selective Serotonin Reuptake Inhibitor (SSRI) (Citalopram)."[24] He performs work as an "SSI" or janitor who cleans the dorm restroom and living areas.[25]

Capuchino is a 45-year-old inmate who reportedly suffers from "hypertension, angina, dysrhythmia, arthritis, coronary artery disease, obesity, muscle cramping, neuropathy, degenerative disc disease, spinal fusion, asthma, pneumonia, gastric esophageal reflux disease (GERD), and allergies."[26] He has been prescribed "a beta blocker, an ACE Inhibitor, a calcium channel blocker, a loop diuretic, an anti-histamine, a non-steroidal anti-inflammatory

---

[21]Id. ¶ 3.

[22]Id. ¶ 4.

[23]Exhibit 1, Declaration of Eugene Boston, Docket Entry No. 92-1, p. 3 ¶ 2.

[24]Id. ¶ 3.

[25]Id. ¶ 4.

[26]Exhibit 3, Declaration of Salvador Capuchino, Docket Entry No. 92-1, p. 10 ¶ 2.

agent, nitroglycerin, and [a] proton pump inhibitor."[27]   Despite these conditions, Capuchino works in the laundry.[28]

Snearly is a 23-year-old inmate with "no chronic medical conditions" or prescription medications.[29]  He also reportedly works in the Luther Unit laundry facility.[30]  Although Snearly considers himself to be "healthy," he states that he feels the effects of heat exhaustion day and night, both in the housing dormitories and at work, because of conditions that are inadequate to afford relief from the outdoor heat.[31]

## B.   The Defendants

The plaintiffs sue two individual defendants under 42 U.S.C. § 1983 for denying them access to climate-controlled conditions of confinement in violation of the Eighth Amendment to the United States Constitution.[32]  The lead defendant, Bryan Collier, is sued in his official capacity as Executive Director of TDCJ.[33]

---

[27]Id. ¶ 3.

[28]Id. ¶ 4.

[29]Declaration of Jesse Snearly, Docket Entry No. 92-1, p. 17 ¶¶ 2 and 3.

[30]Id. ¶ 5.

[31]Id. ¶ 7.

[32]First Amended Complaint, Docket Entry No. 25, pp. 101-02 ¶¶ 315-22.

[33]Id. at 11 ¶ 19.

-8-

James McKee is also sued in his official capacity as Warden of the Luther Unit.[34]

The plaintiffs sue three state entities, TDCJ, UTMB, and CMHCC, for failing to accommodate their "heat sensitive disabilities" in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").[35]   TDCJ is the state agency responsible for operating the Texas prison system, including the Luther Unit, which incarcerates convicted felons.[36]   UTMB is a public medical school that provides "direct patient care" for inmates confined at certain TDCJ facilities, including the Luther Unit, under a contract with the State of Texas.[37]   CMHCC is not an agency, but is a statutorily created committee made up of members employed by TDCJ, UTMB, Texas Tech University Health Science Center ("TTUHSC"), employees of other medical schools, and members of the public who are appointed by the governor.   The purpose of CMHCC is to develop a managed health care plan for TDCJ inmates.[38]

---

[34]Id. at 11 ¶ 20.

[35]Id. at 102-05 ¶¶ 323-32.   The plaintiffs also reference the ADA Amendments Act of 2008 ("ADAAA").   See id.   The court will treat claims under the ADAAA as those arising under the ADA.

[36]Id. at 11 ¶ 22 (citing Tex. Gov't Code § 493.004).

[37]Id. at 12 ¶ 24.

[38]Id. at 12 ¶ 23 (citing Tex. Gov't Code § 501.133); see also CMHCC's Motion to Dismiss, Docket Entry No. 21, pp. 3-4 (citing Tex. Gov't Code § 501.146).

**C.    Conditions at the Luther Unit**

All of the named plaintiffs are currently serving prison sentences at the Luther Unit, which is operated by TDCJ in Navasota, Grimes County, Texas.[39]  Opened in 1982,[40] the Luther Unit has the capacity to house 1,316 inmates and held 1,263 inmates as of July 31, 2018.[41]  The plaintiffs describe the Luther Unit as a "medical facility" that "houses geriatric inmates, inmates with both physical and mental disabilities, and inmates with chronic medical problems," as well as "able-bodied" inmates who perform work in "the fields, laundry, maintenance, the kitchen, and other assigned locations," under conditions that are, for the most part, not air-conditioned.[42]

The plaintiffs present evidence that the heat index for the geographical area where the Luther Unit is located regularly exceeds 90° F (Fahrenheit) during the summer months and frequently exceeds 100° F, particularly in the middle of the day.[43]  The plaintiffs assert that temperatures inside the Luther Unit can be

---

[39]First Amended Complaint, Docket Entry No. 25, p. 12 ¶ 25.

[40]Exhibit 2, TDCJ Unit Directory:  Luther Unit, Docket Entry No. 6-1, p. 34.

[41]First Amended Complaint, Docket Entry No. 25, p. 13 ¶ 27; Exhibit 1, TDCJ - Offenders On Hand at the Luther Unit as of July 31, 2018, Docket Entry No. 6-1, pp. 4-32.

[42]First Amended Complaint, Docket Entry No. 25, p. 13 ¶ 30.

[43]See Temperature Log forms, Docket Entry Nos. 6-4 through 6-13.  For purposes of this Order all temperatures are reported in Fahrenheit.

even hotter than outside temperatures because of inadequate ventilation.[44]

The plaintiffs report that the law library, the education building, and the visitation area of the Luther Unit have air-conditioning, but that access to these locations is limited.[45]  All administrative offices are also air-conditioned.[46]  With the exception of a dormitory with 12 beds reserved for inmates with "serious medical conditions" who require "assisted living,"[47] all other dormitories where inmates are housed do not have air-conditioning.[48]

According to the plaintiffs, the dormitories are poorly ventilated because windows are often difficult to open or close and, while most have screens, gaps in the screen mesh allow "small black biting bugs and others to enter," which irritate the inmates.[49]  There is a ventilation system at the Luther Unit that features industrial fans to circulate air and inmates are also allowed to own a personal fan to promote air flow, but the

---

[44]First Amended Complaint, Docket Entry No. 25, pp. 16-17 ¶ 46. <u>See</u> Exhibit 128, Fifth Sworn Affidavit of John Sain, Docket Entry No. 105-26, p. 5 (alleging that he has observed dorm temperature readings in the 125° F to 130° F range).

[45]First Amended Complaint, Docket Entry No. 25, p. 18 ¶ 48.

[46]<u>Id.</u> at 22 ¶ 60.

[47]<u>Id.</u> at 25 ¶ 68.

[48]<u>Id.</u> at 14 ¶ 32.

[49]<u>Id.</u> at 17 ¶ 45.

plaintiffs assert that neither the ventilation system nor the personal fans operate during power outages, which can occur at night or when there is a storm.[50]  Plaintiffs state that whenever power goes out the exhaust fans installed to evacuate smoke and toxic gas as part of the Luther Unit's "Fire Alarm System" do not work.[51]

All of the named plaintiffs, with the exception of Snearly, who is young and suffers from no pre-existing medical condition, claim that exposure to extreme heat in the Luther Unit, particularly its dormitory housing areas, has caused them to suffer health problems during the summer months, including difficulty in breathing, nausea, headaches, dizziness, muscle cramps, and weakness.[52]  To remedy these conditions, the plaintiffs seek injunctive relief ordering prison officials to provide air-conditioning for all inmates at the Luther Unit on a class-wide basis similar to the relief authorized by the district court in litigation by inmates at the Pack Unit, which is adjacent to the Luther Unit in Navasota.[53]

---

[50]Id. at 14 ¶ 34.

[51]Id. at 7 ¶ 2 and 15 ¶ 35.

[52]See Exhibit 1, Declaration of Eugene Boston, Docket Entry No. 105-1, p. 8; Exhibit 3A, Declaration of David Cummings, p. 14; Exhibit 4, Declaration of Phillip Gullett, Docket Entry No. 105-1, p. 21; Exhibit 8, Declaration of John Sain, Docket Entry No. 105-1, pp. 35-36; Exhibit 9, Declaration of Jerry Smith, Docket Entry No. 105-1, p. 42; Exhibit 10, Declaration of Jesse Snearly, Docket Entry No. 105-1, p. 45.

[53]First Amended Complaint, Docket Entry No. 25, pp. 8-9 ¶ 7.

D.    **The Pack Unit Litigation and <u>Cole v. Collier</u>**

In 2014 inmates at the Pack Unit filed a lawsuit in this district, seeking injunctive relief from exposure to extreme heat. That case, which eventually became known as <u>Cole v. Collier</u>, Civil No. H-14-1698 (S.D. Tex.), resulted in the certification of a general class of "[a]ll inmates who currently are, or in the future will be, incarcerated at the Pack Unit, and who are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas."[54] The district court also certified two sub-classes of Pack Unit inmates, including a "Heat-Sensitive Subclass" and a "Disability Subclass" that were defined respectively as follows:

> (1)   All people who are incarcerated at the Pack Unit, or in the future will be, that are subjected to TDCJ's policy and practice of failing to regulate high indoor heat index temperatures in the housing areas, and either:  (1) have a physiological condition that places them at increased risk of heat-related illness, injury, or death (including, but not limited to, suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, sweat gland dysfunction, and thyroid dysfunction); or, (2) are prescribed an anticonvulsant, anticholinergic, antipsychotic, antihistamine, antidepressant, beta blocker, or diuretic; or (3) are over age 65; and

> (2)   All people incarcerated at the Pack Unit, or who will be in the future, that are subjected to TDCJ's

_____

[54]Memorandum and Order dated June 14, 2016, in <u>Cole v. Livingston</u>, Civil No. H-14-1698, Docket Entry No. 473, pp. 2-3. Sometime after the Memorandum and Order was entered in the <u>Cole</u> case, former Executive Director Brad Livingston retired and current Executive Director Bryan Collier was substituted as the lead defendant in his place pursuant to Fed. R. Civ. P. 25(d).

> policy and practice of failing to regulate high
> indoor heat index temperatures in the housing areas
> and suffer from a disability that substantially
> limits one or more of their major life activities
> and who are at increased risk of heat-related
> illness, injury, or death due to their disability
> or any medical treatment necessary to treat their
> disability.[55]

After a nine-day evidentiary hearing the district court concluded that TDCJ's existing efforts to mitigate the effects of extreme heat for inmates at heightened risk of harm, either from medical conditions or medication regimens that "decrease the body's ability to regulate temperatures," were "insufficient" and that conditions at the Pack Unit violated the Eighth Amendment right to be free from cruel and unusual punishment.[56]  The district court identified the following medical conditions that "impede thermoregulatory functioning," placing individuals at higher risk for heat-related illnesses such as heat stroke:  (1) diabetes; (2) obesity; (3) cardiovascular disease, including chronic hypertension and arteriosclerosis; (4) psychiatric conditions; (5) advanced age; (6) pulmonary disease, such as Chronic Obstructive Pulmonary Disease ("COPD"), emphysema, and asthma; (7) sweat gland dysfunction; and (8) cirrhosis of the liver, cystic fibrosis, and thyroid dysfunction.[57]  The district court also identified several

---

[55]Id. at 3.

[56]Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law dated July 19, 2017, in Cole v. Collier, Civil No. H-14-1698, Docket Entry No. 737, p. 91.

[57]Id. at 32-35.

types of medications that exacerbate the effects of heat on the body.[58]

The court in <u>Cole</u> credited testimony from an expert witness (Dr. Susi Vassallo), who observed that the risk of heat-related illness increases when temperatures exceed a threshold of 88° F.[59] Concluding that exposure to extreme heat posed a serious risk of harm that was not addressed adequately by TDCJ, the district court held that the <u>Cole</u> plaintiffs were entitled to preliminary injunctive relief and ordered the defendants to: "correct the numerous problems with the existing respite program"; lower the temperature in housing areas for heat-sensitive inmates; install window screens to block insects from entering windows of the housing areas; develop a "heat wave policy for the Pack Unit;" and propose within a set time frame remedies that conform to the district court's order.[60]

The parties in <u>Cole</u> engaged in mediation and reached a settlement agreement, in which TDCJ agreed to install air-conditioning in housing units where the class members reside and to "maintain indoor heat indices at or below 88 degrees Fahrenheit between April 15 and October 15 of each year."[61]   The settlement

---

[58]<u>Id.</u> at 35-37.

[59]<u>Id.</u> at 40.

[60]<u>Id.</u> at 98.

[61]Final Order and Judgment Approving Class Action Settlement and Attorneys' Fees, dated June 8, 2018, in <u>Cole v. Collier,</u> Civil No. H-14-1698, Docket Entry No. 1188, p. 5.

agreement called for temporary air-conditioning to be put in place between April and October 2018, and 2019, with "permanent air conditioning in all housing areas of the Pack Unit before April 15, 2020, to keep the heat index at 88 degrees Fahrenheit or less."[62] The settlement agreement was approved by the district court on June 8, 2018.[63]

E.   **The Plaintiffs' Claims**

Pointing to the record in Cole, the plaintiffs argue that the defendants are on notice that excessive heat poses a significant risk to inmate health and safety, but have disregarded this risk where they are concerned.[64]  The plaintiffs allege that an inmate at the Luther Unit (identified by the plaintiffs as "Inmate C") died in July of 2018, shortly after the Cole settlement was finalized, from "apparent heat-related illness" complicated by "chronic asthma" and other unspecified "comorbidities" that placed him at a high risk of heat-related illness.[65]  The plaintiffs state that inmates at other TDCJ facilities such as the Pack Unit have access to air-conditioning, but that TDCJ has chosen not to install air-conditioning at the Luther Unit for "political and financial

---

[62]Id.

[63]Id. at 35.

[64]First Amended Complaint, Docket Entry No. 25, p. 28 ¶ 83.

[65]Id. at 40-41 ¶¶ 134, 135.

reasons."[66]  The plaintiffs assert that the <u>Cole</u> litigation mandates relief for inmates at the Luther Unit because TDCJ and Director Collier are aware that exposure to excessive heat puts inmates at risk of heat-related illnesses, injuries, and/or death, but have failed to take steps to prevent these conditions by installing air-conditioning in areas where most prisoners live, work, eat, and receive other services.[67]

Similar to the <u>Cole</u> litigation, the plaintiffs in this case seek certification of a general class of all inmates at the Luther Unit with two subclasses for Luther Unit inmates who (1) are sensitive to heat for medical reasons; and (2) suffer from a disability that renders them susceptible to the effects of extreme heat.[68]  Arguing that conditions at the Luther Unit violate the Eighth Amendment, the ADA, and the RA, the plaintiffs seek a permanent injunction ordering the defendants to provide (1) consistent "24/7" electrical power throughout the Luther Unit facility to each cubicle outlet, dorm, and roof-mounted exhaust fan for the purpose of ensuring fire safety and air circulation; (2) implementation of an "equitable or better accommodation" similar to the Pack Unit Respite Program; (3) implement an "equitable or better accommodation" similar to the Pack Unit air-conditioning plan by requiring that indoor temperatures be

---

[66]<u>Id.</u> at 27 ¶ 80.

[67]<u>Id.</u> at 28 ¶ 83.

[68]<u>Id.</u> at 92-94 ¶¶ 298-300.

maintained "below dangerous levels" with a heat index of 88° F or lower in all areas where inmates congregate, including all "housing, work, program, activity, and service areas, dining areas, the gymnasium, dayrooms, hallways, new building construction, laundry areas, and kitchen work areas inside the Luther Unit;" and (4) equal access and accommodation to all programs, activities, and services.[69]

## II.  **Plaintiffs' Motion for Class Certification**

The plaintiffs ask the court to certify a general class of all inmates at the Luther Unit, with subclasses for medically sensitive inmates and those with disabilities that are similar to those certified by the district court in <u>Cole.</u>[70]  To obtain class certification a litigant must satisfy four threshold requirements found in Rule 23(a) of the Federal Rules of Civil Procedure by establishing that

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;
>
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   the representative parties will fairly and adequately protect the interests of the class.

---

[69]<u>Id.</u> at 107 ¶ 344(d)(iii).

[70]<u>Id.</u> at 92-94 ¶¶ 298-300.  <u>See also</u> Plaintiffs' First Amended Motion for Class Certification, Docket Entry No. 31, pp. 9-10.

FED. R. CIV. P. 23(a); see also Amchem Products, Inc. v. Windsor, 117 S. Ct. 2231, 2245 (1997) (listing the "four threshold requirements" of numerosity, commonality, typicality, and adequacy of representation for purposes of class certification under Rule 23(a)).   As the party seeking class certification, the plaintiffs bear the burden of proof with respect to these requirements.   Castano v. American Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996).

Even assuming that they could satisfy the first three pre-requisites for class certification, the plaintiffs in this case cannot meet the fourth criteria found in Rule 23(a)(4) regarding adequacy of representation.   To meet the adequacy requirement "the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members."   Unger v. Amedisys Inc., 401 F.3d 316, 321 (5th Cir. 2005) (citing Stirman v. Exxon Corp., 280 F.3d 554, 562 (5th Cir. 2002)).   The plaintiffs do not have counsel and are representing themselves.   As pro se litigants, the plaintiffs cannot establish that they can adequately represent the rights of others.   See McGrew v. Texas Board of Pardons & Paroles, 47 F.3d 158, 162 (5th Cir. 1995) (per curiam) (citing Gonzales v. Cassidy, 474 F.2d 67, 72 (5th Cir. 1973)).   Although the plaintiffs have vigorously pursued this suit, courts have consistently held that "a prisoner proceeding pro se is inadequate to represent the interests of his fellow inmates in a class action."   Caputo v. Fauver, 800

-19-

F. Supp. 168, 170 (D.N.J. 1992) (citations omitted); <u>see also</u>
<u>DeBrew v. Atwood</u>, 792 F.3d 118, 132 (D.C. Cir. 2015) ("[A] pro se
litigant who is not trained as a lawyer is simply not an adequate
class representative."); <u>Fymbo v. State Farm Fire and Casualty Co.</u>,
213 F.3d 1320, 1321 (10th Cir. 2000) (observing that "the
competence of a layman is 'clearly too limited to allow him to risk
the rights of others'") (quoting <u>Oxendine v. Williams,</u> 509 F.2d
1405, 1407 (4th Cir. 1975)); <u>Binkley v. Rendell</u>, Civ. No. 1:10-
1245, 2012 WL 263655, at *6 (M.D. Penn. Jan. 30, 2012) ("It is
well-established that a prisoner proceeding <u>pro se</u> is inadequate to
represent the interests of his fellow inmates[s] in a class
action.") (citations omitted); 7A Charles Alan Wright & Arthur R.
Miller, Federal Practice and Procedure § 1769.1 & n.13 (3rd ed.)
("[C]lass representatives cannot appear <u>pro se.</u>") (collecting
cases).

Although the plaintiffs have asked the court to appoint
counsel for the proposed class under Rule 23(g),[71] "the purpose of
Rule 23(g) is not to enable <u>pro se</u> plaintiffs to obtain [appointed]
counsel in conjunction with class certification; the purpose of the
rule is to ensure that the <u>proposed</u> class counsel is adequate."
<u>Howard v. Pollard</u>, 814 F.3d 476, 478 (7th Cir. 2015) (emphasis in
original).  There is no automatic right to appointment of counsel
in civil rights cases.  <u>See Baranowski v. Hart,</u> 486 F.3d 112, 126

---

[71]Plaintiffs' First Amended Motion for Class Certification,
Docket Entry No. 31, p. 45.

(5th Cir. 2007); <u>Ulmer v. Chancellor,</u> 691 F.2d 209, 212 (5th Cir. 1982).  Where a litigant proceeds <u>in forma pauperis,</u> the court may "request an attorney to represent any person unable to afford counsel."  28 U.S.C. § 1915(e)(1); <u>see also Mallard v. United States Dist. Ct. for the S. Dist. of Iowa,</u> 109 S. Ct. 1814, 1823 (1989) (holding that the statute governing <u>in forma pauperis</u> cases does not authorize "coercive appointments of counsel" for indigent litigants in civil cases).  The plaintiffs have not requested leave to proceed <u>in forma pauperis;</u> nor have they provided the necessary evidentiary support for making such a determination in compliance with the Prison Litigation Reform Act (the "PLRA"), which governs this suit.  <u>See</u> 28 U.S.C. § 1915(a)(2) (requiring a certified copy of an inmate's trust fund account statement or institutional equivalent).  Accordingly, the court will deny the Plaintiffs' First Amended Motion for Class Certification at this time without addressing any of the other arguments raised by the parties.

### III.  <u>Motions to Dismiss By UTMB and CMHCC</u>

Defendant UTMB moves to dismiss the plaintiffs' claims against it under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[72]  Defendant CMHCC also moves to dismiss the plaintiffs' claims against it under Rules 12(b)(1), 12(b)(6), and 9(a).[73]  The

---

[72]UTMB's Motion to Dismiss, Docket Entry No. 19, p. 1.

[73]CMHCC's Motion to Dismiss, Docket Entry No. 21, p. 1.

plaintiffs have filed a response to each motion,[74] to which both UTMB and CMHCC have filed a reply.[75]

## A.    Standards of Review

Federal courts are "courts of limited jurisdiction, having 'only the authority endowed by the Constitution and that conferred by Congress.'" Halmekangas v. State Farm Fire and Casualty Co., 603 F.3d 290, 292 (5th Cir. 2010). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." Krim v. pcOrder.com, Inc., 402 F.3d 489, 494 (5th Cir. 2005). Dismissal under Rule 12(b)(1) is appropriate if the plaintiff lacks the requisite standing to sue. See, e.g., Little v. KPMG LLP, 575 F.3d 533, 540-41 (5th Cir. 2009) (affirming dismissal for lack of standing under Rule 12(b)(1)). When a Rule 12(b)(1) challenge is raised with other Rule 12 challenges, the court should consider the Rule 12(b)(1) arguments before addressing any attack on the merits. Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001) (citing Hitt v. City of Pasadena, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).

---

[74]Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss the CMHCC Pursuant to Rule 12(b) ("Plaintiffs' Response to Defendants' Motion to Dismiss CMHCC"), Docket Entry No. 39, pp. 1-11; Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss the UTMB Pursuant to Rule 12(b), Docket Entry No. 40, pp. 1-10.

[75]Defendant UTMB's Reply to Plaintiff's Response in Opposition to the UTMB's Motion to Dismiss, Docket Entry No 43, pp. 1-8; CMHCC's Reply in Support of its Motion to Dismiss, Docket Entry No. 44, pp 1-7.

Motions to dismiss under Rule 12(b)(6) are appropriate only where the plaintiff's complaint fails to state a claim upon which relief can be granted. In reviewing a motion under Rule 12(b)(6), a court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." Bustos v. Martini Club, Inc., 599 F.3d 458, 461 (5th Cir. 2010). To withstand a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level[.]" Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). If the complaint has not set forth "enough facts to state a claim to relief that is plausible on its face," it must be dismissed. Id. at 1974.

The plaintiffs are representing themselves and have capably done so thus far.[76] Courts are required to give a pro se litigant's contentions a liberal construction. See Erickson v. Pardus, 127 S. Ct. 1081, 2200 (2007) (citing Estelle v. Gamble, 97 S. Ct. 285, 292 (1976)); see also Haines v. Kerner, 92 S. Ct. 594, 595-96 (1972) (noting that allegations in a pro se complaint, however inartly pleaded, are held to less stringent standards than formal pleadings drafted by lawyers). Nevertheless, "[t]hreadbare

---

[76]It is evident that the plaintiffs have access to the pleadings and exhibits filed by counsel for class members in the Cole v. Collier litigation. Although it appears that the plaintiffs have been aided by these professionally prepared documents, the court will apply the standard of liberal construction to the plaintiffs' pleadings.

recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 127 S. Ct. at 1965).

## B.   Claims Against UTMB

UTMB moves to dismiss because the plaintiffs seek relief that UTMB cannot provide -- particularly uninterrupted electricity, air-conditioning, and implementation of heat mitigation measures.[77] Because the pleadings do not allege that UTMB has caused the complained of conditions or has the ability to grant the relief sought, UTMB argues that the plaintiffs fail to establish the requisite case or controversy for purposes of establishing standing to sue and that the plaintiffs further fail to state a claim upon which relief may be granted for that reason.[78]

Article III of the United States Constitution limits federal court jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) ("'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" (quoting Raines v. Byrd, 117 S. Ct. 2312, 2317 (1997))). "[T]he requirement that a claimant have 'standing is an

---

[77]UTMB's Motion to Dismiss, Docket Entry No. 19, p. 1.

[78]Id. at 3-9.

essential and unchanging part of the case-or-controversy requirement of Article III.'" <u>Davis v. Federal Election Comm'n,</u> 128 S. Ct. 2759, 2768 (2008) (quoting <u>Lujan v. Defenders of Wildlife,</u> 112 S. Ct. 2130, 2136 (1992)).

It is well established that "the irreducible constitutional minimum of standing contains three elements." <u>Lujan,</u> 112 S. Ct. at 2136. To satisfy these elements a plaintiff seeking injunctive or declaratory relief must have (1) suffered an injury-in-fact that is concrete and actual or imminent, not hypothetical; (2) that is fairly traceable to the defendant's actions; and (3) that is likely to be redressed by a favorable decision. <u>See id.</u> at 2136; <u>see also BroadStar Wind Systems Group Ltd. Liability Co. v. Stephens,</u> 459 F. App'x 351, 356, 2012 WL 171619, at *3 (5th Cir. 2012) (per curiam) ("Standing to seek declaratory judgment is subject to these same requirements."). At the motion-to-dismiss stage "the plaintiff must clearly . . . allege facts demonstrating each element." <u>Spokeo,</u> 136 S. Ct. at 1547 (internal quotation marks omitted).

UTMB is a public medical school under contract to provide "direct patient care" to offenders housed at some of TDCJ's prisons, including the Luther Unit.[79] <u>See also, e.g., Norman v. TDCJ-ID,</u> 293 F. App'x 285, 287, 2008 WL 4238279, at *1 (5th Cir. Sept. 17, 2008) (per curiam) (noting that "[t]hrough a committee

---

[79]First Amended Complaint, Docket Entry No. 25, p. 12 ¶ 24.

-25-

created by the state legislature, the TDCJ contracts out its medical services to the University of Texas Medical Branch and the Texas Tech University Health Sciences Center."). As a matter of state law TDCJ, and not UTMB, is responsible for operating the Luther Unit, which is part of the state prison system.[80] See Tex. Gov't Code § 494.001 ("The mission of [TDCJ's Correctional Institutions Division] is to provide safe and appropriate confinement, supervision, rehabilitation, and reintegration of adult felons, and to effectively manage or administer correctional facilities based on constitutional and statutory standards."). The plaintiffs acknowledge that TDCJ, not UTMB, is the final authority and decision-maker with respect to the implementation of policies affecting the Luther Unit.[81]

The plaintiffs, whose primary claim concerns the lack of access to climate-controlled conditions of confinement or effective heat mitigation measures, do not allege any facts showing that they have suffered an injury or that they have been exposed to unsafe conditions created by UTMB's conduct. Likewise, the plaintiffs do not allege any facts showing that UTMB can install air conditioning at the Luther Unit or that it has authority to provide any of the other relief sought. Absent a showing that UTMB has caused any of the complained of conditions or that it has the ability to redress

---

[80] Id. at 11 ¶ 22 (citing Tex. Gov't Code § 493.004).

[81] Id. at 23 ¶ 63 ("The TDCJ Medical Director shall retain final approval authority for all statewide policies and procedures.").

the wrongs alleged, the plaintiffs fail to show that they have standing to seek injunctive or declaratory relief against UTMB. See Okpalobi v. Foster, 244 F.3d 405, 426-27, 431 (5th Cir. 2001) (en banc) (concluding that the plaintiffs failed to demonstrate standing to obtain injunctive or declaratory relief because the defendants lacked authority and had "no power to redress the asserted injuries"). For the same reasons, the plaintiffs fail to state a claim upon which relief may be granted where UTMB is concerned. Accordingly, UTMB's Motion to Dismiss will be granted.

## C.   Claims Against CMHCC

CMHCC also moves to dismiss the plaintiffs' claims for lack of standing, arguing that it lacks the authority to redress the alleged violations.[82]   CMHCC notes that it is a committee created by the Texas Legislature for the limited purpose of developing a "managed health care plan" for inmates incarcerated in the state prison system, which is operated by TDCJ.   See Tex. Gov't Code § 501.146.   Although the plaintiffs correctly note that CMHCC assists TDCJ in developing health care policies, only TDCJ has the authority to order, fund, or otherwise require that air conditioning be installed at the Luther Unit.[83]   Under these

---

[82]CMHCC's Motion to Dismiss, Docket Entry No. 21, pp. 3-5.

[83]Id. at 4.   The plaintiffs claim that CMHCC has the authority to enter into contracts for certain services.   See Plaintiffs' Response to Defendants' Motion to Dismiss CMHCC, Docket Entry No. 39, p. 5 (citing Tex. Gov't Code § 501.148(c)-(d)).   CMHCC
(continued...)

circumstances an injunction against CMHCC would be meaningless. See Okpalobi, 244 F.3d at 426-27. Because the plaintiffs have not shown that they satisfy this element of standing, CMHCC's Motion to Dismiss for lack of jurisdiction will be granted.

CMHCC also invokes Rule 9(a) of the Federal Rules of Civil Procedure and argues that the plaintiffs' claims must be dismissed because, as a committee that is subservient to TDCJ, CMHCC lacks capacity to sue or be sued.[84] CMHCC argues, therefore, that it is not a proper party to this suit.[85] Lack of capacity to be sued is a defense that may be raised by a defendant under Rule 9(a)(2) and asserted in a motion under Rule 12(b)(6). See Barrie v. Nueces County District Attorney's Office, 753 F. App'x 260, 265, 2018 WL 5095824, at *3 (5th Cir. Oct. 17, 2018) (per curiam). To have the requisite capacity to sue or be sued, a governmental department or political subdivision must "enjoy a separate legal existence." Darby v. Pasadena Police Dep't, 939 F.2d 311, 313 (5th Cir. 1991) (citation and internal quotation marks omitted). "[U]nless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot

---

[83] (...continued)
notes, however, that the statutory provision relied upon by the plaintiffs was repealed in 2013. See Acts 2013, 83rd Leg., R.S., Ch. 1154, Sec. 29(e), eff. Sept. 1, 2013. Currently, only TDCJ has the authority to contract with an entity to "fully implement the managed health care plan." Tex. Gov't Code § 501.147(b)(5).

[84] CMHCC's Motion to Dismiss, Docket Entry No. 21, pp. 5-6.

[85] Id.

engage in any litigation except in concert with the government itself." Id.

An entity's capacity to sue or be sued "shall be determined by the law of the state where the court is located." Fed. R. Civ. P 17(b)(3). To have the requisite capacity under Texas law, a governmental department or political subdivision must have been granted the authority to "sue or be sued." Darby, 939 F.2d at 313. CMHCC points to numerous examples in which the Texas legislature explicitly granted a state-created entity the power to sue and be sued.[86] By contrast, the statutory scheme that authorizes CMHCC to assist TDCJ with developing state-wide policies related to inmate health care does not include any language granting CMHCC the power to sue and be sued. See Tex. Gov't Code §§ 501.131-501.156. The plaintiffs do not identify any statutory provision that explicitly grants CMHCC with the authority to sue or be sued on its own

---

[86] Id. at 6 & n.2. Examples of state statutes expressly conferring the authority to sue and be sued include: Tex. Gov't Code § 81.014 ("The state bar may sue and be sued in its own name."); Tex. Loc. Gov't Code § 327.161 ("A zoo board may sue and be sued."); Tex. Educ. Code § 45.152(b) (stating that an athletic stadium authority "may sue and be sued"); Tex. Agric. Code § 58.022(2) (creating the Agricultural Finance Authority and including the power "to sue and be sued"); Tex. Agric. Code § 60.060(a) ("The [agricultural development] district may sue and be sued."); Tex. Bus. Orgs. Code § 101.605(1) ("A series established under this subchapter has the power and capacity, in the series' own name, to: (1) sue and be sued; (2) contract."); Tex. Educ. Code § 22.08-App.(b) ("The trustees or common consolidated school district may sue and be sued, plead or be impleaded, in any court of Texas of proper jurisdiction."); Tex. Gov't Code § 1232.067(3) (specifying that the Board of the Texas Public Finance Authority "may sue and be sued").

behalf.  Absent specific legislative action that explicitly confers upon CMHCC the power to sue or be sued, CMHCC lacks the requisite legal capacity and cannot be sued.  For this additional reason, CMHCC's Motion to Dismiss will be granted.

## IV.  <u>Motion for Summary Judgment By Collier, McKee, and TDCJ</u>

Executive Director Bryan Collier, Warden James McKee, and TDCJ have filed a joint motion for summary judgment on the plaintiffs' claim that, by not affording access to cooled air or climate-controlled conditions, these defendants have violated the Eighth Amendment, as well as the ADA and the RA.[87]  In support, the defendants present evidence of a heat mitigation plan implemented as a result of the <u>Cole v. Collier</u> settlement and records showing that several of the named plaintiffs have not exhausted administrative remedies before filing this suit as required by the PLRA, which governs this lawsuit.  The plaintiffs have filed a response,[88] and the defendants filed a reply.[89]  The defendants filed

---

[87]Defendants' MSJ, Docket Entry No. 59.  A separate copy of the Defendants MSJ, which contains a brief un-redacted discussion of the plaintiffs' medical records, is filed under seal.  <u>See</u> Docket Entry No. 60, pp. 22-24.

[88]Plaintiffs' Response to Defendants' Motion for Summary Judgment, with Order and Appendix, Docket Entry No. 74.  The Appendix of exhibits are filed separately at Docket Entry Nos. 75 and 76.

[89]Reply in Support of the Motion for Summary Judgment on Behalf of Defendants Bryan Collier, James McKee, and the Texas Department of Criminal Justice, Docket Entry No. 86.

a motion to strike certain exhibits,[90] to which plaintiffs have filed a response.[91]  Thereafter, the plaintiffs submitted an amended response,[92] and a sur-reply.[93]  The defendants have filed a reply to the plaintiffs' amended response and motions to strike certain exhibits.[94]

## A.    Standard of Review

Defendants' MSJ is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under this rule a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2018); see also Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  A fact is "material" if its resolution in favor of one party might

---

[90]Motion to Strike Exhibits to Plaintiffs' Response to Defendants' Motion for Summary Judgment, Docket Entry No. 87.

[91]Plaintiffs' Response to Defendants' Motion to Strike Exhibits to Plaintiffs' Response for Defendants' Motion for Summary Judgment, with Order, Docket Entry No. 100.

[92]Plaintiffs' First Amended Response to Defendants' Motion for Summary Judgment, with Appendix and Order ("Plaintiffs' First Amended Response"), Docket Entry No. 105.

[93]Plaintiffs' Rejoinder to Defendants' Reply in Support of Defendants' Motion for Summary Judgment, with Appendix and Order ("Plaintiffs' Rejoinder"), Docket Entry No. 107.

[94]Reply to Plaintiffs' First Amended Response to Motion for Summary Judgment on Behalf of Defendants Bryan Collier, James McKee, and the Texas Department of Criminal Justice ("Defendants' Reply"), Docket Entry No. 110; Defendants' Motion to Strike Exhibits, Docket Entry No. 111; Defendants' Motion for Leave to File Motion to Strike Exhibits, Docket Entry No. 119.

affect the outcome of the suit under governing law.   <u>Anderson v.</u> <u>Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2510 (1986).   An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.   <u>Id.</u>

In deciding a summary judgment motion, the reviewing court must "construe all facts and inferences in the light most favorable to the nonmoving party."   <u>Dillon v. Rogers,</u> 596 F.3d 260, 266 (5th Cir. 2010) (internal quotation marks omitted).   If the movant demonstrates an "absence of evidentiary support in the record for the nonmovant's case," the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial."   <u>Sanchez v. Young County, Texas,</u> 866 F.3d 274, 279 (5th Cir. 2017) (citing <u>Cuadra v. Houston Indep. Sch. Dist.,</u> 626 F.3d 808, 812 (5th Cir. 2010)); <u>see also Matsushita Electric Industrial</u> <u>Co., Ltd. v. Zenith Radio Corp.,</u> 106 S. Ct. 1348, 1356 (1986).   The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.   <u>See Diamond Offshore Co.</u> <u>v. A&B Builders, Inc.,</u> 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, the non-movant cannot avoid summary judgment by presenting "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."   <u>Jones v. Lowndes County, Mississippi,</u> 678 F.3d 344, 348 (5th Cir. 2012) (quoting <u>TIG Ins. Co. v. Sedgwick James of</u> <u>Washington,</u> 276 F.3d 754, 759 (5th Cir. 2002)); <u>see also Little v.</u> <u>Liquid Air Corp.,</u> 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (a

non-movant cannot demonstrate a genuine issue of material fact with
conclusory allegations, unsubstantiated assertions, or only a
scintilla of evidence). Further, the court has no obligation under
Rule 56 "'to sift through the record in search of evidence to
support a party's opposition to summary judgment.'" Adams v.
Travelers Indem. Co. of Connecticut, 465 F.3d 156, 164 (5th Cir.
2006).

## B.   Evidentiary Issues

Before turning to the arguments presented in Defendants' MSJ,
the court will address several evidentiary issues raised by the
parties. The defendants have filed motions to strike certain
exhibits filed by the plaintiffs in response to the summary
judgment motion.[95] The defendants note that several of the
plaintiffs' exhibits are mislabeled or out of order as they appear
in the court's electronic filing system, CM/ECF.[96] The court has
retained the original version of the exhibits submitted by the
plaintiffs in their response to the summary judgment, which are
voluminous, and has made every effort to identify them with page-
number cites to the record where they appear in CM/ECF.

---

[95]Defendants' Motion to Strike Exhibits, Docket Entry No. 111,
pp. 1-10; Defendants' Motion to Strike Exhibits to Docket Entry
112: Plaintiffs' Supplement to Plaintiffs' Rejoinder to Defendants'
Reply in Support of Defendants' Motion for Summary Judgment, Docket
Entry No. 119-2, pp. 1-5.

[96]Defendants' Motion to Strike Exhibits, Docket Entry No. 111,
p. 1.

To the extent that the defendants have lodged objections to content found in many of the plaintiffs' exhibits, the court has taken the objections into account when determining whether the exhibits contain competent, admissible evidence for purposes of the summary judgment motion.[97]   Therefore, the defendants' motions to strike will be denied as unnecessary.

In their response to the Defendants' MSJ, the plaintiffs appear to argue that this case is not ripe for consideration because they have not had the opportunity to pursue discovery.[98] The plaintiffs argue, in particular, that they require an expert witness to provide a report regarding the effectiveness of the heat mitigation strategies in place at the Luther Unit.[99]   Defendants have presented a report from Dr. Dean Rieger, who describes the heat mitigation program that TDCJ has implemented and offers an opinion about its efficacy for lowering the risk of heat stroke.[100] The court has taken judicial notice of expert reports that the

---

[97]To the extent that the defendants challenge sworn statements provided by the plaintiffs and other inmates as offering improper expert opinions, the court may consider evidence from fact or lay witnesses regarding matters within their personal knowledge about the conditions of confinement at the Luther Unit.   See United States v. Valencia, 600 F.3d 389, 416 (5th Cir. 2010) (citing Fed. R. Evid. 701; and National Hispanic Circus, Inc. v. Rex Trucking, Inc., 414 F.3d 546, 551-52 (5th Cir. 2005)).

[98]Plaintiffs' First Amended Response, Docket Entry No. 105, pp. 11, 12.

[99]Id. at 12.

[100]Exhibit B, Declaration of Dr. Dean Rieger and Report, Docket Entry No. 59-3, pp. 2-32.

plaintiffs have provided, which were originally submitted in connection with the <u>Cole v. Collier</u> litigation.[101]   Because the available record discloses fact issues that preclude summary judgment on several issues, the court does not consider whether the plaintiffs' argument warrants a continuance for the purpose of allowing discovery under Rule 56(d) of the Federal Rules of Civil Procedure.

## C.   Exhaustion of Administrative Remedies

Because this case is governed by the PLRA, 42 U.S.C. § 1997e(a), the plaintiffs were required to exhaust administrative remedies before filing a suit challenging prison conditions.[102]   <u>See</u> <u>Woodford v. Ngo,</u> 126 S. Ct. 2378, 2382-83 (2006) (citing <u>Porter v. Nussle,</u> 122 S. Ct. 983, 988 (2002); <u>Booth v. Churner,</u> 121 S. Ct. 1819, 1825 (2001)); <u>see also Jones v. Bock,</u> 127 S. Ct. 910, 918-19 (2007) (confirming that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court").   The Fifth Circuit has construed § 1997e(a) to

---

[101]Exhibit 20, Dr. McGeehin's Expert Report, Docket Entry No. 105-5, pp. 1-32; Exhibit 23, Dr. Vassallo's Expert Report, Docket Entry No. 105-6, pp. 1-27; Exhibit 21, Dr. Vassallo's Supplemental Report, Docket Entry No. 105-5, pp. 32-36.

[102]Section 1997e(a) provides that

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

require "that administrative remedies be exhausted <u>before</u> the filing of a § 1983 suit." <u>Wendell v. Asher,</u> 162 F.3d 887, 890 (5th Cir. 1998); <u>see also Johnson v. Johnson,</u> 385 F.3d 503, 515 (5th Cir. 2004); <u>Harris v. Hegmann,</u> 198 F.3d 153, 157 (5th Cir. 1999). Because pre-filing exhaustion is mandatory, a case must be dismissed if available administrative remedies were not exhausted. <u>See Gonzalez v. Seal,</u> 702 F.3d 785, 788 (5th Cir. 2012) (noting further that "[d]istrict courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint").

TDCJ has a formal two-step administrative grievance process. <u>See Johnson,</u> 385 F.3d at 515; <u>see also Wendell,</u> 162 F.3d at 891 (outlining the two-step procedure, which at Step 1 entails submitting an administrative grievance at the institutional level followed by a Step 2 appeal if the result is unfavorable). A Step 1 grievance, which is reviewed by officials at the inmate's assigned facility, must be filed within fifteen days of the alleged incident or challenged event. <u>See Johnson,</u> 385 F.3d at 515. Once an inmate receives a response to his Step 1 grievance, he then has ten days to file a Step 2 grievance to appeal an unfavorable result at the state level. <u>See id.</u> Substantial compliance with this process is not enough to exhaust remedies under the PLRA. <u>Dillon,</u> 596 F.3d at 268 ("Under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion . . . ."). A Texas prisoner must pursue

a grievance through both steps to satisfy the exhaustion requirement. See Johnson, 385 F.3d at 515 (citation omitted).

The defendants acknowledge that plaintiffs David Cummings, Phillip Gullett, and David Wilson appear to have properly completed the exhaustion process with regard to the claims raised in the First Amended Complaint.[103]  The evidence suggests that John Sain and Salvador Capuchino have also filed grievances that appear to have placed the defendants on notice of at least some of their claims in this case.[104]  A fact issue remains as to whether Sain and Capuchino have exhausted required administrative remedies.

The defendants present evidence showing that Jerry Smith and two other proposed plaintiffs (Eugene Boston and Jesse Snearly) have not filed any grievances since January 1, 2016, and have not attempted to exhaust administrative remedies with respect to the claims presented.[105]  Accordingly, the claims by these plaintiffs are subject to dismissal for lack of exhaustion.

---

[103]Defendants' MSJ, Docket Entry No. 59, p. 53, n.9.

[104]Exhibit TT, Grievances #2019003068, #2018170415, #2018141180, #2016181204, Docket Entry No. 60-9, pp. 8-10, 11-22, 33-36 (grievances regarding a disciplinary conviction imposed when Sain objected to an inadequate response to a heat-related emergency, inadequate ventilation in the housing units due to power outages, and overheated conditions resulting in heat-related illness); Exhibit UU, Grievances #2018186706, #2018177352, and #2019003062, Docket Entry No. 60-10, pp. 3-15 (grievances regarding abusive treatment by officers in respite areas and a disciplinary conviction that involved a request for respite).

[105]Exhibits II, JJ, KK, Affidavits from Vickie Barrow, Docket Entry Nos. 59-36, 59-37, and 59-38 (stating that neither Boston, Snearly, nor Smith, has filed a grievance during the time period relevant to this suit).

-37-

The plaintiffs appear to acknowledge that several of the named plaintiffs have not exhausted administrative remedies as required.[106] They argue that only one of the named plaintiffs needs to have satisfied the exhaustion requirement for their claims to proceed as a class action.[107] As the plaintiffs correctly note, the Fifth Circuit has held that the exhaustion requirement is satisfied for a class of plaintiffs if at least one named plaintiff has completed the grievance process. See Gates v. Cook, 376 F.3d 323, 330 (5th Cir. 2004) (citations omitted). Here, however, no class has been certified. Under these circumstances, each named plaintiff must satisfy the exhaustion requirement, which is not excused by the mere filing of a motion for class certification. See, e.g., Leonard v. Federal Bureau of Prisons, No. 3:06-CV-1322-N, 2007 WL 1703638, at *2-3 (N.D. Tex. June 13, 2007) (concluding that a prisoner could not rely on Gates where he fails to meet the prerequisites for a class action).

The Fifth Circuit has emphasized that "pre-filing exhaustion of prior grievance process is mandatory" and that district courts lack discretion to excuse a prisoner's failure to exhaust his

---

[106]Plaintiffs' First Amended Response, Docket Entry No. 105, pp. 74-75. The plaintiffs argue that, in addition to exhaustion by Cummings, Gullett, and Wilson, two other prisoners (Brandon Pruitt and Brian Quintanilla) have exhausted administrative remedies. See id. at 74. The plaintiffs overlook the fact that both Pruitt and Quintanilla were previously dismissed from this case at the plaintiffs' request. See Order, Docket Entry No. 67, p. 3.

[107]First Amended Complaint, Docket Entry No. 25, p. 95 ¶ 307.

administrative remedies.  <u>Gonzalez</u>, 702 F.3d at 788.  Because the record reflects that Jerry Smith, Eugene Boston, and Jesse Snearly did not exhaust available administrative remedies before filing this suit, the defendants are entitled to summary judgment on the claims of these plaintiffs.

## D.   Claims Under the Eighth Amendment

Pointing to the <u>Cole v. Collier</u> case involving the Pack Unit, the plaintiffs allege that the defendants have violated the Eighth Amendment by continuing to expose them to "extremely high indoor temperatures at the Luther Unit despite acknowledging these high indoor apparent temperatures put inmates at risk of heat-related illnesses, injuries, and/or death."[108]  The plaintiffs point to records showing that "outdoor apparent temperatures at the Luther Unit routinely exceed 100° F during the summer" at both the Pack Unit and the nearby Luther Unit facilities.[109]  The plaintiffs assert that an inmate identified as "Inmate C" died in early July of 2018, "from apparent heat-related illness complicated by asthma."[110]  Despite this incident the plaintiffs claim that Warden McKee has failed to investigate costs associated with ways to cool even a single indoor housing area at the Luther Unit and that

---

[108]First Amended Complaint, Docket Entry No. 25, p. 28 ¶ 83.

[109]<u>Id.</u> at 28-30 ¶¶ 84-87 (Tables 1, 2, and 3).

[110]<u>Id.</u> at 40 ¶ 134.

Director Collier has taken "no steps to bring the dangerous temperatures down in any TDCJ facility."[111]

1.   Eighth Amendment Legal Standard

To the extent that Plaintiffs John Sain, David Cummings, Phillip Gullett, David Wilson, and Salvador Capuchino have exhausted administrative remedies, their claims concerning the conditions of their confinement are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment, i.e., the "unnecessary and wanton infliction of pain." Wilson v. Seiter, 111 S. Ct. 2321, 2323 (1991) (quoting Estelle v. Gamble, 97 S. Ct. 285, 291 (1976)).  The Supreme Court has recognized that prison conditions may be "restrictive and even harsh" without violating the Eighth Amendment. Rhodes v. Chapman, 101 S. Ct. 2392, 2399 (1981).  Although the Constitution "'does not mandate comfortable prisons,' . . . neither does it permit inhumane ones." Farmer v. Brennan, 114 S. Ct. 1970, 1976 (1994) (quoting Rhodes, 101 S. Ct. at 2400).  Specifically, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" Farmer, 114 S. Ct. at 1976 (internal quotation marks omitted).

To demonstrate a violation of the Eighth Amendment where conditions of confinement are concerned, a prisoner must

_____

[111]Id. at 31 ¶¶ 89-90.

demonstrate that his confinement resulted in a deprivation that was "objectively, sufficiently serious," such that it resulted in the denial of "the minimal civilized measure of life's necessities." Farmer, 114 S. Ct. at 1977 (quoting Rhodes, 101 S. Ct. 2399). See, e.g., Palmer v. Johnson, 193 F.3d 346, 354 (5th Cir. 1999) (finding that conditions violated the Eighth Amendment where inmates were herded into a small outdoor space, deprived of protection from excessive cold and wind, and provided no sanitary means of disposing of their waste). Under this standard courts must measure prison conditions under the "evolving standards of decency that mark the progress of a maturing society[.]" Gates v. Cook, 376 F.3d 323, 332-33 (5th Cir. 2004) (citation and internal quotation marks omitted).

If a sufficiently serious deprivation is shown, a plaintiff must then show that prison officials acted with "deliberate indifference" to the effect that this deprivation would have on his health and safety. Farmer, 114 S. Ct. at 1977. "Deliberate indifference is an extremely high standard to meet." Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer,

-41-

114 S. Ct. at 1979.  A prison official acts with the requisite deliberate indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 1984.

The Fifth Circuit has repeatedly recognized that the Eighth Amendment "'guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures.'"  Yates v. Collier, 868 F.3d 354, 360 (5th Cir. 2017) (quoting Hinojosa v. Livingston, 807 F.3d 657, 669 (5th Cir. 2015)); see also Gates, 376 F.3d at 339-40 (addressing claims of exposure to extreme heat and conditions posing a substantial risk of heat-related illness).  The Fifth Circuit has qualified that "merely uncomfortable heat in a prisoner's cell does not reflect a basic human need that the prison has failed to meet."  Ball v. LeBlanc, 792 F.3d 584, 592 (5th Cir. 2015) ("Ball I") (internal citation and quotation marks omitted). However, extreme heat in prison cells amounts to a constitutional violation when it poses "an unreasonable risk of serious damage to a prisoner's health" and prison officials act with deliberate indifference to the risk.  Id.

The plaintiffs seek an injunction directing prison officials to air condition the housing units and other areas frequented by inmates at the Luther Unit.  Although air conditioning in prison cells is not "necessarily an impermissible remedy," Yates, 868 F.3d at 370, the Prison Litigation Reform Act limits the availability of prospective injunctive relief.  See Ball I, 792 F.3d at 598-99

-42-

(cautioning that injunctive relief under the PLRA must be "'narrowly drawn'" and "'shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs,'" quoting 18 U.S.C. § 3626(a)(1)(A)). The Fifth Circuit has found that an injunctive remedy requiring air-conditioning is inappropriate unless "other acceptable and less-intrusive remedies" have been tried and found unsuccessful. Yates, 868 F.3d at 370. The Fifth Circuit has upheld the use of heat mitigation measures such as ice, fans, and showers as alternative means by prison officials to reduce the risk of exposure to extreme heat. See Ball v. LeBlanc, 881 F.3d 346, 352 n.10 (5th Cir. 2018) ("Ball II") (collecting cases).

### 2.   The Defendants' Evidence and Arguments

The defendants argue that there has never been a heat-related death at the Luther Unit and present evidence that Inmate C died as the result of chronic asthma that was not attributed to or caused by exposure to excessive heat.[112] The defendants point to medical records showing that Inmate C refused respiratory therapy and work restrictions that were offered shortly before his death.[113] The

---

[112]Defendants' MSJ, Exhibit MM, Autopsy Report and Death Certificate, Docket Entry No. 60-2, pp. 2, 11 (Concluding that the cause of death was "acute respiratory failure due to asthma exacerbation"); Exhibit NN, Correctional Managed Health Care Urgent/Emergent Care Record, Docket Entry No. 60-3, pp. 14-23. See also Exhibit B, Report of Dr. Dean Rieger, Docket Entry No. 59-3, p. 10.

[113]Exhibit NN, Correctional Managed Health Care, Refusal of Treatment or Services, Docket Entry No. 60-3, pp. 3-4, and Clinic (continued...)

defendants also present evidence that the Luther Unit has adopted a comprehensive strategy to reduce the risk of heat-related injury or death pursuant to a Three Year Plan for Offenders Who Are at Highest Risk for Heat Related Illness ("Three-Year Plan"), and a related administrative policy which includes mitigation measures, education, and monitoring.[114]

       a.    The Three-Year Plan

The Three-Year Plan features new policies and mitigation measures that were not in place before the Cole litigation, including:  "allowing offenders unlimited access to air-conditioned respite areas at any time and for any reason; providing cool-down showers and unlimited iced drinking water; increasing training for both offenders and officers regarding heat-stress illnesses and available mitigation measures; and creating an Incident Command System to uniformly respond to periods of excessive temperatures."[115]

The Three-Year Plan also features a new process to place certain offenders who may be at an increased risk of developing a heat-stress illness in air-conditioned housing by assigning "every

---

[113](...continued)
Notes, Docket Entry No. 60-3, pp. 5-14.  The plaintiffs dispute that Inmate C's death was not exacerbated by heat, but present no evidence to support their argument.  See Plaintiffs' First Amended Response, Docket Entry No. 105, p. 41.

[114]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, pp. 4-15.

[115]Defendants' MSJ, Docket Entry No. 59, p. 9.

offender in the TDCJ system . . . a Heat Sensitivity Score based on their medical conditions and prescribed medications."[116]   This system, which is designed to identify "Cool Bed Priority (CBP) offenders," was developed after consultation with medical professionals and incorporates 26 factors that were used to define the Cole sub-class for inmates with heat-sensitivity due to medical issues.[117]  The general categorization of inmates considered to have "Group 1 factors" include those with the following issues:

    1.    Heart and Medical Disease – Offenders are CBP offenders if they have certain conditions, such as:

        a.    Coronary artery disease and chronic ischemic heart disease;

        b.    Previous myocardial infarction;

        c.    Heart failure;

        d.    An implantable cardiac device/ pacemaker; or

        e.    Percutaneous transluminal coronary angioplasty or a stent.

    2.    Mental Health Disorders – Offenders are CBP offenders if they have one of the following active psychiatric conditions:

        a.    Schizophrenia;

        b.    Schizo-affective disorder;

        c.    Psychosis; or

        d.    Bipolar disorder.

---

[116]Id.

[117]Id. at 13; Exhibit A, Three-Year Plan, Docket Entry No. 59-2, pp. 8-9 (explaining that these conditions are considered "Group 1 factors" and that offenders who have at least one Group 1 factor are considered "Cool Bed Priority (CBP) offenders").

3.   Dementia and Alzheimer's Disease – Offenders are CBP offenders if they have dementia or Alzheimer's disease.

4.   Developmental Disabilities – Offenders are CBP offenders if they are developmentally disabled. This includes, but is not limited to, offenders in the Developmental Disabilities Program (DDP).[]

5.   65 Years of Age or Older – Offenders are CBP offenders if they are 65 years or older and have certain conditions or are prescribed certain medications, such as:

   a.   Asthma and are prescribed inhaled or oral steroids and/or long-acting beta-agonist inhalers;

   b.   Chronic Obstructive Pulmonary Disease and are prescribed inhaled or oral steroids and/or long-acting beta-agonist inhalers;

   c.   Cirrhosis and are also receiving one of the following: a diuretic, daily laxatives, or the non-absorbable antibiotics Rifaximin or Neomycin;

   d.   A body mass index (BMI) equal to or greater than 40;

   e.   A BMI equal to 35 but less than 40 and are receiving diuretic medication;

   f.   Diabetes or hypertension with target organ damage; or

   g.   High-activity anticholinergic medications.[118]

Inmates who have a Heat Sensitivity Score of at least one point and those who are designated as a developmentally disabled or DDP offenders are considered to have priority for air-conditioned

---

[118]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 9.

housing.[119]   Inmates who do not meet any of the Group 1 factors will
have a Heat Sensitivity Score of zero.[120]

To implement the Three-Year Plan TDCJ identified approximately
12,000 offenders with a Heat Sensitivity Score of 1 or greater,
4,900 of whom were already located in air-conditioned housing.[121]
Starting in July of 2018 TDCJ relocated 745 offenders with the
highest Heat Sensitivity Scores to air-conditioned housing at the
LeBlanc Unit.[122]   During the first four months of 2019 TDCJ
continued to re-assign inmates to air-conditioned housing based on
their Heat Sensitivity Scores.[123]   Three inmates who were originally
listed as named or prospective plaintiffs in this lawsuit (Michael
Cummings, TDCJ #2079838; Michael Alberts, TDCJ #1554298; and
Antonio Almaraz, TDCJ #1421575) have been moved to air-conditioned
housing as the result of their Heat Sensitivity Scores.[124]

Under the terms of the Cole settlement TDCJ has installed
temporary air conditioning at the Pack Unit, which accommodates

---

[119]Id. at 9-10.

[120]Id. at 9.

[121]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 11.

[122]Id.

[123]Defendants' Supplement to Their Motion for Summary Judgment,
Docket Entry No. 64, pp. 1-2, and Exhibit WW, Affidavit of Justin
Brock, Docket Entry No. 64-1, pp. 2-3 (documenting the relocation
of 142 inmates in January 2019; 315 inmates in February 2019; 294
inmates in March 2019; and 272 inmates in April 2019).

[124]Exhibit LL, Affidavit of Debra Gibbs, Docket Entry No. 60-1,
pp. 2-3.

1,478 inmates, with plans to construct and install permanent air-conditioning at that facility.[125]  To accommodate the security and medical needs of other identified inmates whose Heat Sensitivity Score indicate a priority, TDCJ intends to install permanent air-conditioning in all housing areas at the Hodge Unit,[126] which is anticipated to be completed by 2021.[127]  TDCJ also plans to re-purpose units that are already air-conditioned housing, including "expansion cell blocks" found at the Clements Unit, the Allred Unit, the Smith Unit, and the Gib Lewis Unit, as well as "12-Building" facilities of the Robertson Unit, the McConnell Unit, and the Polunsky Unit in 2019.[128]  TDCJ plans to re-purpose portions of several other state-operated prison units (the Cotulla Unit, the Tulia Unit, the Fort Stockton Unit, the Ney State Jail, and the Chase Field Work Camp) and several privately operated facilities (the Willacy County State Jail, the B. Moore Unit, the Diboll Unit, the Cleveland Unit, and the Estes Unit) by the end of 2021.[129]

---

[125]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 5.

[126]The Three-Year Plan expressly addresses the special needs of developmentally disabled or DDP inmates by air-conditioning the Hodge Unit.  See Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 12.  The Hodge Unit, which is located near the Skyview Unit, houses inmates who are developmentally disabled and may lack the "mental capacity to reliably exercise regular, normal self-care . . . to help mitigate the risk of heat-related illness."  Id.

[127]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 12.

[128]Id. at 12-13.

[129]Id. at 14-15.

TDCJ has also sought additional funding to create air-conditioned special housing for aging offenders at the Stiles Unit and the Lane Murray Unit.[130]  The defendants report that, based on their current Heat Sensitivity Scores, plaintiffs Sain and Gullett are among those inmates who are scheduled to be moved to air-conditioned housing by 2021.[131]

In addition to implementing an automated system that tracks inmates with heat sensitivity and available "cool beds,"[132] medical providers within TDCJ began a "therapeutic conversion" to reduce the number of inmates with mental health disorders who were prescribed tricyclic antidepressants (TCAs), which can affect heat sensitivity.[133]  As of December 18, 2018, there are no longer any patients in TDCJ who are prescribed TCAs.[134]

   b.   Revisions to Administrative Directive 10.64

The Three-Year Plan was adopted pursuant to a revised version of TDCJ Administrative Directive 10.64 (rev. 9) ("AD-10.64") to address extremes in temperature conditions.[135]  AD-10.64 includes

---

[130]Id. at 11.

[131]Defendants' MSJ, Docket Entry No. 59, p. 9; Exhibit C, Affidavits of Sarah Wright, Docket Entry No. 59-4, pp. 2-3 (John Sain) and pp. 6-7 (Phillip Gullett).

[132]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, pp. 10-11.

[133]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 10.

[134]Id.

[135]Attachment A to Exhibit A, AD-10.64, Docket Entry No. 59-2, pp. 17-33.

specific heat mitigation measures that are intended to protect all offenders regardless of their individual risk level.[136]   These measures include making respite areas available 24 hours per day, seven days per week, for all offenders who are not assigned to air-conditioned housing.[137]  Offenders may request access to a respite area "even if they are not feeling ill at the time of the request, and are permitted to stay in the respite area as long as necessary."[138] In addition, offenders requesting such access "are not required to be seen by medical staff unless they are exhibiting signs or symptoms of a heat-related illness."[139]

The newly revised version of AD-10.64 also requires prison units to take extra precautions where the heat index is above 90 degrees, including, but not limited to:

- ○   Providing additional water and cups in offender dorms, housing areas, recreational areas, and during meal times, along with ice;

- ○   Transporting psychiatric inpatient offenders to other facilities via air-conditioned transfer vehicles only;

- ○   Transporting offenders during the coolest hours of the day, when possible;

- ○   Allowing offenders to utilize and carry cooling towels;

---

[136]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 7.

[137]Id.

[138]Id.

[139]Id.

o   Allowing offenders to wear shorts and t-shirts in dayrooms and recreational areas;

o   Ensuring maintenance of fans, blowers, and showers in offender housing areas;

o   Allowing additional showers for offenders when possible;

o   Lowering the water temperature for single temperature showers in offender housing areas;

o   Placing posters in housing areas reminding offenders of heat precautions and the importance of water intake, and ensuring all posters that have been damaged or destroyed are replaced; and

o   Allowing fans for offenders in all custody levels, to include restrictive housing and disciplinary status, and ensuring the fan program is in place allowing the permanent issuance of fans to indigent offenders.[140]

In addition to these measures, wardens are instructed to implement additional precautions when excessive heat or heat-wave conditions last more than three consecutive days by initiating the Incident Command System,[141] which is based upon the National Incident Management System protocols developed by the Department of Homeland Security for improved coordination in response to emergency situations.[142]  Under these conditions wardens may restrict, and potentially cancel, outside work and recreation and may also reduce

---

[140]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 7; Attachment A to Exhibit A, AD-10.64, Docket Entry No. 59-2, p. 25.

[141]Attachment A to Exhibit A, AD-10.64, Docket Entry No. 59-2, p. 25.

[142]Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 6.

kitchen and dish room operations as needed.[143]  Inmates are also permitted to purchase "electrolyte sports drinks from the unit commissary without affecting their spending limit."[144]

AD-10.64 contains additional provisions for first-aid measures in the event of a heat-related illness or injury and features a standardized annual training program that is required at each unit to ensure prevention of injuries due to excessive or extreme temperatures.[145]  Training is required for both officers and inmates.[146]

Pursuant to the new revision of AD-10.64, TDCJ has issued an annual "Seasonal Preparedness Directive" to ensure compliance with procedures developed to prevent illness or injuries related to extreme temperatures beginning on April 15 through the end of October, or at any other time when forecasted temperatures so require.[147]  The list of mandatory precautions and actions required to be implemented generally includes:

   o   Providing flyers and posting information in
       high visibility areas about heat mitigation
       measures.

---

[143]Id. at 25-26.

[144]Id. at 26.

[145]Id. at 27-29.

[146]Id. at 29-30.  Exhibits J and K, Officer and Offender Heat Training Videos, Docket Entry No. 61.

[147]Defendants' MSJ, Attachment B to Exhibit A, "Seasonal Preparedness Directive - February 2018," Docket Entry No. 59-2, pp. 35-38, and Attachment C to Exhibit A, "Seasonal Preparedness Directive - March 2019," Docket Entry No. 59-2, pp. 40-43.

○   Instituting "wellness checks" and monitoring by staff, medical providers, and all others who work with inmates to identify those who are heat sensitive and immediately seek care for those requesting medical assistance or exhibiting signs of an illness.

○   Conducting training to ensure that all staff and inmates are aware of the signs of heat-related illnesses and that all staff are aware of procedures found in AD-10.64.

○   Limiting transportation and prioritizing the use of air-conditioned transport vehicles.

○   Restricting outside activity such as work and recreation.

○   Ensuring that additional water and ice are provided to staff and offenders in work areas.

○   Screening newly arrived inmates to determine if they have conditions or a prescription for medication that makes them more susceptible to heat.

○   Considering heat-sensitive restrictions when making housing assignments.

○   Ensuring access to water, ice, and cold showers in the housing areas.

○   Ensuring that inmates at all custody levels have access to a working fan, cooling towels, and electrolyte drinks, which are available at the commissary.

○   Ensuring that all necessary preventive maintenance is completed on ice machines, blowers, fans, evaporative coolers, and vehicles.[148]

Wardens are required to allocate "all available resources to ensure safety of staff and offenders during periods of excessive heat" and to contact their respective regional director if more resources are

---

[148]Exhibit C, Seasonal Preparedness Directive - March 2019, Docket Entry No. 59-2, pp. 40-43.

Case 4:18-cv-04412   Document 120   Filed on 08/30/19 in TXSD   Page 54 of 76

needed.[149]   To ensure that the heat mitigation measures are implemented correctly, wardens must personally conduct an audit using a preparedness checklist that is then forwarded to the regional director and to the Director of the TDCJ Correctional Institutions Division (currently Lorie Davis).[150]

> c.   Implementation of Measures at the Luther Unit

The defendants present evidence consisting primarily of affidavits from former Assistant Warden Fernando Fuster, who was assigned to the Luther Unit until October 31, 2018,[151] and Senior Warden McKee, who has been assigned to the Luther Unit since December 1, 2018,[152] detailing the extent that the above-referenced remedial measures have been implemented at the Luther Unit since 2018. According to the affidavits provided by these officials and other supporting documentation provided by the defendants, implementation of AD-10.64 has emphasized the several measures, which are summarized below, to reduce the effects of exposure to extreme heat in the summer.

---

[149]Id. at 43.

[150]Id.  See also Exhibit R, Seasonal Preparedness Checklist for the Luther Unit, dated March 29, 2018, Docket Entry No. 59-19, pp. 3-7.

[151]Exhibit G, Affidavit of Fernando Fuster ("Fuster Affidavit"), Docket Entry No. 59-8, p. 2.  Fuster reports that, since November 1, 2018, he has been Senior Warden at TDCJ's Travis County State Jail.  See id.

[152]Exhibit H, Affidavit of James McKee ("McKee Affidavit"), Docket Entry No. 59-9,  p. 2.

Training is required for "all staff" at the Luther Unit on preventing, identifying, and treating heat-related illnesses.[153] All inmates at the Luther Unit were required to participate in "heat-illness prevention training" at least once during the summer, either during job training or in the gym for all inmates who had "unassigned job status."[154]  All newly transferred inmates to the Luther Unit receive a flyer (I-204) about temperature extremes and other information provided as part of a prison safety program during orientation.[155]  In addition, the Seasonal Preparedness Directive and safety posters are displayed in housing, common, and work areas, instructing offenders on how to avoid heat-related illness.[156]

A monitoring system is used to determine whether to implement additional measures that are required when the heat index exceeds 90° F or to initiate the Incident Command System protocol for periods of excessive heat or heat-wave conditions lasting longer than three days.[157]  Officials at the Luther Unit reportedly

---

[153]Fuster Affidavit, Docket Entry No. 59-8, p. 4.  See also Exhibits J and K, Officer and Offender Heat Training Videos, Docket Entry No. 61 (on file with the clerk's office).

[154]Fuster Affidavit, Docket Entry No 59-8, p. 4.

[155]Id. (referencing I-204, which is described as a "Hot/Cold, PREA [Prison Rape Elimination Act], Suicide Prevention Flyer").

[156]Fuster Affidavit, Docket Entry No. 59-8, p. 2; McKee Affidavit, Docket Entry No. 59-9, p. 3.

[157]Defendants' MSJ, Docket Entry No. 59, p. 29.

-55-

monitor, record, and announce the temperature and heat index every hour on the half hour.[158]

Ice water is reportedly available to the inmates in accessible coolers 24 hours a day, seven days a week.[159]  Correctional officers are to be advised at staff meetings of their responsibility to keep the coolers in their area of assignment filled with ice and water.[160]  The Luther Unit has five icemakers, two in the ice house, one in the officers' dining room, one in the kitchen, and one at the Trusty Camp.[161]   The Luther Unit commissary also has ample amounts of electrolyte replenishment drinks and mixes available for inmates.[162]

All housing areas at the Luther Unit and the trusty camp have windows to the outside that can be opened by the inmates, unless directed otherwise by a correctional officer.[163]  The windows that open are covered by screens to allow airflow.[164]  Warden McKee notes

---

[158]Fuster Affidavit, Docket Entry No. 59-8, p. 3; McKee Affidavit, Docket Entry No. 59-9, p. 3.

[159]Fuster Affidavit, Docket Entry No. 59-8, p. 3.

[160]Id.

[161]Id.

[162]Exhibit Y, Electrolyte Sales - Luther Unit, Docket Entry No. 59-26, p. 3 (reflecting that 145,856 electrolyte drinks and drink mixes were dispensed through the commissary at the Luther Unit during 2018).

[163]Fuster Affidavit, Docket Entry No. 59-8, p. 4.

[164]McKee Affidavit, Docket Entry No. 59-9, p. 4.

that a work order request has been approved to replace window screens in multiple locations at the Luther Unit.[165]

All inmates at the Luther Unit, including those who are indigent, reportedly have access to a personal fan for their housing area.[166]   In addition, there are wall-mounted fans throughout the prison and large drum fans that are used to re-circulate air located in the corners of all dorms, chow halls, and the trusty camp dayroom.[167]

Although the plaintiffs allege that fans are inoperable during power outages, the defendants present evidence showing that there have been only two instances of power outages at the Luther Unit since 2016.[168]   The defendants provide an affidavit from a maintenance supervisor at the Luther Unit, who states that temporary power outages from storms have been rare and that when they do happen these outages are of "extremely short duration, lasting from seconds to a matter of minutes."[169]   There are four

---

[165]Id.  See also Exhibit DD, TDCJ Facilities Division Decision Memorandum dated January 29, 2019, and attached documentation, Docket Entry No. 59-31, pp. 6-9.

[166]Fuster Affidavit, Docket Entry No. 59-8, pp. 3-4 (referencing the "indigent fan program").

[167]Id. at 4.  See also Exhibit P, Photographs, Docket Entry No. 59-17, pp. 22-25, 29, 54-55, 65-66, 70-72, 74, 78, 80, 82-83, 86-87, 89-90, 94-95, 97, 99, 109, 120-21, 125, 127, 140-43, 146, 147 (depicting wall mounted fans, mobile fans, and drum fans).

[168]Fuster Affidavit, Docket Entry No. 59-8, pp. 4-5; McKee Affidavit, Docket Entry No. 59-9, pp. 4-5.

[169]Exhibit Z, Affidavit of Kevin Grizzle, Docket Entry No. 59-27, p. 2.

-57-

emergency back-up generators at the Luther Unit.[170]  In the event of a power outage, the emergency back-up generators will power vital functions, including dayroom fans, the ice house, the ice machines, the water pumps, the showers, emergency lights and the emergency room located in the infirmary.[171]

The defendants present evidence showing that all inmates have access to at least one "cool down shower" on a daily basis during the summer.[172]  According to the defendants, any inmate at the Luther Unit can request a cool-down shower at any time, which will be accommodated within reason.[173]

Consistent with AD-10.64, which requires that respite areas be made available at all TDCJ prison units on demand during periods of excessive heat,[174] the Luther Unit has made available several air-conditioned areas that are accessible by inmates requesting relief from extreme heat.  In 2018 those areas included the Major's Hallway and, alternatively, the infirmary or education building, which could be made available at the discretion of the supervisor

---

[170]Id. at 3.

[171]Id.  See also Exhibit AA, Affidavit of Kim Farguson, Docket Entry No. 59-28, pp. 2-3 (describing all areas powered by the four generators).

[172]Fuster Affidavit, Docket Entry No. 59-8, p. 3; McKee Affidavit, Docket Entry No. 59-9, p. 3.

[173]Fuster Affidavit, Docket Entry No. 59-8, p. 3; McKee Affidavit, Docket Entry No. 59-9, p. 4.

[174]Attachment A to Exhibit A, AD-10.64, Docket Entry No. 59-2, p. 24.

on duty depending on the time of day and available staffing levels.[175] Warden McKee has reportedly identified "overflow respite areas for emergency situations," although he does not specify where those areas are located.[176]

TDCJ and medical staff are required by AD-10.64 to work together to identify inmates who are susceptible to heat-related illnesses due to medical conditions or a medication regimen.[177] Inmates who are identified by medical staff as having a condition or prescription for medication that would make them more susceptible to heat are added to a Medical Heat Restriction List, which is provided to correctional officers for the purpose of conducting wellness checks for those inmates during each security round.[178] In conducting a wellness check, officers are required to go to an inmate's cell or bunk to visually inspect or observe the inmate for signs of a heat-related ailment and, if necessary, request that a full medical evaluation be conducted.[179] Correctional officers at the Luther Unit reportedly conduct

---

[175]Fuster Affidavit, Docket Entry No. 59-8, p. 3.

[176]McKee Affidavit, Docket Entry No. 59-9, p. 3.

[177]Attachment A to Exhibit A, AD-10.64, Docket Entry No. 59-2, pp. 22, 23.

[178]Id. at 23-24.

[179]Id. at 18, 22; see also Attachment C to Exhibit A, Seasonal Preparedness Directive – March 2019, Docket Entry No. 59-2, p. 40 (detailing procedures for conducting wellness checks using the "Heat Restriction List" and directing officers to "immediately seek care for all offenders requesting medical assistance or exhibiting signs of illness").

wellness checks every 30 minutes for inmates identified by the medical department.[180]

In addition, all inmates are evaluated by medical personnel for heat sensitivity, and correctional officers are trained in how to acclimatize workers in compliance with this policy, which also allows for frequent breaks and hydration while working outside.[181] Inmates are authorized to wear light clothing such as "t-shirts and shorts" as an added precaution during times of extreme heat.[182] Likewise, inmates are authorized to utilize and carry "cooling towels" that are available from the commissary at the Luther Unit.[183]

The defendants do not dispute that extreme heat poses a serious risk to the health and safety of inmates at the Luther Unit. The defendants acknowledge that heat exhaustion and heat stroke are serious medical conditions which, if left untreated, can lead to disability or death.[184] The defendants state, however, that

[180]Fuster Affidavit, Docket Entry No. 59-8, p. 4; McKee Affidavit, Docket Entry No. 59-9, p. 4.

[181]Fuster Affidavit, Docket Entry No. 59-8, pp. 3, 4; McKee Affidavit, Docket Entry No. 59-9, pp. 3, 4.

[182]Attachment A to Exhibit A, AD-10.64, Docket Entry No. 59-2, p. 25; Attachment C to Exhibit A, Seasonal Preparedness Directive – March 2019, Docket Entry No. 59-2, p. 42.

[183]Attachment A to Exhibit A, AD-10.64, Docket Entry No. 59-2, p. 25; Attachment C to Exhibit A, Seasonal Preparedness Directive – March 2019, Docket Entry No. 59-2, p. 43; Exhibit P, Photograph, Docket Entry No. 59-17, p. 33 (depicting an "EZ-Cool Cooling Towel" available at the Luther Unit commissary).

[184]Defendants' MSJ, Docket Entry No. 59, pp. 19-20.

there has never been a death at the Luther Unit due to untreated
heat   exhaustion,   stroke,   or   environmental   hyperthermia.[185]
Likewise, the defendants contend that there were no heat-stress
illnesses diagnosed in 2016 or 2018.[186]  An inmate who was assigned
to work outdoors was diagnosed with heat exhaustion in July of
2017, but he was promptly treated with IV fluids and subsequently
reassigned to work indoors as a janitor in one of the dorms.[187]

The  defendants  note,  moreover,  that  none  of  the  named
plaintiffs have suffered a serious heat-related illness at the
Luther Unit during the period of time relevant to this lawsuit.[188]
Although lack of injury is a relevant factor for consideration, a
plaintiff does not need to have suffered an injury to warrant an

---

[185]<u>Id.</u> at 20 (referencing Exhibit B, Declaration of Dr. Dean
Rieger, Docket Entry No. 59-3, pp. 16, 19).

[186]Exhibit D, Affidavit of Justin Brock, Docket Entry No. 59-5,
pp. 2-4 (summarizing heat-related illnesses at the Luther Unit
reported to the Emergency Action Center between January 1, 2003,
through December 31, 2018).

[187]Exhibit OO, "Emergency Action Center Incident Report" and
Related Records, Docket Entry No. 60-4, pp. 3-14, 15-16, 20.

[188]Defendants' MSJ (Un-redacted Version Under Seal), Docket
Entry No. 60, pp. 22-24 (observing that Phillip Gullett, Jerry
Smith, David Wilson, Eugene Boston, and Jesse Snearly "have no
medical records that reveal instances where they sought medical
treatment for any conditions that arguably could be caused by
exposure to heat"); Exhibit PP, Docket Entry No. 60-5, pp. 3-8
(medical records showing that John Sain was treated in the
infirmary after he became overheated on August 5, 2016, but
released after his condition improved); Exhibit QQ, Docket Entry
No. 60-6, pp. 3, 7-10 (medical records showing that David Cummings
was treated for "hot flashes" associated with injections to treat
his prostate cancer, but that restrictions were unnecessary because
he was already unassigned for purposes of work).

injunction from potentially life-threatening conditions.[189]   See
Gates, 376 F.3d at 333 (emphasizing that "[an] inmate need not show
that death or serious illness has occurred" in order to demonstrate
that conditions of confinement violate the Eighth Amendment)
(citing Helling v. McKinney, 113 S. Ct. 2475, 2481 (1993) ("It
would be odd to deny an injunction to inmates who plainly proved an
unsafe, life-threatening condition in their prison on the ground
that nothing yet had happened to them.")).   Rather, the legal
standard focuses on whether a plaintiff can prove a "substantial
risk of serious harm" and deliberate indifference to that risk on
the part of prison officials.   Gates, 376 F.3d at 341.

The defendants argue that the mitigation measures implemented
in connection with the Cole v. Collier settlement agreement,
including the Three-Year Plan and revisions to AD-10.64,
effectively counter whatever risk of serious harm is posed by high
temperatures at the Luther Unit.[190]   The defendants argue further
that the mitigation measures currently in place at the Luther Unit
meet or exceed measures upheld by the Fifth Circuit, which affirmed

---

[189]The prohibition found in the PLRA, 42 U.S.C. § 1997e(e),
which limits recovery of damages without proof of a physical
injury, "does not apply in the context of requests for declaratory
or injunctive relief sought to end an allegedly unconstitutional
condition of confinement."   Herman v. Holiday, 238 F.3d 660, 665
(5th Cir. 2001) (citing Harper v. Showers, 174 F.3d 716, 719 (5th
Cir. 1999)).

[190]Defendants' MSJ, Docket Entry No. 59, pp. 17-19 (citing
Gates, 376 F.3d 323 and Ball, 792 F.3d 584).

a district court's injunction requiring the Mississippi Department of Corrections to "provide fans, ice water, and daily showers when the heat index is 90 degrees F or above, or alternatively to make such provisions during the months of May through September." Gates, 376 F.3d at 339.[191]  The defendants note further that, where adequate mitigation measures are in effect, the Fifth Circuit has struck down an injunction that required air-conditioning in a prison facility as overbroad and "unnecessary to correct the Eighth Amendment violation."  Ball, 792 F.3d at 599.[192]  The defendants argue that the plaintiffs cannot demonstrate that extreme heat poses a substantial risk of harm or that they have implemented the newly revised heat mitigation measures, education, and monitoring strategy with conscious disregard or deliberate indifference to such a risk for purposes of making an Eighth Amendment claim.[193]

3.   The Plaintiffs' Evidence and Arguments

Throughout their pleadings, the plaintiffs rely heavily on evidence and findings made during Cole v. Collier, which involved the Pack Unit and a floor plan similar to the one found at the Luther Unit, arguing that they are entitled to similar relief.  As another court in this district recently observed, injunctive relief

---

[191]Defendants' MSJ, Docket Entry No. 59, p. 17.

[192]Id. at 18-19.

[193]Id. at 17.

was entered in Cole based on "an extensive factual record and was specifically tailored to conditions at the Pack Unit and the inmates' medical conditions." Taylor v. Collier, Civil Action No. 3:17-358, 2019 WL 1383021, at *7 (S.D. Tex. March 26, 2019). Standing alone, mere proximity and similarity of floor plans are not sufficient to demonstrate that inmates at the Luther Unit are at equal or greater risk than those at the Pack Unit in 2017, when the findings in Cole were made. Likewise, evidence from the Cole litigation does not establish that conditions currently found at the Luther Unit are identical to conditions previously found to exist at the Pack Unit. While the court does not ignore the evidence presented and the findings made in the Cole case, it looks primarily at whether the plaintiffs have presented evidence showing that efforts to implement improvements to the TDCJ heat mitigation program in the wake of the Cole settlement have been effective to reduce the serious risk of harm posed by extreme heat.

The plaintiffs do not dispute that the Three-Year Plan and revisions to AD-10.64 represent a comprehensive strategy to mitigate the effects of extreme temperatures faced by the entire TDCJ population, including its personnel.[194] The plaintiffs argue,

---

[194]The plaintiffs speculate that the Three-Year Plan will be ineffective to reduce risk because it is "specious" and "non-binding." Plaintiffs' First Amended Response, Docket Entry No. 105, p. 21. However, the plaintiffs do not refute the evidence showing that the measures outlined in the Three-Year Plan have already identified and prioritized hundreds of susceptible inmates (continued...)

however, that the defendants have acted with deliberate indifference in response to the existing risk of harm posed by extreme heat because the revised heat mitigation measures outlined by the Three-Year Plan and revised version of AD-10.64 have not been implemented effectively at the Luther Unit.

The plaintiffs dispute the defendants' contention that no inmate has died at the Luther Unit due to heat-related complications, although they concede that they have not obtained assistance from a medical expert to refute the opinion provided by the defendants' expert that Inmate C's death was not due to heat.[195] The plaintiffs also dispute that there were no heat-related illnesses suffered by an inmate at the Luther Unit in 2018, noting that an inmate with multiple sclerosis and other chronic medical conditions was found unresponsive and had to be hospitalized in August of 2018.[196]   The plaintiffs argue that there are "fact

---

[194](...continued)
for placement in air-conditioned housing, including several proposed plaintiffs in this case. Defendants' Supplement to Their Motion for Summary Judgment, Docket Entry No. 64, pp. 1-2, and Exhibit WW, Affidavit of Justin Brock, Docket Entry No. 64-1, pp. 2-3 (documenting the relocation of 142 inmates in January of 2019; 315 inmates in February of 2019; 294 inmates in March of 2019; and 272 inmates in April of 2019).

[195]Plaintiffs' First Amended Response, Docket Entry No. 105, p. 29.

[196]Exhibit 5, Declaration of Thyee McGruder, Docket Entry No. 105-1, pp. 25-26; Exhibit 8, Declaration of John Sain, Docket Entry No. 105-1, pp. 38-39.

-65-

disputes" regarding the effectiveness of several material aspects of the heat mitigation plan, which are addressed below.[197]

> a.    Availability of Respite "On Demand"

The plaintiffs contend that access to respite on demand is not always available upon request as dictated by AD-10.64.[198]   The plaintiffs present numerous declarations showing that officers have displayed hostility and have denied inmates access to respite when asked.[199]   Plaintiff Cummings reports that he and other inmates were

---

[197]Plaintiffs' First Amended Response, Docket Entry No. 105, pp. 46-58.

[198]Exhibit 8, Declaration of John Sain, Docket Entry No. 105, p. 35 (stating that he "often" has been told to leave respite after only ten or fifteen minutes and has twice been required to submit to "a rectal temperature probe to remain in respite").

[199]See Exhibit 2, Declaration of Salvador Capuchino, Docket Entry No. 105-1, p. 13 (describing opposition from one officer, who placed him in administrative segregation on an unspecified date when he attempted to invoke the policy); Exhibit 6, Declaration of Brandon Pruitt, Docket Entry No. 105-1, p. 29 (stating that he "has utilized respite but encountered difficulty" because he "must appear sick to qualify"); Exhibit 119, "4th Sworn Affidavit of James Brown," Docket Entry No. 105-24, p. 15 (alleging that an officer refused him respite after he advised that he was "feeling dizzy" on June 13, 2019); Exhibit 123, Sworn Affidavit of Joshua Berkery, Docket Entry No. 105-24, p. 24 (stating that he was denied access to a respite area on July 3, 2019, because he wanted to bring a book to read); Exhibit 124, Sworn Affidavit of Harvey Smith, Docket Entry No. 105-24, p. 26 (stating that he was told he could not stay in respite if he had to use the restroom); Exhibit 127, Second Sworn Affidavit of Charles Ray Bragg, Jr., Docket Entry No. 105-26, p. 2 (alleging that he was denied respite on July 10, 2019); Exhibit 131, Fifth Sworn Affidavit of Salvador Capuchino, Jr., Docket Entry No. 105-26, p. 15 (stating that staff harasses inmates by taking their ID cards, threatening them with disciplinary cases, and "stripping out" inmates who ask for respite as a means to discourage such requests); Exhibit 1, Sworn Affidavit
(continued...)

removed from the respite area after only 10 minutes on July 27, 2018.[200]   When another inmate (Adam Wayne Walker) complained and asked to go to a different respite area he was handcuffed and put in administrative segregation, which is not air-conditioned.[201] Cummings states that he was harassed by a sergeant after spending three hours in a respite area on May 26, 2019.[202]

Access to respite on demand is touted by the defendants as an important enhancement in its expanded administrative response to extreme heat.[203]  Viewing the evidence in the light most favorable to the plaintiffs, as non-movants, the plaintiffs have raised a genuine issue of material fact about whether access to respite is available upon request under the current heat mitigation program implemented at the Luther Unit.

b.    Inadequate Respite in the Major's Hallway

The plaintiffs take issue with conditions in the respite area found in the Major's Hallway, arguing that it is not adequately air

---

[199](...continued) of Francisco Cerda, Docket Entry No. 112-1, p. 3 (advising that there is a staff shortage at the Luther Unit and that requests for respite have been ignored "when an officer is not available").

[200]Exhibit 3A, Declaration of David Cummings, Docket Entry No. 105-1, pp. 14-15.

[201]Id. at 15.

[202]Exhibit 108, 2nd Sworn Affidavit of David Cummings, Docket Entry No. 105-23, pp. 22-23.

[203]Defendants' MSJ, Docket Entry No. 59, pp. 35-36; Exhibit A, Three-Year Plan, Docket Entry No. 59-2, p. 7.

conditioned, has no fans, no outlets, and no water cooler available.[204] The space is described as overcrowded and having frequent "in and out" traffic that prevents the area from remaining cool.[205] With a population of around 1,263 inmates as of June of 2018, the court questions how the Major's Hallway depicted in photographs provided by the defendants can suitably offer respite to all inmates who request it during times of extreme heat.[206] Even assuming it could do so during the day, it appears from the record that the Major's Hallway offers no overnight accommodations. The alleged shortcomings raise a genuine issue of material fact regarding whether the Major's Hallway, which is designated as the primary respite area for the Luther Unit, is adequate to provide cooler conditions during periods of extreme heat.

---

[204]Plaintiff's First Amended Response, Docket Entry No. 105, pp. 49-50; Exhibit 3A, Declaration of David Cummings, Docket Entry No. 105-1, p. 14 (alleging that the Major's hallway does not have air-conditioning "other than what comes from Admin offices nearby" and was "not cool"); Exhibit 11, Declaration of David Wilson, Docket Entry No. 105-1, p. 48 (describing the Major's Hallway as offering "virtually no respite" due to lack of adequate A/C duct work).

[205]Exhibit 5, Declaration of Jesse Snearly, Docket Entry No. 92-1, p. 17 (stating that he does not normally utilize the respite areas "because there are so many people here who are trying to get a spot in a limited seated situation and the guards often imply that [he is] too young and healthy to need respite"); Exhibit 131, Fifth Sworn Affidavit of Salvador Capuchino Jr., Docket Entry No. 105-26, p. 13.

[206]Exhibit P, Photographs, Docket Entry No. 105-17, pp. 20-21.

c.   Inadequate Air Circulation

The plaintiffs contend that air circulation in the housing units is inadequate because power goes out on a regular basis.[207] The plaintiffs provide several affidavits from inmates in support of this contention.[208]  The plaintiffs also present evidence showing that, contrary to the defendants' representations, exhaust fans in the housing areas do not work when power is out.[209]

The plaintiffs present evidence that personal fans are not always available for inmates who are indigent.[210]  In addition, even when fans are working, the plaintiffs state that the fans do little

---

[207]Plaintiff's First Amended Response, Docket Entry No. 105, p. 54.

[208]Exhibit 36, Affidavit of Howard Harris, Docket Entry No. 105-10, p. 2 (alleging without providing any details that the Luther Unit has "an extensive history of multiple power outages" as a result of storms, which outages can last a "few minutes" or "several hours"); Exhibit 37, Affidavit of William Taylor, Docket Entry No. 105-10, p. 5 (same); Exhibit 38, Affidavit of Irving Lloyd, Docket Entry No. 105-10, p. 8 (same); Exhibit 39, Affidavit of John Sain, Docket Entry No. 105-10, p. 11 (same).

[209]Exhibit 121, Fourth Sworn Affidavit of John Sain, Docket Entry No. 105-24, p. 20.  The plaintiffs assert that they may be able to raise a fact issue if granted discovery in the form of "Luther Unit shift logs, ICS logs, work orders, overtime requests, comp time requests, large purchases of multiple motors which fail when single phase power burns them out, fuse and transformer parts, requests and purchase orders, the electric utility contracted to provide power and service trouble and work order reports," which could demonstrate that "numerous and frequent power outages occur on a regular basis[.]"  Plaintiffs' First Amended Response, Docket Entry No. 105, p. 53.

[210]Exhibit 112, Second Sworn Affidavit of James Brown, Docket Entry No. 105-23, p. 33.

more than circulate hot air.[211]   The plaintiffs point to an expert report from Dr. Michael McGeehin, who testified during the <u>Cole</u> litigation that the use of industrial and individual fans when temperatures exceed 90° do more harm than good.[212]   In his opinion, the use of fans does not lower the risk of heat-related illness and death.[213]   This evidence raises a genuine issue of material fact on whether the fans installed at the Luther Unit are adequate to reduce temperatures in the housing units during times of sweltering heat.

### d.   Ineffective Cool-Down Showers

The plaintiffs present evidence that cool-down showers are not available upon request and, when available, are ineffective because they are too brief in duration.[214]   The plaintiffs argue further

---

[211]<u>See</u> Exhibit 5, Declaration of Jesse Snearly, Docket Entry No. 92-1, p. 17; Exhibit 1, Declaration of Eugene Boston, Docket Entry No. 105-1, p. 8; Exhibit 3A, Declaration of David Cummings, p. 14; Exhibit 4, Declaration of Phillip Gullett, Docket Entry No. 105-1, p. 22; Exhibit 8, Declaration of John Sain, Docket Entry No. 105-1, p. 36; Exhibit 9, Declaration of Jerry Smith, Docket Entry No. 105-1, p. 42; Exhibit 1, Sworn Affidavit of Francisco Cerda, Docket Entry No. 112-1, p. 4.

[212]Exhibit 20, Dr. McGeehin's Expert Report, Docket Entry No. 105-5, p. 26.

[213]<u>Id.   See also Cole v. Livingston,</u> No. H-14-1698, 2016 WL 3258345, (S.D. Tex. June 14, 2016) (summarizing testimony from Dr. McGeehin that when temperatures rise "above a 95 degree heat index, there is no evidence that fans cool the body, and that they may do further damage").

[214]Exhibit 131, Fifth Sworn Affidavit of Salvador Capuchino, Jr., Docket Entry No. 105-26, p. 15 (stating that requests for cool-down showers are often ignored by officers and are too quick to provide meaningful cooling); Exhibit 1, Sworn Declaration of
(continued...)

that cool-down showers are generally too quick in duration to have any value for reasons discussed by Dr. McGeehin, who has opined that cool showers twice a day did little to abate the serious risk of heat-related illness at the Pack Unit.[215] The Fifth Circuit has also recognized that showers once a day are ineffective to provide relief from heat where the water temperature remains hot. <u>See Ball</u>, 792 F.3d at 596. The plaintiffs have presented sufficient evidence to raise a genuine issue of material fact on whether cool-down showers are available and adequate as a remedy to reduce body heat during the summer months.

The plaintiffs raise several other arguments regarding the adequacy of heat mitigation efforts at the Luther Unit, and they present additional evidence that officials fail to ensure adequate amounts of ice water.[216] Based on the voluminous record and mindful of the objections raised by the defendants regarding the

---

[214](...continued) Francisco Cerda, Docket Entry No. 112-1, p. 4 (stating that cool-down showers have afforded no relief from heat and humidity); Exhibit 2, Sworn Affidavit of Arlen Ray Tenberg, Docket Entry No. 112-1, p. 7 (same).

[215]Exhibit 20, Dr. McGeehin's Expert Report, Docket Entry No. 105-5, p. 28.

[216]Plaintiffs' First Amended Response, Docket Entry No. 105, pp. 51-52. <u>See</u> Exhibit 130, Sworn Affidavit of Travis L. Clinard, Docket Entry No. 105-26, p. 11 (alleging that the Kitchen Captain is refusing to provide ice for coolers); Exhibit 131, Fifth Sworn Affidavit of Salvador Capuchino, Jr., Docket Entry No. 105-26, p. 15 (stating that ice coolers are refilled three times per day at 6:00 a.m., 2:00 p.m., and 10:30 p.m. and that officers refuse requests for refills); Exhibit 1, Sworn Affidavit of Francisco Cerda, Docket Entry No. 112-1, p. 3 (stating that officers ignore requests for additional ice when it runs out).

plaintiffs' evidence, the court concludes that there are a sufficient number of fact issues that require further consideration regarding whether, despite the defendants' efforts to invigorate their heat mitigation program, conditions at the Luther Unit continue to pose a substantial risk of serious harm to the plaintiffs and potentially other inmates whose ability to thermoregulate is compromised by similar medical conditions. Fact issues remain as to whether the defendants have acted with deliberate indifference to a substantial risk of serious harm of which they are well aware, see Yates, 868 F.3d at 360-61 (summarizing several recent cases against TDCJ alleging Eighth Amendment violations based on excessive heat in prison), but have failed to take adequate steps to alleviate that risk at the Luther Unit. As a result, the Defendants' Motion for Summary Judgment will be denied with respect to the plaintiffs' claim that they have been exposed to conditions of extreme heat that violate the Eighth Amendment.

**E. Claims Under the ADA and the RA**

Title II of ADA prohibits "disability discrimination in the provision of public services." Frame v. City of Arlington, 657 F.3d 215, 223 (5th Cir. 2011). Specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. Similarly, the RA prohibits discrimination against individuals with disabilities in federally-funded institutions. <u>See</u> 29 U.S.C. § 794(a).

The same legal standards apply to both the ADA and the RA. <u>See Kemp v. Holder</u>, 610 F.3d 231, 234 (5th Cir. 2010). To establish a viable claim, a plaintiff must show that (1) he is a qualified individual with a disability; (2) he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) he is being discriminated against by reason of his disability. <u>See Hale v. King</u>, 642 F.3d 492, 499 (5th Cir. 2011); <u>Back v. Texas Dep't of Criminal Justice Institutional Div.</u>, 684 F. App'x 356, 358 (5th Cir. 2017).

Assuming that they are disabled,[217] the plaintiffs cannot prevail because they have not established that they were excluded from air-conditioned areas of the prison -- which are maintained for the comfort of administrators, ranking officers, educators, and health care providers -- because of a disability. Instead, the evidence shows that the plaintiffs are excluded from these areas

---

[217]A person is disabled under the ADA and the RA, which incorporates the ADA's definition of disability by reference, if he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); <u>Ball</u>, 792 F.3d at 597 & n.10. Major life activities include, but are not limited to: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." <u>Id.</u> at § 12102(2)(A). Major life activities also include "the operation of a major bodily function." <u>Id.</u> at § 12102(2)(B).

because they are inmates.   Absent a showing that the plaintiffs were discriminated against or adversely treated by reason of a disability, the defendants are entitled to summary judgment on the plaintiffs' claims under the ADA and RA.   See Davidson v. Texas Dep't of Criminal Justice Institutional Div., 91 F. App'x 963, 965, 2004 WL 542206, at *2 (5th Cir. 2004) (affirming dismissal of an inmate's ADA claim because he failed to allege or show that he was adversely treated solely by reason of a disability); Hay v. Thaler, 470 F. App'x 411, 418, 2012 WL 2086453, at *4 (5th Cir. 2012) (dismissing an inmate's claims under the ADA and RA for failing to show that the alleged discrimination was by reason of his disabilities).

## V.   Remaining Claims

What remains for adjudication in this case is a determination whether plaintiff John Sain and proposed plaintiff Salvador Capuchino exhausted administrative remedies as required before filing suit and, if so, whether Sain, Capuchino, and the other plaintiffs who have exhausted administrative remedies (David Cummings, Phillip Gullett, and David Wilson) can establish that they are entitled to prevail on their claim that defendants TDCJ, Bryan Collier, and James McKee (in their official capacities) have violated their rights under the Eighth Amendment by subjecting them to unsafe conditions of confinement with deliberate indifference. This will require a trial on whether the plaintiffs are entitled to relief in the form of an injunction and, if so, the scope of relief

allowed under the Prison Litigation Reform Act.   <u>See</u> 18 U.S.C. § 3626(a)(1).   The court will issue a separate order setting this case for a scheduling conference to address what discovery is needed before the case can be set for trial.

### VI.   <u>Conclusion and Order</u>

Accordingly, the court **ORDERS** as follows:

1.   The University of Texas Medical Branch's Motion to Dismiss (Docket Entry No. 19) is **GRANTED**.

2.   The Correctional Managed Health Care Committee's Motion to Dismiss (Docket Entry No. 21) is **GRANTED**.

3.   The Motion for Summary Judgment on Behalf of Defendants Bryan Collier, James McKee, and the Texas Department of Criminal Justice (Docket Entry No. 59) is **GRANTED IN PART** and **DENIED IN PART**.   The claims of plaintiff Jerry Smith are **DISMISSED** for failure to exhaust administrative remedies.   The plaintiffs' request to add Eugene Boston and Jesse Snearly as parties (Docket Entry No. 92) is **DENIED**.   The plaintiffs' request to add Salvador Capuchino as a plaintiff (Docket Entry No. 92) is **DENIED WITHOUT PREJUDICE** to the right to submit evidence that he has exhausted his administrative remedies.

4.   Defendants' Motion to Strike Exhibits to Plaintiffs' First Amended Response to Defendants' Motion for Summary Judgment (Docket Entry No. 111) and Defendants' Motion for Leave to File Motion to Strike Exhibits to Docket Entry 112: Plaintiffs' Supplement to Plaintiffs' Rejoinder to Defendants' Reply in Support of Defendants' Motion for Summary Judgment (Docket Entry No. 119) are **DENIED**.

5.   Plaintiffs' First Amended Motion for Class Certification and, in the Alternative, Motion for Expedited Discovery (Docket Entry No. 31); Plaintiffs' Supplement to Motion for Class Certification and Response to Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification with Order and Appendix (Docket Entry Nos. 72-73); and Defendants' Motion to Strike

Plaintiffs' Supplement to Motion for Class Certification (Docket Entry No. 82) are **DENIED**.

6.  The court will issue a separate order setting this case for a scheduling conference.

**The Clerk is directed to provide a copy of this Memorandum Opinion and Order to the parties.**

**SIGNED** at Houston, Texas, on this 30th day of August, 2019.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE